**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | : | **C. A. No.** |
| **PULLEN SEEDS AND SOIL, on behalf** | : | |
| **of itself, and all others similarly situated,** | : | |
| | : | **CLASS ACTION** |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **MONSANTO COMPANY,** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **Defendant.** | : | |
| | : | |

## COMPLAINT

Plaintiff Pullen Seeds and Soil, bring this class action on behalf of itself and all others similarly situated, and alleges as follows on personal knowledge as to all matters relating to itself, and on information and belief and based upon the investigation of its counsel as to all other matters:

### I.  NATURE OF THE CASE

1.     Defendant Monsanto Company ("Monsanto") is the world's leading agricultural biotechnology company developing and manufacturing various agricultural products including: (a) seeds containing genetically modified traits tolerant to glyphosate-based herbicides; and (b) glyphosate-based herbicides sold under the name "Roundup." In 2000, Monsanto had over $5 billion in total sales, 40% of which was attributable to Roundup.

2.     Plaintiff Pullen Seeds and Soil is a grower of genetically modified seeds in the State of Iowa that paid non-competitive and artificially inflated prices for the Roundup it used in connection with its crops. In this antitrust action, plaintiff alleges that Monsanto has violated federal

and state antitrust laws by using its monopoly power in various biotechnology seed trait markets to unlawfully monopolize and restrain competition in the market for glyphosate herbicides.

3.      In September 2000, Monsanto's patent for Roundup expired, a significant event that should have opened the market to competition from generic glyphosate herbicides. During the post patent period, however, Roundup has maintained an 80% (or more) market share of all the glyphosate herbicides sold in the United States despite Monsanto's charging dealers 300-400% more for brand-name Roundup than the price charged by generic competitors. In a normal, competitive market, a manufacturer that charged 3-4 times more than its rivals for the same product would lose all (or virtually all) of its sales. Here, however, Monsanto continues to sell over 80% of the glyphosate herbicides sold in the United States, even though it charges substantially more for essentially the same herbicide.

4.      Monsanto's ability to charge higher prices for Roundup is the result of a comprehensive anticompetitive scheme which Monsanto began implementing in the 1990s. At that time, Roundup had only limited use for growers because it is a non-selective herbicide that kills both the commercial crop (such as cotton, corn or soybeans) and unwanted vegetation such as weeds. To spur demand for Roundup (and shift sales from competing herbicides), Monsanto, during the 1990s, started developing genetically modified seeds that contained patented traits which made the seeds tolerant to glyphosate herbicides. This permitted Roundup to be sprayed over-the-top of genetically modified crops, killing all unwanted vegetation while leaving the commercial crop unharmed. Because these seed traits substantially increased farmers' yields and also reduced farmers' costs (among other things), the market for genetically modified seeds grew dramatically and Monsanto quickly became the dominant manufacturer of numerous genetically modified seed traits marketed under the name "Roundup Ready." For example, within 2 years after introducing Roundup Ready cotton seeds in 1997, Monsanto's genetically modified seeds constituted 40% of all the cotton seeds

2

planted in the United States, and by 2005 (8 years after the seeds were introduced), Monsanto's genetically modified seeds constituted 90% of all the cotton seeds sold in the United States.

5.     Not surprisingly, because Monsanto seeds could be used with only glyphosate herbicides and patented Roundup was the only glyphosate herbicide on the market at the time, there was a rapid and dramatic shift in herbicide sales. Within a few years after Monsanto introduced genetically modified seeds, Roundup accounted for approximately 80% of all agricultural herbicide sold in the United States as other types of herbicides were forced out of the market and competing herbicide manufacturers (such as Dow, Dupont and others) discontinued sales of their competing products.

6.     Monsanto has been able to maintain its glyphosate herbicide monopoly, notwithstanding the expiration of its Roundup patent in September 2000, through a comprehensive anticompetitve and exclusionary scheme that has involved Monsanto's unlawful leveraging of its monopolies in both the market for glyphosate herbicides and the markets for genetically modified seed traits. As described in greater detail below, Monsanto acquired its seed trait monopolies not just by developing its own genetically modified seeds but also by blocking the development of competing seeds which could be used with non-glyphosate herbicides. Monsanto was able to block the development of competing seeds by, among other things: (a) acquiring seed companies that were developing genetically modified seed technology; (b) killing those projects that could have lead to the development of genetically modified seeds that could be used with non-glyphosate herbicide; and (c) entering into exclusive-dealing licenses with seed companies and dealers that denied actual and potential competitors access to critical developmental, marketing and distribution channels.

7.     These efforts to block the development of competing genetically modified seeds had a direct affect on Monsanto's glyphosate herbicide monopoly because had competing seeds been developed, farmers would have had a choice not only to buy competing seeds, but also to use

3

different types of herbicides instead of glyphosate. Thus, the development of these competing seeds would have created an increased demand for other non-glyphosate herbicides that would have competed with Roundup. This would have dramatically reduced Roundup's market dominance and Monsanto's ability to charge monopoly prices.

8.     Once Monsanto had unlawfully exploited and leveraged its seed trait monopolies to drive competing (or potentially competing) non-glyphosate herbicides out of the market, Monsanto was able to unlawfully maintain its glyphosate herbicide monopoly, even after its patent expired, by employing various exclusionary tying and bundling practices which: (a) penalized and punished dealers and wholesalers that sold or desired to sell more than a limited amount of generic Roundup; and (b) coerced/induced growers to buy Roundup virtually exclusively even though cheaper generic herbicides were available.

9.     The direct and proximate effect of Monsanto's anticompetitive conduct has been to unlawfully maintain its monopoly in the market for glyphosate herbicides and to command artificially inflated and supracompetitive prices for the Roundup plaintiff and other members of the classes described below purchased during the relevant period. Absent Monsanto's anticompetitive and exclusionary conduct, once Monsanto's patent expired in September 2000, free and unfettered competition in the market for glyphosate herbicides would have forced Monsanto to lower substantially its prices for Roundup.

10.     In this action plaintiff seeks declaratory and injunctive relief under 15 U.S.C. § 26 for Monsanto's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and treble damages under the laws of Iowa, Iowa Code §§ 553.1 *et seq.,* for the overcharges plaintiff and members of the classes have paid.

4

## II.  JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction of this action under 28 U.S.C. §§ 1331 (commerce and antitrust regulation) and 1337 (federal question), as this case arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Section16 of the Clayton Act (15 U.S.C. § 26).

12.    Venue is proper pursuant to 28 U.S.C. § 1391 (a), because Monsanto resides, transacts business, and has an agent in this district, and is therefore subject to personal jurisdiction in this district. Venue is also proper in this district under 28 U.S.C. §1391 (b) and (c), and §§ 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, 26).

13.    The goods and services at issue are marketed, shipped and sold in and through interstate commerce. The anticompetitive acts alleged herein have substantially affected interstate commerce.

14.    This Court also has diversity jurisdiction under 28 U.S.C. §1332 (d)(2) in that the civil action brought under Iowa law is a class action in which the controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and a member of the class is a citizen of a State different from any defendant.

15.    This Court further has supplemental jurisdiction of all claims brought under state law pursuant to 28 U.S.C. § 1367.

## III.  THE PARTIES

16.    Plaintiff Pullen Seeds and Soil, a sole proprietorship located in Sac City, Iowa, is a licensed grower of genetically modified corn and soybeans containing Monsanto's glyphosate-tolerant seed traits. During the relevant period and within the State of Iowa, Pullen Seeds and Soil purchased Roundup for commercial agricultural purposes at non-competitive and artificially inflated prices.

5

17.     Defendant Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto is the world's leading agricultural biotechnology company producing and developing agricultural products and pharmaceuticals. Monsanto had over $5 billion in total sales in 2000. In 2000, $2 Billion or approximately 40% of Monsanto's sales were attributable to Monsanto's sales of Roundup. In addition to its production and sale of herbicides, Monsanto produces and/or licenses to other seed companies multiple types of biotechnology seed traits including cotton traits, corn traits and soybean traits. Monsanto owns or controls large groups of formerly independent seed and biotechnology companies that develop and market genetically modified crop seed. As used herein, "Monsanto" refers to Monsanto Company and all of its subsidiaries and affiliated companies and corporations.

## IV. TRADE AND COMMERCE

18.     Monsanto's acts alleged herein have taken place in and affected United States trade and commerce, and have unlawfully and unreasonably, directly, substantially and foreseeably restrained such trade and commerce.

19.     Monsanto sells and ships substantial quantities of biotechnology seed traits and "Roundup" glyphosate herbicide products in interstate commerce and receives payment for the seed or the use of proprietary genetic traits across state boundaries. As reported by Monsanto, sales of "Roundup" glyphosate herbicide products during the relevant period were approximately $2 billion per year.

## V. CLASS ALLEGATIONS.

### The Federal Injunction Class

20.     Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(b)(2), as representative of a class consisting of the following:

> All persons and entities (excluding Monsanto and its officers, directors and employees, coconspirators and governmental entities)

6

> who purchased Monsanto's Roundup herbicides in the United States
> for commercial agricultural purposes at any time from September 26,
> 2002 to the present (the "Federal Injunction Class").

21.    This class is so numerous and geographically dispersed that joinder of all members
is impractical. The exact number and identity of the members of the Federal Injunction Class are
unknown to the plaintiff at this time, as such information is exclusively in the hands of defendant,
but the number of class members is estimated to number in excess of 100,000.

22.    Plaintiff will fairly and adequately protect the Federal Injunction Class' interests.
Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other class
members.

23.    Plaintiff's claims are typical of the claims of the other Federal Injunction Class
members' claims. Plaintiff and all members of the class were injured and damaged by defendant's
wrongful conduct alleged herein.

24.    Plaintiff is represented by experienced and able counsel competent in the prosecution
of complex class action and antitrust litigation.

25.    There exist in this litigation questions of law and fact common to all class members,
including but not limited to:

> a.    Whether the product markets alleged in this complaint constitute relevant
>        antitrust product markets;
>
> b.    Whether the United States constitutes the relevant antitrust geographic
>        market in which to evaluate Monsanto's conduct;
>
> c.    Whether Monsanto engaged in actions that had as their purpose and effect,
>        among other things, the suppression of competition in unreasonable restraint
>        of trade in violation of §1 of the Sherman Act;
>
> d.    Whether Monsanto's conduct constituted unlawful monopolization in
>        violation of §2 of the Sherman Act;

7

   e. Whether and to what extent Monsanto's alleged wrongful conduct caused injury to the business and property of the members of the Federal Injunction Class; and

   f. Whether Monsanto's violations of law are continuing such that injunctive relief under 15 U.S.C. §26 is appropriate.

26. The above common questions of law and fact will predominate over any individual issues that may arise in this litigation. This class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons to prosecute their claims in singe forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

## The Iowa Indirect Purchaser Class

27. Plaintiff also brings this action on behalf of itself and, under Fed. R. Civ. P. 23(b)(3), and the laws of the State of Iowa, Iowa Code §§ 553.1, *et seq.*, as representative of a class consisting of the following:

> All persons and entities (excluding Monsanto and its officers, directors and employees, coconspirators and governmental entities) who purchased Monsanto's Roundup herbicides in the State of Iowa for commercial agricultural purposes at any time from September 26, 2002 to the present (the "Iowa Indirect Purchaser Class"). The Iowa Indirect Purchaser Class does not include persons who purchased Monsanto Roundup herbicides for resale.

28. This class is so numerous and geographically dispersed that joinder of all members is impractical. The exact number and identity of the members of the Iowa Indirect Purchaser Class are unknown to the plaintiff at this time, as such information is exclusively in the hands of defendant, but the number of class members is estimated to number in excess of 1000.

8

29.    Plaintiff will fairly and adequately protect the Iowa Indirect Purchaser Class' interests.
Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other class
members.

30.    Plaintiff's claims are typical of the claims of the other Iowa Indirect Purchaser Class
members' claims. Plaintiff and all members of the class were injured and damaged by defendant's
wrongful conduct alleged herein.

31.    Plaintiff is represented by experienced and able counsel competent in the prosecution
of complex class action and antitrust litigation.

32.    There exist in this litigation questions of law and fact common to all class members,
including but not limited to:

> a.    Whether the product markets alleged in this complaint constitute relevant
>       antitrust product markets;
>
> b.    Whether the United States constitutes the relevant antitrust geographic
>       market in which to evaluate Monsanto's conduct
>
> c.    Whether Monsanto engaged in actions that had as their purpose and effect,
>       among other things, the suppression of competition in unreasonable restraint
>       of trade in violation of Iowa Code § 553.4;
>
> d.    Whether Monsanto's conduct constituted unlawful monopolization in
>       violation of Iowa Code § 553.5;
>
> e.    Whether and to what extent Monsanto's alleged wrongful conduct caused
>       injury to the business and property of the members of the Iowa Indirect
>       Purchaser Class; and
>
> f.    The appropriate measure of damages to the Iowa Indirect Purchaser Class.

33.    The above common questions of law and fact will predominate over any individual
issues that may arise in this litigation. This class action is the superior method for the fair and
efficient adjudication of this controversy. Class treatment will permit a large number of similarly
situated persons to prosecute their claims in singe forum simultaneously, efficiently, and without the

9

unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

## VI.   THE RELEVANT ANTITRUST MARKETS

34.   The relevant geographic market for the product markets at issue in this case is the United States.

### Relevant Herbicide Markets

35.   Glyphosate herbicides used for commercial agricultural purposes constitute a relevant product market in which to analyze Plaintiff's claims.

36.   Glyphosate herbicides (of which glyphosate is the active ingredient) possess a combination of attributes that make them uniquely attractive to growers. Glyphosate herbicides are non-selective herbicides in that they do not distinguish between a commercial crop (such as cotton, corn or soybeans) and unwanted vegetation such as weeds. Glyphosate herbicides are easy to use, environmentally safe, and effective in killing a broad spectrum of weeds. They are also the herbicides of choice for conservation tillage, which is an increasingly popular farming procedure that replaces plowing. As a result of these factors and others, the price of glyphosate herbicides is not significantly constrained by the price of non-glyphosate herbicides.

37.   Monsanto has monopoly power in the market for glyphosate herbicide in the United States. Monsanto markets and sells its glyphosate herbicides under the brand name "Roundup", including "Roundup WeatherMAX," "Roundup UltraMAX" and "Roundup OriginalMAX." During the relevant period, Roundup constituted more than 85% of the glyphosate herbicide marketed in the United States.

38.   Through its control of Roundup, Monsanto has monopoly and/or market power over the price of glyphosate herbicides and has exercised that power to charge and/or command

10

supracompetitive prices. During the relevant, the price that plaintiff and other growers have paid for Roundup was and is substantially more than the price for generic versions of Roundup.

39.     Barriers to entry into the glyphosate herbicide market are high. A new entrant must make a substantial investment in a manufacturing plant and find reliable, competitively-priced sources for hard-to-find input chemicals. In addition, a new entrant must also overcome a number of time-consuming regulatory hurdles, particularly obtaining the registrations from the Environmental Protection Agency (EPA) and from a number of states that regulate the sale of herbicides..

40.     Alternatively, non-selective herbicides which include glyphosate herbicides constitute a relevant product market.

41.     Monsanto has monopoly power in the non-selective herbicide market and possesses a market share in excess of 80%. As set forth in paragraph above, barriers to entry into the non-selective herbicide market are high.

## Relevant Biotechnology Seed Trait Markets

42.     Biotechnology has made possible the introduction of new genetic characteristics, or "transgenic events" into plant seeds. The insertion of a desirable transgenic event into a seed alters the seed's characteristic conferring a desirable "trait" in the seed. Among the biotechnology seed traits most widely used are those that make a particular crop glyphosate-tolerant and those that confer pesticide-resistant traits.

### Glyphosate-Tolerant Seed Traits

43.     Glyphosate-tolerant seed traits constitute a relevant product market. Currently there are several crop specific glyphosate-tolerant seed traits commercialized in the United States including, soybean, cotton and corn. As of 2004, genetically modified crop seeds accounted for 85

11

percent of all U.S. soy acreage, 45 percent of all corn acreage and 76 percent of all cotton acreage. In 2003, 84 percent of U.S. canola acreage was genetically engineered.

44.     Monsanto has monopoly and/or market power in the market for glyphosate-tolerant seed traits which it markets under the name "Roundup Ready." These include its "Roundup Ready Corn," "Roundup Ready Cotton," "Roundup Ready Soybeans," "Roundup Ready Canola" and "Roundup Ready Alfalfa." Upon information and belief, during the relevant period:

(a) glyphosate-tolerant soybean seeds containing Monsanto seed traits constituted over 95% of the glyphosate-tolerant soybean seeds sold in the United States;

(b) glyphosate-tolerant cotton seeds containing Monsanto seed traits constituted over 90% of the glyphosate-tolerant cotton seeds sold in the United States; and

c) glyphosate-tolerant corn seeds containing Monsanto seed traits constituted over 95% of the glyphosate-tolerant corn seeds sold in the United States.

45.     As alleged herein, there are substantial barriers to entry with respect to glyphosate-tolerant seed traits which include the considerable time and expense to develop seed traits and obtain the necessary regulatory approvals. Furthermore, as alleged herein, Monsanto's exclusionary conduct has imposed additional barriers to entry by foreclosing actual and/or potential competitors in the market for glyphosate-tolerant seed traits from access to various critical manufacturing and distribution assets and channels.

46.     Alternatively glyphosate-tolerant corn traits, glyphosate-tolerant cotton traits, glyphosate-tolerant soybean traits, glyphosate-tolerant canola traits and glyphosate-tolerant alfalfa traits constitute relevant product markets or sub-markets of the broader market for glyphosate-tolerant seed traits defined above.

12

**Pesticide-Resistant Seed Traits**

47.     Pesticide-resistant seed traits constitute a relevant market power.  Pesticide resistant seed traits provide protection against various insects and pests such as European Corn Borer, Rootworm and other lepidopteran insect pests.  Monsanto has monopoly power in the market for pesticide-resistant seed traits which it markets under the names "YieldGard Corn Borer", "YieldGard Rootworm", "YieldGard Plus" (a combination of YieldGard Corn Borer and YieldGard Rootworm), "Bollgard Cotton" and "Bollgard II Cotton."  Upon information and belief, Monsanto's share of the pesticide-resistant seed trait market is in excess of 80%.

48.     Alternatively, each of the pesticide-resistant crop seed traits identified above constitutes a separate product market or submarket of the broader pesticide-resistant seed trait market.

49.     As set forth above there exist substantial barriers to entry into the market for pesticide-resistant seed traits or alternatively the submarkets for pesticide-resistant seed traits which include the considerable time and expense required to develop the seed traits and obtain the necessary regulatory approvals.  Furthermore, as alleged herein, Monsanto's exclusionary conduct has imposed additional barriers to entry by foreclosing actual and/or potential competitors in the market for genetically modified crop seed from access to various critical manufacturing and distribution assets and channels.

50.     Additionally the ability to stack or combine various seed traits such as glyphosate-tolerant seed traits with pesticide-resistant seed traits (such as combining Roundup Ready Cotton with Bollgard II) further enables Monsanto to leverage, combine and bundle its monopolies in various related seed trait markets to further maintain these monopolies and produce anticompetitive effects.

13

## VII.  FACTUAL ALLEGATIONS

**A.    Weeds and Herbicides**

51.    Weeds reduce crop yield and quality.  To control weeds, growers use significant amounts of herbicides or chemical compounds that destroy or inhibit the growth of undesirable plants.  Herbicides are usually used as part of a field maintenance program, either prior to, or in conjunction with, the planting and growing of the crop.  As a general matter, these herbicides can be classified by type of activity:  (a) *selective herbicides* that are tolerated by the crop but will kill or suppress one or more weeds that infest the crop, and (b) *non-selective herbicides* that are active on all vegetation that is present at the time of application, including the crop.  Non-selective herbicides do not distinguish between a commercial crop (such as cotton, corn or soybeans) versus other unwanted vegetation such as weeds.

52.    Because there is no single selective herbicide that can control all types of weeds with equal effectiveness, growers can apply a combination of selective herbicides, either at the same time or in sequence, to control important target weeds.  Selective herbicides are usually classified by (a) the kind of weeds they control (*e.g.*, grass or broadleaf), (b) the timing of the application (pre-emergence or post-emergence of the crop), and (c) the length of time the herbicide controls weeds (residual control).

53.    Since 1974 Monsanto has manufactured and sold a non-selective herbicide called ""Roundup", which has the active ingredient glyphosate.  Because it is a non-selective herbicide, Roundup kills a wide variety of vegetation, without distinguishing between valuable crops and unwanted weeds.

**B.    Biotechnology Crop Seed Traits**

54.    Advances in biotechnology have made it possible to introduce new and desired genetic characteristics into a given plant seed.  Through genetic modification, a characteristic or trait

14

of the seed is altered by transferring an individual gene or DNA (sometimes referred to as a "transgenic event") to the seed genome, and consequently altering the characteristics of the crop grown from the seed. Through use of this technology, a crop can be given a trait that makes it tolerant of, or resistant to, certain herbicides or insects.

55.     In or about 1992, Monsanto began investigating the creation of genetically modified crops. In 1997 Monsanto commercially introduced genetically modified cotton seeds that were glyphosate-tolerant and which would therefore allow Roundup to be applied post-emergence, or "over the top" of a cotton crop, without destroying the plants. These glyphosate-tolerant cotton varieties are marketed under the Monsanto trademark "Roundup Ready." In 1998, Monsanto introduced genetically modified Roundup Ready corn seeds. Since then Monsanto has commercialized Roundup resistant seeds traits for soybeans, alfalfa and canola.

56.     In addition to glyphosate-tolerant seed traits, Monsanto also developed pesticide-resistant biotechnology traits such as corn seed resistant to the European Corn Borer ("ECB") and rootworm which were created by the insertion of the gene for Bacillus thuringensis ("Bt") into the corn seed genome. Monsanto sells its pesticide-resistant corn seed traits under the name "YieldGard." Monsanto has also developed pesticide-resistant cotton seed traits which it sells under the name "Bollgard."

57.     Since the introduction of Roundup Ready cotton seeds in 1997, the number of acres planted with Monsanto's Roundup Ready seed traits has grown dramatically. By 1999, Roundup Ready cotton seeds accounted for nearly six million of the 14.6 million acres of cotton grown in the United States in that year. On information and belief, as of 2000, Roundup Ready cotton seeds comprised approximately 50% of all the cotton seeds grown in the United States. As of 2005, Roundup Ready Soybeans seeds constituted 80% of all soybean seeds grown in the United States, and Roundup Ready Corn seeds constituted 45% of the corn seeds bought in the United States.

15

C.     **Monsanto's Domination of the Market for Biotechnology Seed Traits**

58.     Starting in or about 1996, in order to solidify its growing dominance in the biotechnology seed traits markets, Monsanto embarked on an $8 billion acquisition program whereby it acquired, merged with, or obtained an ownership interest in a large number of then existing and leading biotechnology and seed companies. Monsanto's plan also included the suppression of potentially competing herbicide-tolerant trait technologies – such as glufosinate-tolerant traits – that could compete with Monsanto's Roundup Ready technology.

59.     In 1996, Monsanto acquired a minority interest in DeKalb Genetics Corporation ("DeKalb"), which was seeking to develop a hybrid corn seed. Monsanto also acquired a license to the GA21 event which DeKalb was jointly developing with Rhone-Poulenc (later Bayer), as well as the intellectual property rights for an ECB-resistant corn trait seed and glufosinate an alternative non-selective herbicide.

60.     During this period, AgrEvo (an Aventis predecessor) was also trying to develop a glufosinate-based seed trait through a collaboration agreement with Asgrow, a soybean and corn seed company. Had AgrEvo been able to develop such seed, growers could have sprayed glufosinate over glufosinate-tolerant crops. Thus direct seed trait competition would have emerged between Monsanto's glyphosate-tolerant seed traits and glufosinate-tolerant seed traits as well as direct competition between glufosinate-based herbicides and Monsanto's glyphosate-based Roundup. In or about February 1997, however, Monsanto acquired Asgrow and promptly killed the glufosinate project.

61.     In September 1997, Monsanto acquired Holdens Foundation Seed ("Holdens"), another large seed and technology company and in 1998 similarly caused Holdens to withdraw its support for glufosinate-tolerant corn traits.

16

62.     In 1998 Monsanto acquired the remaining shares in DeKalb and withdrew all support for the development of glufosinate-tolerant corn traits. Thus, as a result of its acquisitions, Monsanto effectively suppressed the potential for a trait tolerant to a non-glyphosate herbicide to be developed and/or commercialized that could compete with Monsanto's Roundup Ready or glyphosate-tolerant traits.

63.     During this period Monsanto also acquired various other seed and seed technology companies such as Argrocetes (1996), Ecogen (1996), Calgene (1997) and Plant Breeding International (1999) (a Brazilian seed company), all of which had been involved in the development and/or production of biotechnology traits or seeds.

64.     Through its acquisitions from 1996 to 1998, Monsanto gained control over approximately 45% of the foundation corn seed production in the United States and 70% of the foundation corn seed sold or licensed to independent seed companies. Because foundation seed companies like Dekalb, Holdens and Agrow play a critical role in the testing, development and commercialization of new types of seeds, Monsanto's acquisition of those companies substantially reduced the number of actual and/or potential competitors that could otherwise compete with Monsanto in the emerging market for genetically modified glyphosate-tolerant seed traits.

65.     These acquisitions not only eliminated competition in the developing market for genetically modified crop seeds, but also stifled competition in the related herbicide market by preventing the development of genetically modified crop seeds that would be resistant to different types of herbicides.

66.     Moreover, by eliminating ongoing projects to develop seeds that were tolerant of other types of herbicide, Monsanto ensured that its domination of the market for genetically modified glyphosate-tolerant crop seed and Roundup would be long term. More specifically, a very long lead time is needed to develop and commercialize a genetically modified herbicide-resistant crop seed.

17

As an initial matter, it can take several years to identify the genetic traits that will make a plant herbicide-tolerant. Once those genetic traits are identified, it may take a substantial amount of time to isolate and extract those genetic traits so that they can be incorporated into a corn, soybean or cotton seed. Once that is done, it takes several growing cycles to identify and isolate exactly which forms of the seeds will grow best in various conditions and in varying climates. Finally, once the appropriate seeds are created, it will take several growing cycles to amass enough seeds to start selling commercially to farmers. Consequently, by eliminating existing projects to develop seeds that tolerated other herbicides, Monsanto delayed the market entry of such seeds for several years.

67.     In addition to eliminating actual competition through acquisitions, Monsanto also pursued the strategy to neutralize potential competitors by entering into restrictive licensing agreements with independent seed companies.

68.     Starting in or about 1997, Monsanto entered into numerous long-term (typically10-years) licensing agreements with seed companies which grow the seed with Monsanto's biotechnology seed traits for resale to the market. These agreements (300 plus) prohibited foundation seed companies from growing or developing new seeds that could be combined or "stacked" with traits that would make the seeds tolerant to other types of herbicides. The agreements also required the seed companies to use and promote only Roundup herbicides in connection with the Roundup Ready seed they produced. These seed companies were thus locked into non-terminable long-term licenses that prohibited them from developing seeds or traits that were tolerant to both glyphosate herbicides and other non-selective herbicides and/or promoting a glyphosate herbicide other than Roundup.

69.     For example:

(a)     In or about 1997, Monsanto sub-licensed to Syngenta the technology for ECB-tolerant corn which Monsanto had licensed from Dekalb in1996, so that Syngenta could develop and market ECB-tolerant seeds. Syngenta was prohibited, however, from promoting the fact that the ECB-tolerant seed was tolerant to glufosinate-based

18

herbicides, thereby suppressing information which would stimulate the demand for glufonate-based herbicides; and

(b)     In or about April 1992, Monsanto sub-licensed to Pioneer, Monsanto's technology for Roundup-tolerant soybean seeds. Under the license agreement, Pioneer agreed to insert Roundup tolerant gene traits into Pioneer's most promising soybean varietal lines, and that Pioneer would promote only Roundup herbicide for use with its herbicide-tolerant soybeans.

70.     Monsanto's use of licenses to block the development and growth of competing types of biotechnology seed traits and herbicides was the focus of its 1996 strategy called the "Monsanto Maize Protection Business Plan". The Monsanto Maize Protection Business Plan outlined a scheme to obtain and exercise monopoly control of the markets for biotechnology seed traits by licensing seed trait technology (including the glyphosate-tolerant technologies) to independent seed companies who might otherwise compete with Monsanto. The Monsanto Maize Protection Business Plan set forth, among other things, the following plan of action:

Monsanto should enter into commercial agreements with the Maize seed companies that comprise 90% of the sales in the U.S. hybrid market;

If we [Monsanto] can secure 90% of the distribution, it will be difficult for our competitors to gain significant share long term;

It will be more difficult for other suppliers of traits to demand dollars and expect gene switching when seed companies are already paying Monsanto;

Patents for Roundup Ready genes have been issued. Using these patents and agreements with Maize seed companies, Monsanto can prevent the use of any other glyphosate product in-crop [a.k.a. Roundup Ready competitor] to corn.

While the Monsanto Maize Protection Plan was addressed to genetically modified corn seeds, upon information and belief, the foregoing strategy became the blueprint for Monsanto's overall licensing strategy to restrict competition in the biotechnology seed traits and related markets.

19

71.     Ironically, while Monsanto was aggressively seeking to sign seed companies to long term licenses with respect to glyphosate-tolerant biotechnology, it turned out that Monsanto did not have any rights to the particular technology its was licensing. As previously alleged, in 1996, Monsanto acquired a minority interest in Dekalb, then a leading biotechnology seed trait company. Dekalb then licensed to Monsanto the intellectual property rights to the GA21 (glyphosate-tolerant) trait that DeKalb was developing in collaboration with Rhone-Poulenc. In 1997, however, Rhone-Poulenc (now Bayer CropScience) sued DeKalb and Monsanto alleging that DeKalb had misappropriated Rhone-Poulenc's GA21 technology. In February 2000, DeKalb was held to have no rights in GA21, *Rhone-Poulenc Agro, S.A. v. Monsanto Co. And Dekalb Genetics Corp.*, No. 1:97CV1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C. Feb. 8, 200), *aff'd in relevant part*, 272 F.3d 1335 (Fed. Cir. 2001).

72.     Recognizing that the glyphosate-tolerant biotechnology rights it had licensed to numerous seed companies was now non-existent, Monsanto required its "licensees" to switch to NK603 (a glyphosate-tolerant event Monsanto owned) and sign new equally restrictive NK603 contracts.

73.     In or about February 2004, Syngenta Seeds, Inc., a direct competitor of Monsanto's acquired the rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience and announced its plan to market a glyphosate-tolerant seed trait in competition with Monsanto. Syngenta is also the manufacturer of generic glyphosate herbicide sold under the name Touchdown.

74.     According to an antitrust complaint filed by Syngenta in this Court, *Syngenta Seeds, Inc., v. Monsanto Company and Monsanto Technology, LLC*, C.A. No. 04-908-SLR, once Monsanto learned of Syngenta's efforts to develop and market its own glyphosate-tolerant corn seed traits

20

based on the GA21 event, Monsanto prohibited its seed company licensees from developing a seed trait using the GA 21 event, effectively foreclosing competition from Syngenta in glyphosate-tolerant corn traits.

75.    Monsanto's efforts to block Syngenta's GA21-trait corn seeds from the market were significant because Syngenta's entry into the market with a GA21-trait would have created real competition not just for Monsanto's Roundup Ready corn-seeds, but glyphosate herbicides as well. Syngenta now manufactures and sells its own glyphosate herbicide under the name "Touchdown." Had Monsanto not blocked and/or delayed Syngenta's access to the market, a competing biotechnology corn seed trait and a competing glyphosate herbicide would have been available to growers.

76.    In addition to the exclusive-dealing requirements with its seed company licensees, Monsanto has used various types of bundled rebates to ensure that seed companies produce and sell seed containing Monsanto's seed traits virtually exclusively. For example, Monsanto's licenses with seed companies typically provide that Monsanto will pay substantial incentive rebates and waive royalty fees provided the seed company's sales of Monsanto's products, per seed trait and in combination, constitute 70-85% of a seed company's total sales. Monsanto sells over 50 different variations of corn seed traits, 120 different types soybean seed traits and numerous variations of cotton seed traits. Accordingly, if the seed company falls below that threshold for even one seed type variation, then Monsanto will withhold the financial benefits for all of the other seed traits produced and/or sold by the seed company. Thus, for example, if Monsanto products constitute 85% or more of a seed companies' sales for 49 of the 50 different types of genetically-altered corn seeds, but a competitor's products constitute more than 30% of a single corn seed variation, the seed companies

21

will lose the rebates and will have to pay the full royalties for all of the corn seeds, even those for which Monsanto products constituted over 85% of the seed companies' sales.

**D.      Monsanto Exploits its Monopoly in the Gylphosate Tolerant Seed Traits Market to Unlawfully Acquire/Maintain its Monopoly Power in the Glyphosate Herbicide Market**

77.      As a result of Monsanto's development and the wide-scale acceptance of glyphosate-tolerant seed traits, Monsanto's sales of glyphosate based Roundup increased exponentially. On information and belief, Roundup's market share of all herbicides used for cotton increased from 8% prior to 1997 to approximately 50% in 1999. Because including these traits enable the growth of herbicide-tolerant plants that can metabolize glyphosate herbicides (i.e. Roundup and its generic equivalents), farmers can spray non-selective Roundup to kill virtually all weeds during the growing season without damaging valuable cash crops. Consequently, Roundup used in conjunction with Roundup Ready crop seeds eliminated the need for other selective or non-selective herbicides and the commercial use of Roundup has grown geometrically as these genetically modified crop seeds were introduced and adopted over the last several years by commercial farmers.

78.      In order to protect its growing glyphosate herbicide monopoly Monsanto undertook various steps at the manufacturer and seed company level to prevent the emergence of competing herbicides. For example, in the late 1990s, in contemplation of Roundup's patent expiration, Monsanto entered into supply agreements with DuPont and several other chemical companies under which: (a) Monsanto would supply the glyphosate salt used in Roundup (which was patented at the time); and (b) the companies would have a license to produce and sell herbicides containing Monsanto's patented glyphosate-salts under their own brand names. As a result of these agreements,

22

Monsanto was able to control the key inputs necessary for herbicide manufacturers to compete effectively and consequently increased Monsanto's control over the herbicide market.

79.     Further, as part of Monsanto's efforts to restrict a competitor's access to the raw materials necessary to compete, Monsanto sought to acquire the available supply of glyphosate, IPA (which is an essential chemical for making glyphosate herbicides) and other chemicals. In February 2001, for example, five months after Monsanto's Roundup patent expired, Chemical Products Technology ("CPT"), had finished the two-year process required to obtain EPA approval to sell a generic version of Roundup.  As part of a series of efforts to block CPT's entry into the glyphosate herbicide market, Monsanto targeted CPT's suppliers of glyphosate and other input chemicals, offering to buy up their supply. According to CPT, Monsanto had no legitimate business purpose for its actions since at the time Monsanto had an excess capacity of glyphosate. Similarly, in 2001, Monsanto sought to purchase CPT's supplier of IPA, even though Monsanto had an adequate, independent source of IPA. As a result of Monsanto's anticompetitive and exclusionary conduct, CPT's ability to compete in the glyphosate herbicide market has been substantially impaired.

## E.     Monsanto's Scheme To Leverage and Extend Its Monopoly Power In Biotechnology Seed Trait Markets to Unlawfully Acquire and/or Maintain Monopoly Power In The Glyphosate Herbicide Market

80.     As alleged above, Monsanto has obtained monopoly power in the market for glyphosate-tolerant seed traits (as well as pesticide-resistant seed traits) as a result its acquisitions and licensing strategy, and its efforts to prevent and/or forestall other companies from developing seed traits that were tolerant to herbicides other than glyphosate (such as glufosinate). As alleged above, because Monsanto's Roundup Ready seeds were the only non-selective herbicide-tolerant seeds on the market and because those seeds were tolerant to only glyphosate, Monsanto was able

23

to drive virtually all of the competing (and potentially competing) non-selective herbicides (such as glufosinate) out of the market.

81.     However, since Roundup's glyphosate related patent was set to expire in September 2000, Monsanto feared a substantial loss of revenue (Roundup had accounted for almost 50% of the company's revenue) as a result of competition from manufacturers of generic versions of Roundup. Indeed, in an October 2000 stock prospectus filed with the SEC, Monsanto identified generic competition in the glyphosate herbicide market as a "principal risk" to Monsanto, and its 2001 Annual Report stated that Monsanto's "most important near-term priority is [to] . . . limit potential price erosion" of Roundup.

82.     In order to prevent this potential price erosion and maintain its monopoly profits from Roundup, Monsanto pursued a systematic licensing and marketing strategy that leveraged its monopoly power in the seed trait markets (including but not limited to glyphosate-tolerant seed trait market) to (a) coerce and/or pressure dealers and distributors to substantially restrict the amount of generic glyphosate herbicides they carried and sold to growers and (b) require growers that wished to plant seeds that contained Monsanto's biotechnology traits to use Roundup herbicide virtually exclusively rather than a competitor's generic equivalent herbicide product.

83.     Monsanto's dealers and distributors are subject to a variety of restrictive conditions that limit their ability and incentive to sell competing glyphosate herbicide products and which in fact penalize them for selling non-Monsanto herbicides. These restrictive conditions include, for example, minimum percentage sales requirements that typically require a dealer's Roundup sales to constitute 80% or more of the dealer's total glyphosate herbicide sales. Under Monsanto's arrangements with its dealers and distributors, if the dealer's or distributor's total sales of Roundup

24

herbicides falls below the stipulated percentage, the dealer or distributor forfeits all, or a substantial portion, of the rebates otherwise payable on all of its Roundup sales. In some instances, Monsanto is deliberately vague as to the percentage of glyphosate sales that must be Roundup, so the only way a dealer or distributor can be sure that it will not lose any rebates is to make Roundup its exclusive glyphosate herbicide. The rebates a dealer receives from Monsanto is a significant part of the dealer's income since dealer and distributor markups are generally small and dealers therefore must strictly adhere to Monsanto's percentage sales requirements.

84.    Upon information and belief, Monsanto, for example, has various programs such as its so-called "Action Pact Program," pursuant to which Monsanto pays dealers and distributors a percentage rebate on -- (a) their purchases of Roundup herbicide, (b) their purchases of genetically modified seeds containing Monsanto's seed traits from either Monsanto or a separate seed company that licensed the technology from Monsanto, and (c) the substantial "technology fees" which the growers must pay in connection with their use of Monsanto's patented seed trait technology – *provided the dealer's sales to growers maintains or exceeds Monsanto's market share for Roundup*. Moreover, the rebates available in connection with herbicide purchases, seed purchases, and patent fees are collectively bundled together by Monsanto, and the existence or amount of the rebate that Monsanto ultimately pays to the dealer for sales of any Monsanto genetically modified seed or herbicide product is based on the extent of the dealer's compliance with Monsanto's percentage sales requirements for Roundup. In other words, if more than 10 - 20 % of the dealer's glyphosate herbicide sales are generic, a dealer will be penalized and forfeit all its rebates on Monsanto seed sales and technology fees not just on its Roundup sales.

25

85.     Monsanto's rebate programs are patently exclusionary and lack any procompetitive purpose since they are not volume or cost based. Additionally, there is no procompetitive or non-exclusionary justification for bundling the rebates on Monsanto's seed trait products to the percentage of a dealer's sales of Roundup. In economic terms, Monsanto's rebate program imposes a substantial cost (or penalty) on any dealer or distributor that purchases anything more than a token amount of generic glyphosate herbicides. As a result of Monsanto's rebate programs, dealers and distributors have little or no incentive to purchase, stock or sell generic glyphosate since if they sell more than a de minimus amount, they stand to be penalized by losing the substantial rebates the would otherwise receive on the sale of Monsanto products.

86.     Monsanto has also imposed exclusionary and restrictive conditions at the grower level that prevent growers from using generic glyphosate in connection with Monsanto's glyphosate-tolerant seed traits. While Monsanto does not typically sell seeds directly to farmers, Monsanto requires growers to sign a technology license, Grower's Agreement and Technology Use Agreement ("TUA") that effectively mandates that they use only Roundup herbicides on Roundup Ready crops. When Monsanto (and its licensed seed companies) first commercialized various Roundup Ready seeds in 1997, Monsanto explicitly conditioned the grant of a license to use its Roundup Ready seed technology on the grower's agreement to purchase and use only Monsanto's Roundup herbicide. For example, from 1998 thru 2000 , the Grower's Agreement provided that

"if a herbicide containing the same active ingredient as a Roundup Ultra herbicide (or one with a similar mode of action) is used over the top of Roundup Ready crops, you (the farmer) agree to use only Roundup branded herbicide."

87.     While the language in Monsanto's more recent Grower's Agreements and TUAs appear to permit a grower to use a non-Roundup glyphosate herbicide in connection with Monsanto's

glyphosate-tolerant seed traits, other aspects of the Grower's Agreement demonstrate that this "choice" is illusory and that a grower is still effectively locked into using Roundup virtually exclusively.

88.     When Monsanto first began marketing biotechnology seed traits in 1997, it recognized that farmers would be reluctant to pay the higher prices for those seeds because crop failures were a significant risk and growers would frequently lose their crops to adverse natural occurrences (such as hail, frost, drought, etc.).   Accordingly, to induce growers to buy the significantly more expensive biotechnology seeds, Monsanto included as an inherent component of the Tech Fee and patent/technology license the grower pays, a crop protection program pursuant to which Monsanto agreed to waive the Tech Fee for replacement seeds if the crop fails within the first 60 days of planting.  Because, as alleged earlier, the Tech Fee constitutes a substantial component of the grower's seed costs (up to 70%), the crop protection program was and still is a critical factor in a grower's decision to use seed with biotechnology seed traits.  Significantly, Monsanto's crop protection program is not otherwise available and cannot be purchased independently by any grower, in large part because Monsanto has exclusive control over its patented seed trait technology, and thus Monsanto has the sole ability to reward or punish growers for their herbicide choices by altering how much, if any, the growers have to pay for Monsanto's seed licenses.  Thus, Monsanto is using its monopoly control over various biotechnology seed traits to reward or punish growers depending on whether they use Roundup or a competing manufacturer's glyphosate herbicide.

89.     Monsanto has continually acknowledged the importance of the crop protection program to its ability to sell its biotechnology products. For example, Monsanto's website currently describes the crop protection program as "the comprehensive program you [the grower] rely on for trait and herbicide investment protection," and the crop protection program "offers added protection and reduced risk program elements for your farming operation so you can farm with confidence

27

when you use Monsanto technologies and agricultural herbicides. Since 1997, over 236,000 growers have claimed more than $451 million in program benefits."

90.     Up until at least 2000/2001, a grower was automatically entitled to the crop protection program once it paid the Tech Fee. Thus, up until 2000/2001, growers automatically received – at no additional cost – the valuable replacement Tech Fee waiver as part of the growers' original purchase. However, at or about the same time that Monsanto revised its Grower and TUA agreements to give the appearance that a grower could use generic Roundup on Monsanto seed traits, Monsanto modified its crop protection program requirements to make the benefits available *but only if the grower used Roundup.* Thus, growers who continue to use Roundup still receive the replacement Tech Fee waiver at no additional cost as before, but growers that want to use generic glyphosate herbicides are faced with a substantial penalty – the replacement Tech Fee costs. Moreover, to continue to get the benefits of the "Roundup Rewards" program (Monsanto's current name for its crop protection program), the grower must use Roundup not only for over-the-top application, but for general field clearing ("burndown") purposes as well. Thus Monsanto has effectively maintained the same condition in its technology license that requires a grower using Monsanto's biotechnology seed traits to use Roundup virtually exclusively rather than a cheaper generic glyphosate herbicide.

91.     The "Roundup Rewards" crop protection program has contributed to Monsanto's exclusionary scheme to eliminate competition in various ways. First, it generally uses pricing penalties for the monopolized patent seed trait technology to punish growers that buy competing glyphosate herbicides, thereby limiting demand for the generic products. Second, because the Roundup Rewards crop protection program works to limit the demand for generic glyphosate herbicides, it also supports Monsanto's broader exclusionary scheme. If dealers believed that they could shift all (or virtually all) of their herbicide sales to generic glyphosate herbicides, then the

28

dealers would suffer only limited penalty from the loss of Monsanto's Roundup rebates (although the dealers would still continue be harmed and coerced by the loss of seed and tech-fee rebates). Because Monsanto's Roundup Reward program has been able to limit the demand for generic glyphosate herbicides, it means that even if a dealer wanted to sell generic herbicides, a substantial amount of its sales would still be brand-name Roundup and thus the dealer would be seriously penalized, and at serious financial risk, from the loss of the herbicide rebates (as well as the seed and Tech fee rebates). The combination of both limiting demand for generic glyphosate herbicides through the crop protection program, and limiting supply of generic glyphosate herbicides on dealer shelves and inventory, meant that Monsanto was able to contain and curtail the extent of its competitive risk and market exposure from competing glyphosate products. This, in turn meant that Monsanto was unconstrained by competition and could charge a substantial premium for its brand-name Roundup because Monsanto knew that it faced only limited competitive exposure due its efforts to limit grower demand and dealer willingness to sell the competing products. The result has been that Monsanto would have been forced by competitive pressures to charge substantially lower prices for Roundup absent Monsanto's exclusionary conduct, and the total, aggregate effect of Monsanto's scheme has enabled it to charge inflated, supra-competitive prices for Roundup.

92.     In sum, as a result of Monsanto's anticompetitive conduct including its exclusionary licensing agreements with seed companies, dealers and growers, Monsanto has unlawfully restrained trade and maintained its monopoly in the market for glyphosate herbicides. The effect of these unlawful agreements and monopolistic conduct has been to foreclose competition in the glyphosate herbicide market and to force plaintiff and other members of the classes to purchase Monsanto's

29

brand name Roundup products when cheaper generic versions of Roundup were and/or would otherwise have been available.

## VIII.  DAMAGES

93.    During the relevant period, plaintiff and members of the classes described above have purchased substantial amounts of brand-name Roundup.  As a result of Monsanto's unlawful conduct, Plaintiff and members of the classes were forced to pay, and did pay, artificially inflated and monopolistic prices for their Roundup purchases.  Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides and Monsanto would have been forced to lower prices for Roundup to competitive levels.  Members of the classes have, as a consequence, sustained substantial losses and damage to their business and property in the form of overcharges.  Plaintiff and members of the Iowa Indirect Purchasers Class are entitled to recover treble damages pursuant to  state antitrust law on account of the overcharges they paid.  The full amount and form and components of such damages will be calculated after discovery and upon proof at trial.

## IX.  INJUNCTIVE RELIEF

94.    Monsanto's violation of federal and state antitrust law are continuing and the effects thereof will continue unless the injunctive relief is granted.  Plaintiff has no adequate remedy at law.

30

## COUNT I

### Unreasonable Restraint of Trade in Violation of §1 of the Sherman Act (Anticompetitive Tying/Bundling Agreement)

### (Claim for Injunctive Relief Under 15 U.S.C. §26)

95.     Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates the same into this Count as if here set out in full.

96.     Monsanto has monopoly and/or market power in the market for glyphosate-tolerant seed traits (as well as pesticide-resistant traits).

97.     Beginning in or about 1999 and continuing to date Monsanto and its coconspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the substantial terms of which have been to coerce and/or force growers to purchase and/or use Monsanto's glyphosate herbicide Roundup (the tied product) as a condition of growing or using seed containing Monsanto's glyphosate-tolerant traits (the tying product or products). Monsanto has monopoly and/or market power in the markets for biotechnology seed traits including glyphosate-tolerant seed traits. But for Monsanto's anticompetitive tying arrangements, growers who purchase and/or use seed with glyphosate-tolerant traits would be free to use generic glyphosate herbicides that are comparable to, but substantially less costly than, Roundup.

98.     As a result of Monsanto's anticompetitive agreements and conduct, competition in the market for glyphosate herbicides has been substantially reduced, limited and foreclosed.

99.     Plaintiff and members of the Federal Injunction Class have been injured in their business and property as a result of Monsanto's aforesaid violations of §1 of the Sherman Act. As

31

a result of Monsanto's conduct, Monsanto has caused Plaintiff and members of the Federal Injunction Class to pay artificially-inflated and supra-competitive prices for Monsanto's Roundup glyphosate herbicide. Absent Monsanto's improper conduct, actual and potential competitors would have been able to enter the market and compete with Monsanto on the merits. Had such competition not been foreclosed by Monsanto, free and unfettered competition would have forced Monsanto to lower its prices for Roundup herbicides to competitive levels. As a consequence, Plaintiff and members of the Federal Injunction Class have sustained substantial losses and damage to their business and property.

100.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Federal Injunction Class have no adequate remedy at law.

## COUNT II

### Sherman Act § 2 - Unlawful Monopolization
### (Monsanto's Unlawful Use/Leveraging of its Seed Trait Monopolies to Eliminate Competition in the Glyphosate Herbicide Market)

#### (Claim for Injunctive Relief Under 15 U.S.C. §26)

101.    Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates same into this Court as if fully set out in full.

102.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits as set forth in paragraphs 34 through 50 including the market for glyphosate-tolerant seed traits.

103.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has wilfully and unlawfully maintained and exercised its monopoly power in the relevant markets referred to above by seeking to foreclose competition or to gain a competitive advantage in the glyphosate

32

herbicide market (or alternatively the non-selective herbicide market) by the coercive, exclusionary and anticompetitve conduct set forth above.

104.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has acquired and or maintained monopoly or market power in the glyphosate herbicide market (or alternatively the non-selective herbicide market) and competition in that market has been unlawfully eliminated or foreclosed.

105.    There is no legitimate business justification for the actions and conduct through with Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set for above.

106.    As purchasers of Monsanto's herbicides and Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), Plaintiff and the other members of the Federal Injunction Class have been injured in their business and property as a result of Monsanto's aforesaid violations of §2 of the Sherman Act. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels.

107.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Federal Injunction Class have no adequate remedy at law.

33

## COUNT III

### Sherman Act § 2 - Unlawful Monopolization
### (Monsanto's Unlawful Acquisition and/or Maintenance of its Glyphosate Herbicide Monopoly)

#### (Claim for Injunctive Relief Under 15 U.S.C. §26)

108.   Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates same into this Court as if fully set out in full.

109.   Monsanto has monopoly power in the glyphosate herbicide market.

110.   In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has wilfully and unlawfully acquired and/or maintained its monopoly power in the glyphosate herbicide through the coercive, exclusionary and anticompetitve conduct set forth above.

111.   As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has acquired and or maintained monopoly or market power in the glyphosate herbicide market and competition in that market has been unlawfully eliminated or foreclosed.

112.   There is no legitimate business justification for the actions and conduct through with Monsanto unlawfully maintained and exercised its monopoly power in the market for genetically modified seed crop.

113.   As purchasers of Monsanto's herbicides and Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), Plaintiff and the other members of the Federal Injunction Class have been injured in their business and property as a result of Monsanto's aforesaid violations of §2 of the Sherman Act. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the

34

market for glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels.

114.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Federal Injunction Class have no adequate remedy at law.

## COUNT IV

## VIOLATION OF IOWA CODE §553.4
### (Anticompetitive Tying/Bundling Agreement)

### (Claim for Treble Damages under Iowa Code §553.4)

115.    Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates the same into this Count as if here set out in full

116.    Monsanto has monopoly and/or market power in the market for glyphosate-tolerant seed traits (as well as pesticide-resistant traits).

117.    Beginning in or about 1999 and continuing to date Monsanto and its coconspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of trade in violation of Iowa Code §553.4, the substantial terms of which have been to coerce and/or force growers to purchase and/or use Monsanto's glyphosate herbicide Roundup (the tied product) as a condition of growing or using seed containing Monsanto's glyphosate-tolerant traits (the tying product or products). Monsanto has monopoly and/or market power in the markets biotechnology seed traits including for glyphosate-tolerant seed traits. But for Monsanto's anticompetitive tying arrangements, growers who purchase and/or use seed with

35

glyphosate-tolerant traits would be free to use generic glyphosate herbicides that are comparable to, but substantially less costly than, Roundup.

118.    As a result of Monsanto's anticompetitive agreements and conduct, competition in the market for glyphosate herbicides has been substantially reduced, limited and foreclosed.

119.    Plaintiff and members of the Iowa Indirect Purchaser Class have purchased Roundup in the State of Iowa for commercial agricultural purposes and have been injured in their business and property as a result of Monsanto's aforesaid violations of Iowa Code §553.4. As a result of Monsanto's conduct, Monsanto has caused Plaintiff and members of the Iowa Indirect Purchaser Class to pay artificially-inflated and supra-competitive prices for Monsanto's Roundup glyphosate herbicide. Absent Monsanto's improper conduct, actual and potential competitors would have been able to enter the market and compete with Monsanto on the merits. Had such competition not been foreclosed by Monsanto, free and unfettered competition would have forced Monsanto to lower its prices for Roundup herbicides to competitive levels. As a consequence, Plaintiff and members of the Iowa Indirect Purchaser Class have sustained substantial losses and damage to their business and property and are entitled treble damages pursuant to Iowa Code §553.12.

120.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff and members of the Iowa Indirect Purchaser Class have no adequate remedy at law.

36

## COUNT V

## VIOLATION OF IOWA CODE §553.5
### (Monsanto's Unlawful Use/Leveraging of its Seed Trait Monopolies to Eliminate Competition in the Glyphosate Herbicide Market)

### (Claim for Treble Damages under Iowa Code §553.5)

121.    Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates same into this Court as if fully set out in full.

122.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits as set forth in paragraphs 34 through 50, including the market for glyphosate-tolerant seed traits.

123.    In violation of Iowa Code §553.5, Monsanto has wilfully and unlawfully maintained and exercised its monopoly power in the relevant markets referred to above by seeking to foreclose competition or to gain a competitive advantage in the glyphosate herbicide market (or alternatively the non-selective herbicide market) by the coercive, exclusionary and anticompetitve conduct set forth above.

124.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has acquired and or maintained monopoly or market power in the glyphosate herbicide market (or alternatively the non-selective herbicide market) and competition in that market has been unlawfully eliminated or foreclosed.

125.    There is no legitimate business justification for the actions and conduct through with Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set for above.

126.    Plaintiff and members of the Iowa Indirect Purchaser Class have purchased Monsanto's Roundup in the State of Iowa for commercial agricultural purposes and have been

37

injured in their business and property as a result of Monsanto's aforesaid violations of Iowa Code §553.5. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels. As a consequence, Plaintiff and members of the Iowa Indirect Purchaser Class have sustained loss and damage to their business and property and are entitled to treble damages pursuant to Iowa Code §553.12.

127.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff has no adequate remedy at law.

## COUNT VI

## IOWA CODE §553.5 - Unlawful Monopolization
## (Monsanto's Unlawful Acquisition and/or Maintenance of its Glyphosate Herbicide Monopoly)

### (Claim for Treble Damages under Iowa Code §553.5)

128.    Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates same into this Court as if fully set out in full.

129.    Monsanto has monopoly power in the glyphosate herbicide market.

130.    In violation of Iowa Code §553.5, Monsanto has wilfully and unlawfully acquired and/or maintained its monopoly power in the glyphosate herbicide through the coercive, exclusionary and anticompetitve conduct set forth above.

131.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has acquired and or maintained monopoly or market power in the glyphosate herbicide market and competition in that market has been unlawfully eliminated or foreclosed.

38

132.    There is no legitimate business justification for the actions and conduct through with Monsanto unlawfully maintained and exercised its monopoly power in the market for genetically modified seed crop.

133.    Plaintiff and members of the Iowa Indirect Purchaser Class have purchased Monsanto's Roundup in the State of Iowa for commercial agricultural purposes and have been injured in their business and property as a result of Monsanto's aforesaid violations of Iowa Code §553.5. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels. As a consequence, Plaintiff and members of the Iowa Indirect Purchaser Class have sustained loss and damage to their business and property and are entitled to treble damages pursuant to Iowa Code §553.12.

134.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff, on behalf of itself and all others similarly situated, demands judgment against defendant Monsanto Company and requests the following relief:

A.    That the Court certify that this action may proceed and be maintained as a class action pursuant to Fed.R.Civ.P. 23(b)(2); designate plaintiff Pullen Seeds and Soil as a representative of the Federal Injunction Class and designate plaintiff's counsel as class counsel;

B.    That the Court find and declare that Monsanto has committed the violations of federal antitrust law as alleged herein;

39

C.      That the Court enter a judgment against Monsanto in favor of the Federal Injunction

Class and enjoin Monsanto's continued violation of federal antitrust law pursuant to 15 U.S.C. §26;

D.      That the Court certify that this action may proceed and be maintained as a class action

pursuant to Fed.R.Civ.P. 23(b)(3) on behalf of an Iowa Indirect Purchaser Class; designate plaintiff

Pullen Seeds and Soil as the representative of the class and designate plaintiff's counsel as class

counsel;

E.      That the Court find and declare that Monsanto has committed the violations of Iowa

antitrust law as alleged herein;

F.      That the Court enter a judgment against Monsanto in favor of the Iowa Indirect

Purchaser Class and award money damages, including treble and compensatory damages as

authorized by state law;

G.      That the Court order Monsanto to pay the costs of this action, including but not

limited to plaintiff's attorneys' fees; and

H.      That the Court award such other and further relief as this Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues properly triable thereby.

Dated: September 26, 2006

By:     _____

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
*Attorney for Plaintiff Pullen Seeds and Soil*

## *Additional Plaintiff's Counsel*

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Noah H. Silverman
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

ODOM & DES ROCHES, LLP
Stuart E. Des Roches
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Lance A. Harke, Esq.
HARKE & CLASBY, LLP
155 S. Miami Avenue, Suite 600
Miami, FL 33130
Tel: 305-536-8220
Fax: 305-536-8229

KOZYAK TROPIN & THROCKMORTON,
P.A.
Adam Moskowitz, Esq.
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2335
Tel: (305) 372-1800

PERCY, SMITH & FOOTE, LLP
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

Michael Miller, Esq.
Law Office of Michael Miller
926 Chulie Drive
San Antonio, TX 78216
Tel: 210-225-6666
Fax: 210-225-2300

JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| PULLEN SEEDS AND SOIL, on behalf ot itself and all others similarly situated | MONSANTO COMPANY |

**(b)** County of Residence of First Listed Plaintiff **Sac County, Iowa**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) **(302) 656-4433**
Rosenthal, Monhait & Goddess, P.A.
P. O. Box 1070
Wilmington, DE  19899-1070

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Sherman Act, 15 U.S.C. §§1 and 2.  Civil antitrust action by end
Brief description of cause: purchasers in connection with defendants' monopolization
of market for glyphosate herbicides (sold as Roundup)

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ ____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE **Robinson**
05-358 SLR    04-908 SLR
DOCKET NUMBER 04-305 SLR

DATE
9/26/06

SIGNATURE OF ATTORNEY OF RECORD
— Jeffrey S. Goddess (No. 630)

**FOR OFFICE USE ONLY**

RECEIPT # ____   AMOUNT ____   APPLYING IFP ____   JUDGE ____   MAG. JUDGE ____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 6 - 5 9 9 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF __2__ COPIES OF AO FORM 85.

_09/26/06_
(Date forms issued)

_Charles W. Klein_
(Signature of Party or their Representative)

_Charles W. Klein_
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action