## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PULLEN SEEDS AND SOIL, on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 06-599-SLR |
| MONSANTO COMPANY, | ) ) | |
| Defendant. | ) ) ) | |
| WADE FARMS, WHITTINGTON & SUMNER FARMS, CLIFFORD F. DANCE, D/B/A CLIFFORD DANCE FARMS, and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-600-SLR |
| v. | ) ) | |
| MONSANTO COMPANY, | ) ) | |
| Defendant. | ) | |

## DECLARATION OF JOHN J. ROSENTHAL IN SUPPORT OF MONSANTO'S MOTION TO QUASH PLAINTIFFS' THIRD-PARTY SUBPOENA TO FAEGRE & BENSON, LLP

I, John Rosenthal, declare as follows:

1.      I am a partner at Howrey LLP, counsel of record for defendant Monsanto Company.

2.      In preparation of Monsanto's Motion to Quash, I have reviewed various materials from the *E.I. du Pont de Nemours & Co. v. Monsanto Co.*, No. 00-952-CWH (D.S.C.) and *E.I. du Pont de Nemours & Co. v. Monsanto Co.*, No. 00-359-SLR (D. Del.) cases (collectively hereinafter, "the *DuPont* cases"), including the publicly-available docket, complaint, stipulated protective order, and settlement agreement for both cases.

3.    A true and correct copy of the third party subpoena served on Faegre &
Benson, LLP ("Faegre") is attached hereto as Exhibit 1. Plaintiffs served Faegre with the
subpoena on April 9, 2007, seeking all the documents produced by Monsanto in the
*DuPont* cases, as well as all the deposition transcripts and exhibits and court filings,
pleadings, and discovery requests served in the *DuPont* cases. Ex. 1.

4.    A true and correct copy of the complaint filed in *E.I. du Pont de Nemours
& Co. v. Monsanto Co.*, No. 00-359-SLR (D. Del.) ("*DuPont Delaware*") is attached
hereto as Exhibit 2. This complaint was filed on March 30, 2000. Ex. 2.

5.    A true and correct copy of the complaint filed in *E.I. du Pont de Nemours
& Co. v. Monsanto Co.*, No. 00-952-CWH (D.S.C.) ("*DuPont South Carolina*") is
attached hereto as Exhibit 3. This complaint was filed on March 27, 2000. Ex. 3.

6.    A true and correct copy of the Protective Order entered into in the *DuPont
Delaware* case is attached hereto as Exhibit 4. The parties filed the Protective Order on
August 30, 2000 and the Court granted the Protective Order on September 7, 2000. Ex.
4.

7.    A true and correct copy of the Amended Protective Order entered into in
the *DuPont South Carolina* case is attached hereto as Exhibit 5. The parties entered into
the Protective Order on November 7, 2000 and the Court granted the Protective Order on
November 21, 2000. Ex. 5.

8.    The Protective Orders entered in the *DuPont* cases are virtually identical,
and both governed the use of materials produced or used in the course of discovery. Ex.
4, 5. For instance, both Protective Orders provided:

> "Confidential Information disclosed pursuant to this Protective Order shall
> be used only for purposes of this litigation and shall be protected from any
> unauthorized or unrelated use."

2

*Id.* at ¶7.  Similarly, both Protective Orders specified what the parties were supposed to do with confidential materials produced or used in the course of the litigation after the case ended:

> Within one hundred twenty (120) days of the final disposition of the above entitled case, whether by judgment and exhaustion of all appeals, or by settlement, the attorneys of record:

> (1)    Shall destroy or return to the disclosing Party or Third Party, or its attorney of record, the Confidential Information in their possession, custody or control or in the possession, custody or control of their staff.

> (2)    Shall insure that all Confidential Information in the possession, custody or control of their experts and consultants is destroyed or returned to the disclosing Party or Third Party, or its attorney of record.

> (3)    Shall destroy all notes, memoranda or other documents which contain excerpts from any of the Confidential Information; and

> (4)    Shall deliver to the disclosing Party or Third Party, or its attorney of record, written confirmation that there has been compliance with the terms of this paragraph or that there has not been compliance and the reason for such noncompliance, upon receipt of which the disclosing Party or Third Party may make application to the Court for such further order as may be appropriate.

> Notwithstanding the foregoing, either Party may retain copies of any material filed with the Court.

*Id.* at ¶14.  Finally, both of the *DuPont* Protective Orders survived termination of the suit. *Id.* at ¶15.

        9.    Monsanto undertook a massive document collection and review in connection with the *DuPont* cases.  Pursuant to the Protective Orders in the two *DuPont* cases, Monsanto produced 1.2 million pages of documents in response to DuPont's discovery requests.  The parties also partook in extensive deposition discovery.  DuPont also took over seventy depositions of Monsanto employees between the two cases.  By way of comparison, only twenty-two Monsanto employees were deposed in the *Syngenta*

antitrust action.  Many of Monsanto's employees were deposed in both the *DuPont Delaware* and *South Carolina* actions.

10.    As counsel of record for Monsanto, I have been in contact with several attorneys at Faegre & Benson, LLP who represented DuPont in the *Delaware* and *South Carolina* cases.  During those conversations, I was advised that Faegre had not destroyed Monsanto's confidential information produced in the *DuPont* cases because he was instructed by the Department of Justice to maintain all of those materials.

11.    A true and correct copy of an August 19, 2004 New York Times article entitled "Company News; Monsanto Says Justice Department Inquiry Has Ended" is attached hereto as Exhibit 6, and is also available online at http://query.nytimes.com/gst /fullpage.html?res=9F06E3D91E3FF93AA2575BC0A9629C8B63.  In the article, Monsanto announced that the Department of Justice had officially closed its investigation into Monsanto's herbicide business.  Ex. 6.

12.    A true and correct copy of Plaintiffs' First Request for Production of Documents is attached hereto as Exhibit 7.  Plaintiffs' served their document requests on Monsanto on April 9, 2007.  Ex. 7.  In their document requests, Plaintiffs seek materials from four prior cases, two of which are the *DuPont* cases.  *Id.* at 9-10.  Indeed, Plaintiffs' document requests seek the *same* materials from Monsanto that are sought in the Faegre subpoena:

> **REQUEST NO. 1:**  All non-privileged documents received, produced, or filed with a court, in connection with any case or legal action which contains allegations that Monsanto engaged in, and/or attempted to engage in, unfair, wrongful, or anticompetitive business or trade practices, exclusive dealing, exclusionary dealing, bundling, tying, monopolization, violations of the antitrust laws, unfair trade practices, and/or violations of state statutes or common law governing fair competition and/or business practices regarding RoundUp, Glyphosate or Herbicides, including but not limited to:

(a) *E. I. DuPont De Nemours and Company v. Monsanto Company*, No. 4:00-CV-00952-CWH, (D.S.C.)(Florence Division);

(b) *E.I. DuPont de Nemours and Co. v. Monsanto Co. and Asgrow Seed Co.*, No. 00-359-SLR (D. Del);

(c) *Agrevo Environmental Science USA LP v. Scotts Company, et al*, (S.D.N.Y.) 1:99-CV04015-LAP-THK; and

(d) *Aventis v. Scotts Company and Monsanto*, (S.D.N.Y.) 1:02-CV-03722-LAP-THK This request includes, but is not limited to:

This request includes, but is not limited to:

(a) all documents produced or received by Monsanto in discovery in any of the cases or actions described in this request;

(b) all court filings, court orders or opinions, pleadings, discovery requests and responses, correspondence, deposition testimony, deposition exhibits, expert reports or affidavits, exhibits attached to or cited in any expert reports of affidavits, and/or deposition videos in any of the cases or actions described in this request.

Id.

13.    A true and correct copy of Plaintiffs' May 11, 2007 letter to counsel for Monsanto is attached hereto as Exhibit 8.

I declare under the penalty of perjury according to the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed on May 23, 2007.

            */s/ John J. Rosenthal*
            John J. Rosenthal, Esq.


797414/30803

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 23, 2007, the attached document was hand

delivered to the following persons and was electronically filed with the Clerk of the Court using

CM/ECF which will send notification to the registered attorney(s) of record that the document

has been filed and is available for viewing and downloading:

Jeffrey S. Goddess
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899

I hereby certify that on May 23, 2007, I have sent by Electronically Mailed the foregoing

document to the following:

Noah H. Silverman
Bruce E. Gerstein
Joseph Opper
Garwin Gerstein & Fisher LLP
1501 Broadway, Suite 1416
New York, NY 10036
nsilverman@garwingerstein.com
bgerstein@garwingerstein.com
jopper@garwingerstein.com

Adam M. Moskowitz
Tucker Ronzetti
David M. Buckner
Kozyak Torpin & Throckmorton, P.A.
2525 Ponce de Leon, 9th floor
Miami, FL 33134
amm@kttlaw.com
tr@kttlaw.com
dmb@kttlaw.com

/s/ David E. Moore
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Potter Anderson & Corroon LLP
Hercules Plaza
Wilmington, DE 19899
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

763267 / 30803

# EXHIBIT 1

Issued by the
## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **PULLEN SEEDS AND SOIL,**<br>**on behalf of themselves**<br>**and all others similarly situated,** | :    **06-599 SLR** |
| :<br>**Plaintiff,**<br>**v.** | :<br>:<br>: |
| **MONSANTO COMPANY,** | :<br>: |
| **Defendant.** | : |

| | |
|---|---|
| **WADE FARMS, et al.,** | : |
| **Plaintiffs,**<br>**v.** | :<br>:    **06-600 SLR** |
| **MONSANTO COMPANY,** | :<br>: |
| **Defendant.** | : |

TO:    Faegre & Benson, LLP
       2200 Wells Fargo Center
       90 South Seventh Street
       Minneapolis, MN 55402-3901
       Attn: John Hinderaker

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
       **SEE EXHIBIT A**

| PLACE  Faegre & Benson LLP<br>2200 Wells Fargo Center<br>90 South Seventh Street<br>Minneapolis, MN 55402-3901<br>612-766-7000 | DATE AND TIME<br>14 days from the service of this subpoena<br>9:30 a.m. |
|---|---|

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.    Federal Rules of Civil Procedure 30(b)(6)

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>*Noah Silverman*    Attorneys for Plaintiff | DATE<br>April 9, 2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Noah Silverman, Garwin Gerstein & Fisher LLP, 1501 Broadway – Room 1416,
New York, New York, 10036  (212) 398-0055

## PROOF OF SERVICE

| SERVED | DATE | PLACE |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE _____  SIGNATURE OF SERVER

_____  ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(d) DUTIES IN RESPONDING TO SUBPOENA.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ------------------------------------------------- : | | |
| : | | |
| **PULLEN SEEDS AND SOIL, on behalf** : | | |
| **of itself, and all others similarly situated,** : | | |
| : | | |
| **Plaintiff** : | 06-599 SLR | |
| **v.** : | | |
| : | | |
| **MONSANTO COMPANY,** : | | |
| **Defendant.** : | | |
| _____ : | | |
| : | | |
| _____ : | | |
| : | | |
| **WADE FARMS, WHITTINGTON &** : | | |
| **SUMNER FARMS, CLIFFORD F.** : | | |
| **DANCE, D/B/A CLIFFORD DANCE** : | | |
| **FARMS, and all others similarly** : | 06-600 SLR | |
| **situated,** : | | |
| **Plaintiffs** : | | |
| **v.** : | | |
| : | | |
| **MONSANTO COMPANY,** : | | |
| : | | |
| **Defendant.** : | | |
| _____ : | | |

## NOTICE OF SUBPOENA DUCES TECUM FOR
## PRODUCTION OF DOCUMENTS FROM FAEGRE & BENSON, LLP

**TO:   All counsel of record**

**PLEASE TAKE NOTICE,** that, in accordance with the Federal Rules of Civil Procedure,

Plaintiffs hereby notice the subpoena of the following documents: see Appendix A.

1

The documents shall be produced on the following date at the following time and location:

Date:        14 days from service of this subpoena

Location:    Faegre & Benson, LLP
                2200 Wells Fargo Center
                90 South Seventh Street
                Minneapolis, MN 55402-3901
                Phone: 612-766-7000

Counsel are invited to appear and participate as they see fit.

April 9, 2007

By:_____

      Noah Silverman
      Garwin, Gerstein & Fisher, LLP
      1501 Broadway,  Suite 1416
      New York, NY 10036
      Tel: (212) 398-0055

      Counsel for Plaintiffs

2

## CERTIFICATE OF SERVICE

I, Noah Silverman, do hereby certify that on April 9, 2007, I caused the attached NOTICE

OF SUBPOENA DUCES TECUM FOR PRODUCTION OF DOCUMENTS FROM FAEGRE &

BENSON, LLP to be served via overnight express mail on:

> John Hinderaker
> Faegre & Benson, LLP
> 2200 Wells Fargo Center
> 90 South Seventh Street
> Minneapolis, MN 55402-3901
> Phone: 612-766-7000

I also caused to be served the foregoing document electronically and by First Class Mail on the

following Defendant's counsel:

> Peter E. Moll, Esquire (mollp@howrey.com)
> John J. Rosenthal, Esquire (rosenthalj@howrey.com)
> Scott Flick, Esquire (flicks@howrey.com)
> Howrey LLP
> 1299 Pennsylvania Avenue, N.W.
> Washington, DC 20004

> Kenneth A. Letzler, Esquire (kenneth.letzler@aporter.com)
> Jonathan Gleklen, Esquire (jonathan.gleklen@aporter.com)
> Robert N. Weiner, Esquire (robert.weiner@aporter.com)
> Arnold & Porter LLP
> 555 12th Street, N.W.
> Washington, DC 20004

In addition, I also caused the attached to be served electronically on the following Plaintiffs'

counsel:

ROSENTHAL, MONHAIT & GODDESS, P.A.
Jeffrey S. Goddess
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
Tel: (302) 656-4433

KOZYAK TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
T. Tucker Ronzetti
David M. Buckner
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

3

ODOM & DES ROCHES, LLP
John Odom
Stuart E. Des Roches
Charles Zimmer
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

HARKE & CLASBY, LLP
Lance A. Harke, Esq.
David Maher
155 S. Miami Avenue, Suite 600
Miami, FL 33130
Tel:  305-536-8220
Fax: 305-536-8229

PERCY, SMITH & FOOTE, LLP
David P. Smith
W. Ross Foote
David Raphael
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

LAW OFFICE OF MICHAEL MILLER
Michael Miller
926 Chulie Drive
San Antonio, TX  78216
Tel: 210-225-6666
Fax: 210-225-2300

WHITTINGTON, BROCK & SWAYZE,
P.A.
H. Donald Brock.
308 Fulton
Greenwood, MS 38930
Tel:  662-453-7325
Fax:  662-453-7394

_____

Noah Silverman
GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel:  (212) 398-0055
Fax: (212) 764-6620

4

EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------ :
PULLEN SEEDS AND SOIL, on behalf   :
of itself, and all others similarly situated,   :
                                   :
                    Plaintiff      :      06-599  SLR
          v.                       :
                                   :
MONSANTO COMPANY,                  :
                    Defendant.     :
_____:


_____
                                   :
WADE FARMS, WHITTINGTON &          :
SUMNER FARMS, CLIFFORD F.          :
DANCE, D/B/A CLIFFORD DANCE        :
FARMS, and all others similarly    :      06-600  SLR
situated,                          :
                    Plaintiffs     :
          v.                       :
                                   :
MONSANTO COMPANY,                  :
                                   :
                    Defendant.     :
_____:
```

## PLAINTIFFS' SUBPOENA DUCES TECUM FOR
## PRODUCTION OF DOCUMENTS FROM FAEGRE & BENSON, LLP

FAEGRE & BENSON, LLP is directed to produce the requested documents at the offices of

Faegre & Benson, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402-3901

within fourteen (14) days of service hereof. Each Request is continuing in nature and must be

supplemented as provided by Federal Rule of Civil Procedure 26(e).

1

# I.  DEFINITIONS

1.      The term "person" means a natural person, corporation, association, company, firm, partnership, joint venture, trust, estate, agency, department or bureau, governmental or judicial person or legal entity.

2.      The terms "you," "your" or "yours" mean the recipient of this discovery request and unless otherwise specified in a particular request, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), employees, consultants, independent contractors, agents, attorneys, representatives and/or other persons acting or authorized to act on its behalf and in the course and scope thereof.

3.      The term "Monsanto" means Monsanto Company and any of its predecessors or successor entities, officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), employees, consultants, independent contractors, agents, attorneys, representatives and/or other persons acting or authorized to act on its behalf and in the course and scope thereof.

4.      The term "including" shall be deemed to be followed by the phrase "but not limited to."

5.      The term "RoundUp" means any form, version, model or brand of Monsanto RoundUp that is used or sold or promoted for use for commercial agricultural uses.

6.      The term "Glyphosate" means any product that is used, or sold or promoted for use for commercial agricultural uses, and which product contains Glyphosate as the active, primary or main ingredient.

7.      The term "document" means any written, printed, recorded, digital, electronic and/or video matter and/or tangible thing upon which any words, phrases, numbers, data and/or images are affixed or conveyed, including but not limited to any item within the scope of Rule 34 of the Federal Rules of Civil Procedure.  The term "document" includes, but is not limited to, any writing, report, memorandum, file, computer file, computer-stored data or databases in computer-readable format, computer drive, home computer contents, personal computer contents, floppy disk, zip disk, printout, communications, computer transmission, e-mail, correspondence, electronic transmission, word

2

processing file, spreadsheet, spreadsheet program file, calculation, database, database entries, database queries, database query results, mainframe computer file, computerized spreadsheet, analysis, outline, pro forma, forecast, white paper, projection, market study, marketing plan, tactical plan, long-range plan, strategic forecast, plan of action, pricing study, budget, presentation, slide, slide deck, Powerpoint presentation, proposal, record, draft, memorialization, computerized memorialization, personal digital assistant file, message, book, survey, research, background information, talking points, list, contract, agreement, purchase order, invoice, receipt, shipping paper, catalog, brochure, manual, publication, policy statement, promotional or advertising literature or materials, credit memos or memoranda, claim form, production record, inventory record, account, letter, side letter, letter of commitment, journal, profit and loss statement, income and expense sheet, statement of financial condition, audit report, organizational chart, flow chart, addendum, check, docket sheet, brief, court filing, pleading, transcript, affidavit, deposition, discovery request, discovery response, log, calendar, list, journal, pamphlet, abstract, computation, tabulation, bill, statement, invoice, schedule, exhibit, attachment, photostat, electronic transmission, image, network communications and transmissions, satellite network communications, study, telegram, telex, agenda, minutes, bulletin, instruction, literature, memorandum of conversations, notes, notebook, diary, data sheet, work sheet, recording, tape, videotape, audiotape, internal or interoffice communication, drawing, table, diagram, graph, index, chart, telephone record, photograph, phonographic record, written memorialization of oral communication, and/or other data compilation of any other written, recorded, transcribed, punched, taped, filed and/or other graphic matter including any draft of the foregoing items upon which any notation, work, figure or form is recorded or has been made which does not appear on the original, or as to whose existence, either past or present, the responding party has any knowledge or information.

        8.      The phrases "relating to" and "relates to" include reflecting, constituting, memorializing, discussing, regarding, evidencing, referring to, concerning, involving, explaining, treating, dealing with, in connection with, referenced in, attached to, and/or bearing on (whether legally, factually, or otherwise), in whole or in part.

3

9.    The terms "communication" and "communications" include all forms of transmission of information, whether oral, in writing, electronic, or in some other medium.

10.    The term "correspondence" means any letter, memorandum, email, or other writing.

11.    The term "minutes" includes action taken in lieu of meeting, minutes of meetings, including exhibits and attachments, agendas for meetings (including exhibits, attachments and/or materials distributed or circulated at, or in connection with, any meeting), notices of meetings, waivers of meetings and certification or signatures appended to or referred to in the notices, agendas or minutes.

12.    "And" and "or" shall be construed either conjunctively or disjunctively so as to bring within the scope of any particular Request any document or writing or information that might be deemed outside its scope by another construction.

13.    The phrases "any document" and "any documents" also includes "each document(s)" and "all document(s)," and *vice versa*. The word "document" also includes "any document," "all documents," and "each document."

## II. INSTRUCTIONS

1.    In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your predecessor and/or successor entities, affiliates, officers, directors, managing agents, shareholders, parent and/or subsidiary companies (whether direct or indirect), employees, agents, attorneys and/or their agents, representatives and/or other persons acting or authorized to act on your behalf.

2.    Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and/or other versions of a document must be produced in addition to the unaltered version of the document.

4.    If responsive documents exist in computerized, digital, imaged or other electronic form, please produce them in that form, particularly for transactional and sales data.

4

5.     If you are unable to produce a document in response to any request, so state and indicate whether the document ever existed, or whether the document once existed but cannot be located, or otherwise. If any document once was, but is no longer in your possession, custody or control, state the whereabouts of any such document, state when it was last in your possession, custody or control, state the date and manner of its disposition, and identify its last known custodian. To the extent any documents are lost or destroyed, produce any documents which support your assertion that the document was lost or destroyed, and provide the date thereof.

6.     If any documents requested herein have been lost, discarded, destroyed, or are otherwise no longer in your possession, custody or control, or have been transferred voluntarily or involuntarily to another person or persons, or otherwise disposed of, they shall be identified as completely as possible including information necessary to identify the document and the following information: the date of disposal or transfer; the manner of disposal or transfer; the reason for disposal or transfer; the person authorizing the disposal or transfer; and the person disposing of or transferring the document.

7.     If you file a timely objection to any portion of a request, definition, or an instruction, provide a response to the remaining portion.

8.     The terms defined above and the individual requests for production and inspection should be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

9.     As used in these requests, the singular shall also be treated as plural and vice-versa.

10.     These document requests are continuing and require supplemental responses as specified in Federal Rule of Civil Procedure 26(e) if you (or any person acting on your behalf) obtain additional information called for by the request between the time of the original response and the time set for trial. Each supplemental response shall be served on Plaintiff no later than thirty (30) days after discovery of the additional information, and in no event shall any supplemental response be served later than the day before the first day of trial.

11.     The fact that a document is produced by another party does not relieve you of the

5

obligation to produce your copy of the same document, even if the two documents are identical in all respects.

12.    Documents are to be produced in full, regardless of whether you consider the entire document to be relevant or responsive to these Requests. If any requested document or thing cannot be produced in full, produce it to the extent possible, indicating which document or portion of that document is being withheld and the reason that document or portion is being withheld. Production of a partial or redacted document without an indication of which portion of the document has been withheld and/or without an explanation of the reason that the entire document has not been produced will not constitute compliance with these requests

14.    Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the request.

15.    All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained by you. If the container cannot be produced, produce copies of all labels or other identifying marks.

16.    Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose possession they were found and the business address of each document's custodian(s).

17.    Documents attached to each other should not be separated.

18.    Documents not otherwise responsive to this discovery request shall be produced if such documents help to understand the documents which are called for by this discovery request, or if such documents are attached to documents called for by this discovery request and constitute routing slips, transmittal memoranda, letters, comments, evaluations or similar materials.

19.    If you claim the attorney-client privilege, or any other privilege or work product protection for any document, you shall provide all information required by Fed. R. Civ. P. 26(b)(5) and Loc. Civ. R. 34.1, including but not limited to the following information with respect to each such

6

document:

    a.      The title of the document or writing;

    b.      The number of pages of the document or writing;

    c.      The identity of all author(s) or drafters of the document or writing;

    d.      The identity of each person to whom an original or a copy of the document or writing was sent;

    e.      The subject matter of the document or writing;

    f.      The subject matter and a description of the material withheld, to the fullest extent possible short of waiving the claim to privilege, in sufficient detail to permit plaintiffs to assess the applicability of the privilege claimed;

    g.      The reason for withholding the document or writing;

    h.      The identity of each person, firm, corporation or other entity in possession of an original or copy of the document or writing; and

    i.      The date the document or writing was created.

Failure to comply with the foregoing will result in the waiver of any such privilege or other basis for nonproduction. *See, e.g., Tarlton v. Cumberland County Correctional Facility*, 192 F.R.D. 165 (D.N.J. 2000); *Nagele v. Electronic Data Sys. Corp.,* 193 F.R.D. 94, 108 (W.D.N.Y. 2000); *In re Imperial Corp. of America*, 174 F.R.D. 475 (S.D. Cal. 1997); *Massachusetts School of Law at Andoyer, Inc. v. Am. Bar Assoc.,* 914 F. Supp. 1172, 1178 (E.D. Pa. 1996); *Burns v. Imagine Films Entertainment, Inc.,* 164 F.R.D. 589, 594 (W.D.N.Y. 1996); *Dorf & Stanton Communications, Inc. v. Molson Breweries,* 100 F.3d 919, 923 (Fed. Cir 1996); *Rural Water Sys. Ins. Benefit Trust v. Group Ins. Adm'r,* 160 F.R.D. 605 (D. Kan.1995).

    20.     If a document contains both privileged and non-privileged information, all portions of the document that are not privileged must be produced.

7

### III.  DOCUMENT REQUESTS

**REQUEST NO. 1**:  All documents and/or other things in your custody or control which were produced by Monsanto (including, but not limited to it subsidiaries, divisions, or agents) in the following legal actions:

(a) *E. I. DuPont De Nemours and Company v. Monsanto Company*, No. 4:00-cv-00952-CWH, (D.S.C.)(Florence Division); and

(b) *E.I. DuPont de Nemours and Co. v. Monsanto Co. and Asgrow Seed Co.*, No. 00-359-SLR (D.Del)

**REQUEST NO. 2**: Any unmarked copies in your custody or control of any deposition or court transcripts created or received in connection with:

(a) *E. I. DuPont De Nemours and Company v. Monsanto Company*, No. 4:00-cv-00952, (D.S.C.)(Florence Division); and

(b) *E.I. DuPont de Nemours and Co. v. Monsanto Co. and Asgrow Seed Co.*, No. 00-359-SLR (D.Del)

This requests includes, but is not limited, to: (a) paper, electronic, or video copies of any such transcripts; and (b) any exhibits or documents cited or used therein.

**REQUEST NO. 3**: Copies in your custody or control of any court filings, court orders or opinions, served pleadings, and/or served discovery requests in:

(a) *E. I. DuPont De Nemours and Company v. Monsanto Company*, No. 4:00-cv-00952, (D.S.C.)(Florence Division); and

(b) *E.I. DuPont de Nemours and Co. v. Monsanto Co. and Asgrow Seed Co.*, No. 00-359-SLR (D.Del)

# EXHIBIT 2

MSW

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

E. I. DU PONT DE NEMOURS AND
COMPANY,

                  Plaintiff,

    vs.

MONSANTO COMPANY and
ASGROW SEED COMPANY LLC

                  Defendants.

Civil No. **0 0 - 3 5 9**

**COMPLAINT**
**DEMAND FOR JURY TRIAL**

Plaintiff E. I. du Pont de Nemours and Company ("DuPont") for its Complaint against Monsanto Company ("Monsanto") and Asgrow Seed Company LLC ("Asgrow") alleges as follows:

## THE PARTIES

1.    Plaintiff DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont is a global science company, offering science-based solutions in the aerospace, agricultural, automotive, packaging and pharmaceutical industries, among others. DuPont's Agricultural Enterprise segment includes crop protection, feed, seed, food ingredient and food safety businesses. As used herein, "DuPont" refers to DuPont and all of its affiliated and subsidiary corporations.

2.    Defendant Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto develops and produces agricultural products and

pharmaceuticals.  As used herein, the term "Monsanto" refers to Monsanto and all of its affiliated and subsidiary corporations.

3.     Asgrow is a Delaware corporation with its principal place of business in Kalamazoo, Michigan.  Asgrow develops and markets varieties of seeds, including soybean and corn seeds.  Upon information and belief, Asgrow is the largest producer of soybean seeds in the world.  Asgrow was at one time owned by The Upjohn Company ("Upjohn").  In early 1995, Upjohn sold Asgrow to Empresas La Moderna.  In 1997, Monsanto acquired Asgrow and it is currently a wholly-owned subsidiary of Monsanto.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over DuPont's federal antitrust claims pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the Delaware common law claims pursuant to 28 U.S.C. § 1367, in that they arise out of the same operative facts as the federal antitrust claims.

5.     This Court has pendent jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), because all such claims originate from the same nucleus of operative facts as do the federal antitrust claims.

6.     Venue is proper pursuant to 28 U.S.C. § 1391(c), because Monsanto and Asgrow inhabit, transact business, and have agents in this District, and are therefore subject to personal jurisdiction in this District.

7.     The goods and services at issue are marketed, shipped and sold in and through interstate commerce.  The anticompetitive acts alleged herein have substantially affected interstate commerce.

2

## FACTS

### A.    The Soybean Seed and Herbicide Businesses

8.    Soybean is the second largest crop grown in the United States. Soybean has a wide variety of uses, including food, animal feed and industrial applications.

9.    Weeds can impair crop growth. In order to control weeds, growers generally must use significant amounts of herbicides. Herbicides are chemical compounds used to destroy or inhibit the growth of undesirable plants. Herbicides usually are used as part of a field maintenance program, either prior to or in conjunction with the planting and growing of the crop, to reduce or eliminate weed growth.

10.    Herbicides are used on soybean fields to control weeds that reduce crop yield or quality. As a general matter, these herbicides can be classified by type of activity: (i) *selective herbicides* are tolerated by the crop but will kill or suppress one or more weeds that infest the crop, and (ii) *non-selective herbicides* are active on all vegetation that is present at the time of application, including the crop. Non-selective herbicides do not distinguish between a commercial crop such as soybeans and other vegetation such as weeds.

11.    No single selective herbicide controls all types of weeds with equal effectiveness. Growers often apply a combination of selective herbicides, either at the same time or in sequence, to control important target weeds. Selective herbicides are usually classified by (i) the kind of weeds they control (e.g., grass or broadleaf), (ii) the timing of the application (pre-emergent or post-emergent), and (iii) the length of time the herbicide controls weeds (residual control).

12.    DuPont and Monsanto are both manufacturers of agricultural chemicals, including herbicides. Their herbicide products compete in a number of crop markets. At all

3

times material to this action, DuPont and Monsanto have marketed competing herbicides for
use on soybeans.

13.    DuPont has for many years manufactured and sold a class of herbicides known
as sulfonylureas ("SU"). SUs provide a broad range of weed control for a number of crops,
including soybeans. SUs are very active compounds. They are effective at lower rates of
application and have high safety margins compared to many competing herbicides. Many
SUs are selective while others are non-selective. They generally have good residual control.
Growers have used combinations of DuPont SUs for both pre-emergent and post-emergent
application for weed control with soybean crops.

14.    Monsanto has for a number of years manufactured a herbicide that it markets
under the trademark "Roundup." The active ingredient in Roundup is glyphosate.
Glyphosate *per se* and various salts of glyphosate are unpatented articles of commerce.
Monsanto uses the isopropylamine salt of glyphosate in Roundup. Monsanto has a patent on
this form of glyphosate, which is due to expire in September 2000.

15.    More recently, Monsanto introduced a glyphosate herbicide called "Roundup
Ultra". In addition to the isopropylamine salt of glyphosate, Roundup Ultra also contains a
surfactant. As used herein, "Roundup" brand herbicides includes both Roundup and
Roundup Ultra.

16.    Roundup is today the largest-selling herbicide in the world. Prior to 1996,
however, Roundup was not widely used on soybeans. On information and belief, its share of
the soybean herbicide market in 1996 was approximately 9 percent. Roundup's utility on
soybeans was limited by the fact that its active ingredient, glyphosate, kills soybeans. That is
because glyphosate is a systemic, non-selective herbicide. It provides no residual control.

4

FILE No.010 04/12 '00 03:32   ID:LANIER 51127FD          FAX:                        PAGE 3
Mar-31-2000 10:40am  From-LAW-EING                 +314-694-2885    T-158  P.006/028  F-281

Thus, prior to 1996, Roundup's use on soybeans was limited for the most part to non-selective, pre-emergent applications (i.e., burndown).

B.    DuPont Herbicide Tolerant Soybeans

17.    By 1987, DuPont had developed through conventional breeding techniques a soybean variety with a trait that made the crop tolerant of its SU herbicides. This was a major breakthrough because it permitted wider applications of SUs over the top of soybeans to control a broader range of weeds without any damage to the crop itself. DuPont named this SU tolerant soybean "STS".

18.    In the late 1980s, DuPont was also developing other soybean varieties with traits providing for improved food and feed qualities of harvested soybeans.

19.    An essential requirement for development of high quality, commercial soybean varieties is access to high quality soybean germplasm. Asgrow was then, and is still, a leading retail soybean seed company and has at all times relevant to this action controlled large quantities of high quality soybean germplasm.

20.    To advance its soybean program, DuPont entered into a series of soybean research and commercialization programs with Asgrow starting in June 1988. The first program was specifically directed to the development and commercialization of STS soybeans using Asgrow's germplasm. This effort began under the "Plant Breeding and Development Agreement" of June 24, 1988.

21.    In 1989, DuPont and Asgrow agreed to expand their collaboration to develop and commercialize a wide variety of soybeans with useful traits. Under a "Soybean Seed Research and Commercialization Agreement" entered into August 1, 1989 between DuPont and Asgrow, the parties agreed "...to combine their respective skills and resources to take

5

elite soybean germplasm, characterize the germplasm, determine traits that are believed to

add value industrially and/or agronomically to the germplasm, and apply both traditional

breeding skills and biotechnology skills to expedite the incorporation of industrial and/or

agronomic traits into such germplasm...and, thereafter, commercialize the results of this

effort....". (This agreement, together with the 1994 STS Soybean Commercialization

Agreement described below, are referred to collectively as the "Soybean Agreements".)

22.     The Soybean Seed Research and Commercialization Agreement anticipated

that each party would exchange confidential and proprietary technology and information in

the course of carrying out the agreement.  Moreover, the agreement required Asgrow to keep

confidential all DuPont Technical Information and Developed Know-How, disclosed by

DuPont to Asgrow, and to use it only in connection with Asgrow's development and

commercialization programs with DuPont.

23.     The program with Asgrow to develop and commercialize new STS soybean

varieties was of great importance to DuPont.  The commercialization and widespread use of

STS soybeans would expand the market for DuPont's SU herbicides.  STS soybeans would

also give growers a wider choice of herbicides to use on their soybean crops.

24.     To facilitate DuPont's soybean development programs with Asgrow, DuPont

gave Asgrow access to a powerful proprietary genetic marker identification and analysis

system DuPont had developed based upon restriction fragment length polymorphism

("RFLP") of plant materials.  The DuPont proprietary RFLP genetic marker and

identification system technology ("DuPont's proprietary molecular breeding technology")

makes it possible to predict the genetic traits which have been bred or implanted into a seed,

immediately after it sprouts, without the need for growing the plant to maturity.  Because it

6

FILE No.011 04/12 '00 03:28   ID:LANIER 5112FFD              FAX:                               PAGE  7
Mar-31-2000  10:50am  From-LAE-EING                   +314-894-2955          T-159  P.008/028  F-261

eliminates the necessity to wait for multiple generations of plants to grow and mature,
DuPont's proprietary molecular breeding technology can greatly accelerate the process of
developing soybeans or other plants having desired agronomic or quality traits.  Moreover,
due to its prediction capability, DuPont's proprietary molecular breeding technology permits
breeders to make better choices in deciding which plant varieties to cross to achieve a
variety having desired genetic characteristics.  As a result, DuPont's proprietary molecular
breeding technology enables one to get to the market faster with better soybean varieties.

25.    By 1994, STS soybean seeds were ready for commercialization.  Asgrow and
DuPont therefore entered into an STS Soybean Commercialization Agreement on March 31,
1994.  This agreement provided, *inter alia*, that DuPont and Asgrow would coordinate their
marketing and advertising activities, the conduct of demonstration plots and grower
meetings, and other activities relevant to the commercial success of STS soybeans and
DuPont's herbicides.

26.    The Soybean Agreements established joint committees, consisting of
representatives of both DuPont and Asgrow, who were responsible for managing and
coordinating the activities of the parties under the Agreements.  The Soybean Agreements
provided, *inter alia*, for joint control of the enterprise by the parties, a community of interest
in the STS soybean research and commercialization program, and a sharing of any profits
that would result from the commercialization of STS soybeans, with Asgrow profiting on
sale of the soybean seeds, and DuPont profiting through sales of SU herbicides.

7

C.    Monsanto and Asgrow Misappropriate DuPont's Proprietary Molecular
      Breeding Technology to Develop Glyphosate Tolerant Herbicide

27.    On information and belief, beginning in the early 1990's, and while Asgrow
was working with DuPont to develop and commercialize STS soybeans, Monsanto began a
collaboration with Asgrow to commercialize a soybean seed which would be tolerant of its
Roundup herbicide. These glyphosate-tolerant soybeans eventually came to be known as
"Roundup Ready" soybeans. They compete directly with STS soybeans. Monsanto wanted
to develop Roundup Ready soybeans in part to expand the market for Monsanto's Roundup
herbicide.

28.    At a time not precisely known to DuPont, Asgrow misappropriated DuPont's
proprietary molecular breeding technology and used it to expedite and advance its
development, in collaboration with Monsanto, of Roundup Ready soybeans. On information
and belief, Monsanto knew about Asgrow's theft of DuPont's proprietary molecular breeding
technology and encouraged, participated in, and knowingly benefited from that theft.

29.    On information and belief, Asgrow's misappropriation of DuPont's
proprietary molecular breeding technology accelerated the development of Roundup Ready
soybeans by about two years. This acceleration was critical to Monsanto, because prior to
Asgrow's misappropriation and use of this technology on Monsanto's behalf, STS soybean
technology was more advanced than Roundup Ready technology.

D.    Defendants' Misappropriation Leads to the First Addendum

30.    DuPont ultimately learned that Asgrow had misappropriated DuPont's
proprietary molecular breeding technology and used it to analyze dozens of Roundup Ready
varieties. When DuPont confronted Asgrow with this information, Asgrow admitted

8

misusing its access to DuPont's proprietary molecular breeding technology for Monsanto's

benefit to accelerate the development of Roundup Ready soybeans.

      31.     Thereafter, the parties agreed to an Addendum to the Soybean Agreements,

which provided certain additional STS commercialization benefits to DuPont and imposed

additional obligations on Asgrow beyond those contained in the Soybean Agreements.

Except to the extent that the Addendum specifically modified the Soybean Agreements, the

terms and conditions of those agreements remained in force.  DuPont agreed to defer

assertion of its claims based on the misappropriation of its proprietary molecular breeding

technology, pending Asgrow's satisfactory performance of its obligations under the

Addendum, as well as the original Soybean Agreements.

      32.     This Addendum, dated April 19, 1996, provided in part that:

> ASGROW and DUPONT will jointly develop by August 1,
> 1996, a detailed written plan for achieving the sale of enough
> soybeans containing the STS trait to plant at least 10,000,000
> acres by 1999. These acres could be planted with soybean
> varieties ...with the following resistance combinations: STS,
> STS and Roundup Ready (pending the approval of Monsanto to
> combine genetic tolerances to both herbicides), and/or STS and
> Liberty Link. Both ASGROW and DUPONT shall make every
> reasonable effort to achieve this goal.

      33.     The April 1996 Addendum provided further that:

> ASGROW will not use DUPONT molecular breeding
> technology in the further development of Roundup Ready or
> Liberty Link soybean varieties without the approval of
> DUPONT. In addition, ASGROW will not commercialize any
> soybean line for which DUPONT molecular breeding
> technology has been found to be useful in the development of
> herbicide resistance unless DUPONT approves its release.

Asgrow was given approval to market one Roundup Ready soybean variety

created using the DuPont proprietary molecular breeding technology for just one year.

34.    In 1996, Asgrow introduced six new Roundup Ready soybean varieties, which together comprised 95 percent of all Roundup Ready soybeans sold during that growing season.

**E.    Monsanto Tortiously Interferes with the Soybean Agreements and Induces Asgrow to Breach the First Addendum**

35.    Despite DuPont's efforts to carry out the Soybean Agreements as amended, including but not limited to its efforts to develop a plan whereby enough STS seeds would be available to plant at least 10,000,000 acres by 1999, Asgrow breached the Soybean Agreements and the Addendum thereto. Asgrow did not make every reasonable effort to achieve the goal of sufficient seeds to plant 10,000,000 acres. On the contrary, Asgrow made little or no effort to achieve that goal, as required by the First Addendum.

36.    On information and belief, Monsanto began negotiations to acquire Asgrow in early 1996 and announced its intention to acquire Asgrow in September 1996. Monsanto completed the acquisition of Asgrow in February 1997. Throughout these times, on information and belief, Monsanto influenced Asgrow's conduct, particularly with respect to the soybean development and commercialization programs with DuPont. After completing the acquisition, Monsanto assumed complete control over Asgrow's operations, particularly as they related to the Soybean Agreements. Monsanto employees assumed responsibility for the Soybean Agreements, dealing directly with DuPont's employees on matters relating to those Agreements.

37.    Monsanto directed and induced Asgrow to breach the Soybean Agreements, including the First Addendum thereto. Monsanto prevented Asgrow from making every

10

FILE No.011 04/12 '00 03:30   ID:LANIER 51121FD           FAX:                    PAGE 11

Apr-31-2000  10:51am  From-LAW-EING                    +814-894-2965         T-168  P.012/028  F-281

... ......... .. ...... ... .... .. ......... ..... .. 31S soybeans by 1999.

Monsanto directed Asgrow to make little or no effort to achieve this goal.  In so directing

Asgrow, Monsanto was motivated by its desire to monopolize the soybean seed market with

its own Roundup Ready soybean seed varieties, which Asgrow was now developing and

marketing on a massive scale.  Monsanto knew that by inducing Asgrow to breach its

agreements with DuPont, it could eliminate an important source of competition in the

soybean seed market, which, in turn, would enable it to monopolize the soybean herbicide

market.

38.    On information and belief, Monsanto also induced and directed Asgrow to

breach that provision of the First Addendum prohibiting Asgrow from using DuPont's

proprietary molecular breeding technology in the further development of Roundup Ready

seeds, and further prohibiting Asgrow from commercializing soybean lines for which

DuPont's proprietary molecular breeding technology was found useful in the development of

herbicide resistance, without DuPont's approval.

F.    The Second Addendum

39.    Following the First Addendum, DuPont tried diligently to work with Asgrow

to achieve the purposes of the Soybean Agreements.  However, it eventually became

apparent that Asgrow had no intention of fulfilling its obligations under the Soybean

Agreements or the First Addendum thereto, and on the contrary, was doing little or nothing

to promote the development and marketing of STS soybeans.

40.    During late 1996 or early 1997, DuPont confronted Asgrow and Monsanto

with Asgrow's default under the First Addendum to the Soybean Agreements.  Asgrow and

Monsanto freely acknowledged that Asgrow had no intention of fulfilling its obligations

11

FILE No.011 04/12 '00 03:30  ID:LANIER 5112TFD        FAX:                    PAGE 12
Jar-31-2000  10:51am  From-LAW-EING              +914-694-2985     T-156  P.013/028  F-261

..., and in particular, has no intention of producing enough STS seeds to plant 10,000,000 acres by 1999.

41. Once again, the parties negotiated a Second Addendum to the Soybean Agreements that would require Asgrow to produce at least a minimal amount of STS seed. The Second Addendum to the Soybean Agreements was signed by Asgrow and DuPont on or about March 19, 1998.

42. The Second Addendum provided that DuPont and Asgrow would promptly form a joint marketing committee to ensure demand and marketing for STS soybean seed. This Second Addendum required Asgrow to produce 6,000,000 (+/- 2%) Units (i.e. 50-pound bags) of STS soybean seeds in 1998, available for sale by Asgrow in 1999. One 50-pound bag of soybean seeds will plant less than one acre. The Second Addendum further required Asgrow to produce sufficient seed stock to produce up to 5,000,000 Units of STS soybean seeds in 1999, and to actually produce at least 3,000,000 Units of STS soybean seeds, which would be available for sale by Asgrow in 2000. Except to the extent specifically modified by the Second Addendum, the terms and provisions of the Soybean Agreements and the First Addendum remained in full force and effect. DuPont again agreed to defer assertion of any claims relating to the misappropriation of its proprietary molecular breeding technology pending Asgrow's satisfactory performance of its obligations under the Second Addendum, as well as the original Soybean Agreements.

43. Asgrow has breached the Second Addendum to the Soybean Agreement. Upon information and belief, Asgrow did not produce 6,000,000 Units of STS soybean seeds for sale in 1999.

44.     Asgrow has further breached the Second Addendum to the Soybean

Agreement by failing to produce at least 3,000,000 Units of STS soybean seeds for the 2000

growing season.

45.     Asgrow has further breached the Soybean Agreements, including but not

limited to the Second Addendum thereto, in that, rather than using every reasonable effort to

develop and produce STS soybeans, Asgrow has actively undermined the STS soybean

project. Asgrow continues to fail to develop or implement marketing plans to sell STS

soybeans, as required by the Soybean Agreements and the Addenda thereto, nor has Asgrow

implemented programs to ensure demand for STS seeds or to support the marketing of STS

seeds.  There is currently a shortage of STS seeds, and substantial demand for STS seeds, but

Asgrow is not acting to satisfy that demand.  Instead, Asgrow has directed parties owned or

controlled by Asgrow that are <u>involved</u> in production and distribution of STS seed to salvage

STS seed as animal feed rather than selling it as soybean seed.

46.     All of Asgrow's contract breaches as alleged herein have been directed or

induced by Monsanto, and Asgrow and Monsanto have acted with the joint purpose of

eliminating STS soybean seeds as a competitor with Roundup Ready soybean seeds in order

to facilitate Monsanto's scheme to monopolize the soybean seed and soybean herbicide

markets.

47.     Because Asgrow has continuously breached the Soybean Agreements and the

Addenda thereto, DuPont is entitled to assert its claims for the misappropriation of its trade

secrets, as well as its additional claims for breach of the Soybean Agreements and their

Addenda.

FILE No.011 04/12 '00 03:31   ID:LANIER 51121FD            FAX:                    PAGE 14

Mar-31-2000  10:52am   From-LAN-E1NG                       +314-694-2805      T-161   P.015/020   F-261

... ........................ ... ... Soybean Seed and Soybean Herbicide Markets

48.      Monsanto has used its control over its subsidiary Asgrow to suppress the
commercialization and ready availability of STS soybean seeds.

49.      Monsanto has used a variety of other illegal means to monopolize the soybean
seed and soybean herbicide markets, including, *inter alia*, the imposition of tying and
exclusive dealing arrangements on seed producers and dealers, herbicide dealers and
distributors, and growers.

50.      On information and belief, Monsanto has patented technology to make certain
plants, including soybeans, tolerant of herbicides containing glyphosate as the active
ingredient.  Monsanto's patents relate to the glyphosate resistant trait, the process by which it
is produced and the use of glyphosate with plants containing this trait.

51.      Glyphosate-resistant soybean seeds and soybean herbicides are separate and
distinct products for which there is a separate and independent demand by purchasers.
Growers and other consumers who purchase Roundup Ready soybean seeds may or may not
also wish to purchase Monsanto's Roundup brand herbicide, or may wish to purchase other
herbicides in addition to Roundup.

52.      When a grower buys Roundup Ready soybean seeds, he is required to pay a
"technology fee" which ostensibly compensates Monsanto for the grower's license to use
patented Roundup Ready technology.  The technology fee is substantial in relation to the
price of the seeds.

53.      When a grower buys Roundup Ready seeds and pays the technology fee
described above, he becomes eligible for Monsanto's "Roundup TVP Rewards" program.
The TVP Rewards program is the only tangible benefit the grower receives from the

14

FILE No.013 04/12 '00 05:55    ID:LANIER 5112MFD        FAX:                    PAGE 2
Mar-31-2000  10:52am  From-LAW-EING                    +314-604-2805        T-160  P.018/023  F-281

technology fee, beyond the purchase of the seeds themselves. The TVP Rewards program

provides various benefits to the grower, particularly an insurance program. Under this

insurance program, if a grower's crop is destroyed for any reason, Monsanto will reimburse

the grower the cost of seeds necessary to replant, and also provide herbicide free of charge.

However, Monsanto limited the TVP Rewards program by providing that if the grower used

a herbicide for either burndown or in-crop application that was not manufactured by

Monsanto, he lost his rights under the program. In this way, Monsanto improperly tied the

purchase of Roundup herbicide to the purchase of Roundup Ready soybean seeds.

54.    Monsanto has further sought to monopolize the soybean seed and herbicide

markets through the "Action Pact" program, which applies to both herbicide and seed

dealers. The Action Pact program rewards each seed retailer based on that retailer's rate of

growth in sales of Monsanto (i.e., Roundup Ready) seeds, as compared to Monsanto's

overall rate of growth in seed sales. If the soybean seed dealer does not achieve a rate of

sales growth equal to at least 90 percent of Monsanto's general rate of sales growth in

soybean seeds, the dealer receives no Action Pact bonuses at all. Since the individual seed

dealer has no way to know how much Monsanto's overall sales will increase, he has an

incentive to sell Monsanto's seeds at the expense of competitive varieties. Given

Monsanto's market power in the soybean seed market, this practice excludes competitors

from the soybean seed market, and in turn the soybean herbicide market.

55.    Monsanto has further monopolized the soybean seed market through the

"Value Club," in which seed producers and dealers participate. Out of the total quantity of

herbicide-resistant seed sold by Value Club members, at least 90 percent is expected to be

Roundup Ready seed. If producers or dealers fail to sell at least 90 percent Roundup Ready

15

..., they are subject to severe penalties under the terms of their agreements with

Monsanto. The Value Club agreements provide that if the seed producer or dealer is not

selling at least 90 percent Roundup Ready soybean seeds, out of his total sales of herbicide-

tolerant soybean seeds, by December 2000, the producer or dealer must pay severe financial

penalties to Monsanto. Given Monsanto's market power in the soybean seed market, these

practices further exclude competitors from the soybean seed market, and in turn the soybean

herbicide market.

56.    In addition to the monopolistic practices described above, which have directly

impacted DuPont's sales of its competing soybean herbicides, Monsanto has engaged in

additional practices which have not yet directly damaged DuPont because DuPont has not yet

sold a competing glyphosate herbicide in the soybean market. However, these additional

practices relating specifically to glyphosate are anti-competitive and monopolistic, and have

contributed to Monsanto's market power in the soybean herbicide market.

57.    When a grower buys Roundup Ready soybean seeds, he is required to sign a

"technology agreement" which binds the grower in various ways and limits his ability to use

the seed. The technology agreement contractually obligates the grower to use Monsanto's

Roundup herbicide or another herbicide approved by Monsanto, if he uses any herbicide

containing glyphosate on his crop. Thus Monsanto ties the purchase of herbicide to the

purchase of Roundup Ready seeds, and precludes competitors who sell other brands of

glyphosate from competing for herbicide sales on all acres planted with Roundup Ready

seeds.

58.    Monsanto has also imposed tying and exclusive dealing arrangements on seed

producers, dealers and distributors. Soybean seed producers and others who wanted to

16

FILE No.010 04/12 '00 03:34    ID:LANIER 51121FD    FAX:    PAGE 9
                                                        4314-694-2965    T-168  P.018/028  F-261
.ar-31-2000 10:53am  From-LAW-ENG

produce or sell Roundup Ready soybean seeds were required by Monsanto to obtain patent

licenses that obligated them to use, promote and sell only Roundup brand glyphosate for use

with the Roundup Ready seed they produce or sell.

59.    Monsanto has also imposed tying and exclusive dealing arrangements on

chemical dealers. These tying and exclusive dealing arrangements exert powerful control

over chemical dealers because markups on Monsanto's products are generally small or

nonexistent. Dealers make most of their profits on Monsanto products in the form of rebates

that they receive from Monsanto. Monsanto typically pays these rebates at the end of each

growing season. This discretionary power to pay or withhold rebates gives Monsanto a great

deal of power over chemical dealers.

60.    Monsanto has told dealers selling its Roundup and Roundup Ultra herbicides

that 90 percent of all sales of herbicides containing glyphosate must be Monsanto's products.

Dealers have been told that if they sell more than 10 percent of their glyphosate in the form

of competitive products, Monsanto will withhold all or most of the rebates otherwise payable

on all of the dealer's sales of Roundup and Roundup Ultra. Many of these chemical dealers

are also seed dealers and Value Club members, and are restricted with respect to both the

sale of seeds and the sale of herbicides.

61.    Through these and other means, Monsanto has improperly achieved market

power in the soybean seed and soybean herbicide markets. Since the introduction of

Roundup Ready soybean seed in 1996, Roundup Ready's share of the soybean seed market

has grown from approximately 1.5 million acres in 1996 to 35 million acres in 1999, or 50

percent of all soybean acres in the United States. Monsanto's Roundup herbicides have

grown from a 9 percent market share on soybeans in 1996 to at least 82 percent in 1999.

These market shares are expected to increase in 2000 as a result of Monsanto's ongoing

monopolistic practices.

62.    Monsanto has acquired market power in the soybean seed market with the

intent, and for the purpose, of obtaining market power, and ultimately monopoly power, in

the soybean herbicide market.

63.    As a result of Monsanto's illegal and monopolistic conduct described above,

the number of acres planted with STS soybean seed has fallen from 7.5 million acres in 1996

to 5 million acres in 1999, and DuPont's soybean herbicide revenues have markedly

decreased during that same time.

## THE RELEVANT MARKETS

64.    The markets relevant to DuPont's antitrust claims include:  a) the market for

soybean seeds, in which Monsanto has market power, and b) the market for soybean

herbicides, in which Monsanto also has market power.

65.    The relevant geographic market is the United States of America.

66.    Monsanto has market power, and dangerously threatens to achieve monopoly

power, in each of the relevant markets.

## FIRST CLAIM FOR RELIEF

### *Theft of Trade Secrets—Asgrow and Monsanto*

67.    The allegations of paragraphs 1 through 66 are realleged and incorporated

herein by reference.

68.    The conduct of Asgrow and Monsanto in misappropriating DuPont's

proprietary molecular breeding technology, and using it to advance Monsanto's Roundup

Ready technology, violated the Uniform Trade Secrets Act, 6 Del. C. §§ 2001 *et seq.*

69.    The statute of limitations on plaintiff's claim for violation of the Uniform

Trade Secrets Act was tolled by the parties' entering into Addenda to the Soybean

Agreements in settlement of said claim, and by Asgrow's subsequent breach of the Addenda.

70.    In consequence of defendants' misappropriation, DuPont is entitled to recover

damages, including lost profits resulting from reduced sales of SU and other soybean

herbicides, and to disgorgement of all amounts by which defendants have been unjustly

enriched, including but not limited to all profits made by Monsanto on sales of Roundup

Ready soybean seeds and Roundup and Roundup Ultra herbicides as a result of the

misappropriation.

## SECOND CLAIM FOR RELIEF

### *Breach of Contract—Asgrow*

71.    The allegations of paragraphs 1 through 66 are realleged and incorporated

herein by reference.

72.    By misappropriating DuPont's proprietary molecular breeding technology,

failing to make every reasonable effort to sell enough STS soybean seeds to plant at least

10,000,000 acres by 1999, failing to produce 6,000,000 Units (+/- 2%) of STS soybean seeds

for sale in 1999, failing to produce sufficient stock for the production of up to 5,000,000

Units of STS soybean seeds in 1999, and at least 3,000,000 Units of STS seeds for sale in

2000, failing to coordinate and cooperate with DuPont to market and advertise STS

soybeans, develop demonstration plots for STS soybeans, conduct grower meetings relating

to STS soybeans, carry out further activities relevant to the commercial success of STS

soybeans, and by other conduct which was intended to frustrate and impede the development,

sale and promotion of STS soybean seeds, Asgrow breached the Soybean Agreements and

the Addenda thereto.

    73.    DuPont has been damaged by said breaches of contract.

### THIRD CLAIM FOR RELIEF

### *Breach of Implied Covenant—Asgrow*

    74.    The allegations of paragraphs 1 through 66 are realleged and incorporated

herein by reference.

    75.    Under Delaware law, an implied covenant of good faith and honest conduct

exists in every contract.

    76.    By the various acts and omissions alleged herein, and by other, similar acts

and omissions which were intended to impede and frustrate rather than promote the sale of

STS soybean seeds, Asgrow has breached the implied covenant of good faith and honest

conduct in the Soybean Agreements and the Addenda thereto.

    77.    DuPont has been damaged by said breach.

### FOURTH CLAIM FOR RELIEF

### *Joint Venture and Breach of Fiduciary Duty—Asgrow*

    78.    The allegations of paragraphs 1 through 66 are realleged and incorporated

herein by reference.

    79.    The Soybean Agreements, by, *inter alia*, providing for the joint control of the

enterprise created by the Agreements, a common interest in the enterprise between DuPont

and Asgrow, and a sharing of the profits of the enterprise between DuPont and Asgrow,

created a joint venture.

80.   As a joint venturer, Asgrow had, and continues to have, fiduciary duties toward DuPont. Asgrow is required to act toward DuPont, in the conduct of the joint venture, with the highest degree of loyalty and good faith, and to use its best efforts and the highest degree of care to achieve the goals and objectives of the joint venture.

81.   Through the acts and omissions alleged herein, and other similar acts and omissions, Asgrow has breached its fiduciary duties toward DuPont.

82.   DuPont has been damaged by Asgrow's breach of its fiduciary duties.

### FIFTH CLAIM FOR RELIEF

#### Tortious Interference With Contract—Monsanto

83.   The allegations of paragraphs 1 through 66 are realleged and incorporated herein by reference.

84.   Monsanto has tortiously interfered with the Soybean Agreements between DuPont and Asgrow by directing and encouraging its wholly-owned subsidiary, Asgrow, to breach the Agreement and the Addenda to the Agreement, and has aided and abetted Asgrow's breaches of contract.

85.   Monsanto has also tortiously interfered with DuPont's rights as a joint venturer with Asgrow by encouraging and directing Asgrow to violate its fiduciary duties to DuPont, and has aided and abetted Asgrow in its violation of fiduciary duties.

86.   DuPont has sustained damages as a direct and proximate result of Monsanto's tortious interference with contract and with Asgrow's fiduciary obligations, and Monsanto's aiding and abetting Asgrow in its breach of contract and violation of its fiduciary duties.

FILE No.010 04/12 '00 03:36   ID:LANIER 51121FD          FAX:                    PAGE 14
                                                     +914-694-2966    T-153  P.023/026  F-261
Mar-31-2000 10:54am  From-LAH-E1RG

## SIXTH CLAIM FOR RELIEF

### *Interference with Prospective Business Opportunity*

87.     The allegations of paragraphs 1 through 66 are realleged and incorporated

herein by reference.

88.     As alleged herein, DuPont had a prospective business opportunity to promote

the development and commercial success of STS soybean seeds, which would have benefited

DuPont's sales of soybean herbicides.

89.     Through the various acts and omissions alleged herein, including but not

limited to Monsanto's interference with Asgrow's contracts with DuPont, its encouragement

of Asgrow to violate its fiduciary duties to DuPont, and its own monopolistic and anti-

competitive practices, Monsanto has intentionally interfered with DuPont's prospective

business opportunity.

90.     DuPont has sustained damages as a direct and proximate result of Monsanto's

interference with prospective business opportunity.

## SEVENTH CLAIM FOR RELIEF

### *Sherman Act § 2—Attempt to Monopolize*

91.     The allegations of paragraphs 1 through 66 are realleged and incorporated

herein by reference.

92.     Through the various wrongful acts alleged herein and others, including,

without limitation, procuring the breach of the Soybean Agreements by Asgrow for the

purpose of suppressing the production of STS soybean seeds; tying the sale of Roundup and

Roundup Ultra herbicides to the sale of Roundup Ready soybean seeds; entering into tying

FILE No.C10 04/12 '00 03:36    ID:LANIER 5112'FD    FAX:    PAGE 15

.r-81-2000 10:54am   From-LAW-EING    +814-894-2985    T-156  P.024/028  F-261

and exclusive dealing agreements with seed and chemical dealers and distributors; and
obtaining market power in the soybean seed market and leveraging that market power to
control the market for soybean herbicides, Monsanto has engaged in predatory and
exclusionary conduct with the specific intent of monopolizing the relevant markets. As a
result of Monsanto's predatory actions as alleged herein, there is a dangerous probability that
it will monopolize the relevant markets.

93.    As a direct and proximate result of Monsanto's attempted monopolization,
competition in the relevant markets has been injured, and DuPont has been injured.

94.    Monsanto's scheme adversely affects interstate commerce in violation of
Section 2 of the Sherman Act, 15 U.S.C. § 2.

### EIGHTH CLAIM FOR RELIEF

### Sherman Act § 2—Monopolization

95.    The allegations of paragraphs 1 through 66 are realleged and incorporated
herein by reference.

96.    Through the various wrongful acts alleged herein and others, including,
without limitation, procuring the breach of the Soybean Agreements by Asgrow for the
purpose of suppressing the production of STS soybeans; tying the sale of Roundup and
Roundup Ultra herbicide to the sale of Roundup Ready soybean seeds; entering into tying
and exclusive dealing agreements with seed and chemical dealers and distributors; and
obtaining market power in the soybean seed market and leveraging that market power to
control the market for soybean herbicides, Monsanto has engaged in predatory and
exclusionary conduct with the specific intent of monopolizing the relevant markets, and has
in fact achieved monopoly power in the relevant markets.

97.  As a direct and proximate result of Monsanto's monopolization, competition in the relevant markets has been injured, and DuPont has been injured.

98.  Monsanto's scheme adversely affects interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## NINTH CLAIM FOR RELIEF

### Clayton Act § 3 and Sherman Act § 1—Exclusive Dealing and Unlawful Tying

99.  The allegations of paragraphs 1 through 66 are realleged and incorporated herein by reference.

100.  Through the various wrongful acts alleged herein and others, including, without limitation, wrongfully tying the purchase of Roundup herbicide to the purchase of Roundup Ready seed through the TVP Rewards program; economically coercing seed dealers to sell 90% Roundup Ready seeds; and obtaining market power in the soybean seed market, and using that market power to control the market for soybean herbicides, Monsanto has precluded and limited competition in the relevant markets.

101.  As a direct and proximate result of Monsanto's exclusive dealing and tying arrangements, competition in the relevant markets has been injured, and DuPont has been injured.

102.  Monsanto's unlawful conduct adversely affects interstate commerce, in violation of § 3 of the Clayton Act and § 1 of the Sherman Act.

## TENTH CLAIM FOR RELIEF

### Sherman Act §§ 1 and 2—Conspiracy in Restraint of Trade

103.  The allegations of paragraphs 1 through 66 are realleged and incorporated herein by reference.

24

conspired to restrain trade and to monopolize the soybean seed and soybean herbicide markets by, *inter alia*, suppressing the production of STS soybeans and facilitating the monopolization of the soybean seed market by Roundup Ready soybeans by misappropriating DuPont's proprietary molecular breeding technology.

105.   As a direct and proximate result of defendants' combination and conspiracy in restraint of trade and conspiracy to monopolize the relevant markets, competition in the relevant markets has been injured, and DuPont has been injured.

106.   Defendants' conduct adversely affects interstate competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### ELEVENTH CLAIM FOR RELIEF

#### *Clayton Act § 7 - Acquisition of Asgrow*

107.   The allegations of paragraphs 1 through 66 are realleged and incorporated herein by reference.

108.   Because of the conduct alleged herein, Monsanto's acquisition of Asgrow has substantially lessened competition and has tended to create monopolies both in the soybean seed market and in the soybean herbicide market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

109.   As a direct and proximate result of Monsanto's violation of Clayton Act § 7, DuPont has been injured and is entitled to legal and equitable relief, including but not limited to recovery of damages and the divestiture of Asgrow by Monsanto.

25

FILE No.010 04/12 '00 03:37   ID:LANIER 5112TFD          FAX:    |                    PAGE 18

Mar-31-2000  10:55am   From-LAN-ENG                  +314-094-2005       T-168  P.027/028  F-281

**WHEREFORE**, plaintiff DuPont respectfully requests that this Court:

(1)    Award DuPont damages for Asgrow's breach of contract, breach of the implied covenant of good faith and honest conduct, and breach of its fiduciary duties to DuPont;

(2)    Award DuPont damages for Monsanto's tortious interference with contract and with prospective business opportunity;

(3)    Adjudge and decree that Monsanto has engaged in unlawful conduct in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and §§ 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18;

(4)    Award DuPont treble damages plus attorneys' fees and costs of suit, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15;

(5)    Award DuPont damages for defendants' misappropriation of DuPont's trade secrets, pursuant to 6 Del. C. § 2003;

(6)    Order that all profits earned by Monsanto on the sale of Roundup Ready soybeans and Roundup and Roundup Ultra herbicides, as a result of Asgrow's misappropriation of DuPont's trade secrets and application of such trade secrets to the development of Roundup Ready soybeans, be disgorged by Monsanto and paid to DuPont;

(7)    Order that Monsanto divest itself of Asgrow;

(8)    Order that Asgrow turn over to DuPont, free of any claim for royalties or any form of compensation, all germplasm for all STS seed varieties, for DuPont's future use and development in its sole discretion;

(9)    Enjoin Monsanto against continuing its anticompetitive and monopolistic practices in the soybean seed and soybean herbicide markets as alleged herein;

26

FILE No.010 04/12 '00 03:37   ID:LANIER 5112 FD            FAX:                    PAGE 19

Mar-31-2000  10:55am   From-LAW-EING                    +314-864-2886        T-158  P.026/026  F-281

Aagrow for their conduct as alleged herein; and

(11)   Grant such further relief at law or in equity, as the Court deems just and

appropriate.


CONNOLLY, BOVE, LODGE & HUTZ

Rudolf E. Hutz (#484)
George Pazuniak (#478)
Thomas A. Stevens (#3039)
1220 Market Street
Post Office Box 2207
Wilmington, Delaware 19899-2207
(302) 658-9141
*Attorneys for Plaintiff E. I. Du Pont
De Nemours and Company*

OF COUNSEL:

FAEGRE & BENSON LLP

John D. French,
John H. Hinderaker,
Brian B. O'Neill,
Gerard M. Nolting,
2200 Norwest Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
(612) 336-3000
*Attorneys for Plaintiff E. I. Du Pont
De Nemours and Company*

Dated:  March 30, 2000

84732

27

# EXHIBIT 3

FILED

MAR 27 2000

LARRY W. PROPES, CLERK
FLORENCE, S.C.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
(Florence Division)**

E. I. DU PONT DE NEMOURS AND
COMPANY,

                Plaintiff,

vs.

MONSANTO COMPANY,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT AND
JURY DEMAND**

Civil Action No. 4:00- 953-23

      Plaintiff E. I. du Pont de Nemours and Company ("DuPont") for its Complaint against Monsanto Company ("Monsanto") alleges as follows:

### THE PARTIES

      1.     Plaintiff DuPont is a Delaware corporation with its principal place of business in Wilmington, Delaware. DuPont is a global science company, offering science-based solutions in the aerospace, agricultural, automotive, packaging and pharmaceutical industries, among others. DuPont's Agricultural Enterprise segment includes crop protection, feed, seed, food ingredient and food safety businesses. As used herein, the term "DuPont" refers to DuPont and all of its affiliated and subsidiary corporations.

      2.     Defendant Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto develops and produces agricultural products and pharmaceuticals. As used herein, the term "Monsanto" refers to Monsanto and all of its affiliated and subsidiary corporations.

### JURISDICTION AND VENUE

      3.     This Court has jurisdiction over DuPont's federal antitrust claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the South Carolina state law claims pursuant to 28 U.S.C. § 1367, in that they arise out of the same operative facts as the federal antitrust claims.



4.      This Court has pendent jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all such claims originate from the same nucleus of operative facts as do the federal antitrust claims.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(c), because Monsanto inhabits, transacts business, and has an agent in this District, and is therefore subject to personal jurisdiction in this District.

6.      The goods and services at issue are marketed, shipped and sold in and through interstate commerce. The anticompetitive acts alleged herein have substantially affected interstate commerce.

FACTS

**A.      The Cotton Seed and Herbicide Businesses**

7.      Cotton is a crop cultivated for its fiber, which in turn is used to manufacture, among other things, fabrics for apparel. In 1999, approximately 14.6 million acres of cotton were grown in the United States. Cotton is grown primarily in the southern portions of the United States, which have the optimum climate for this crop.

8.      Like most crops, cotton production can be impaired by weeds. In order to control weeds, growers generally must use significant amounts of herbicides. This is particularly true in the Southern and Southeastern cotton-growing regions. Herbicides are chemical compounds used to destroy or inhibit the growth of undesirable plants. Herbicides usually are used as part of a field maintenance program, either prior to or in conjunction with the planting and growing of the crop, to reduce or eliminate weed growth.

9.      Herbicides are used on cotton fields to control weeds that reduce crop yield or quality. As a general matter, these herbicides can be classified by type of activity: (i) *selective herbicides* are tolerated by the crop but will kill or suppress one or more weeds that infest the crop, and (ii) *non-selective herbicides* are active on all vegetation that is present at the time of application, including the crop. Non-selective herbicides do not distinguish between a commercial crop such as cotton and other vegetation such as weeds.

2

10.    No single selective herbicide controls all types of weeds with equal effectiveness. Growers often apply a combination of selective herbicides, either at the same time or in sequence, to control important target weeds. Selective herbicides are usually classified by (i) the kind of weeds they control (e.g., grass or broadleaf), the timing of the application (pre-emergence or post-emergence of the crop), and (iii) the length of time the herbicide controls weeds (residual control).

11.    DuPont and Monsanto are both manufacturers and sellers of agricultural chemicals, including herbicides. Their products compete in a number of markets, including cotton. At all times material to this action, DuPont and Monsanto have marketed competing herbicides for use on cotton.

12.    Monsanto has for a number of years manufactured a herbicide that it markets under the trademark "Roundup". The active ingredient in Roundup is glyphosate. Glyphosate *per se* and various salts of glyphosates are unpatented articles of commerce. Monsanto uses the isopropylanine salt of glyphosate in Roundup. Monsanto has a patent on this form of glyphosate, which is due to expire in September 2000.

13.    More recently, Monsanto introduced a glyphosate herbicide called "Roundup Ultra". In addition to the isopropylanine salt of glyphosate, Roundup Ultra also contains a surfactant. As used herein, "Roundup" brand herbicides includes both Roundup and Roundup Ultra.

14.    Roundup is today the largest-selling herbicide in the world. Prior to 1997, however, Roundup was not widely used on cotton. On information and belief, its share of the cotton herbicide market in 1996 was approximately 8 per cent. Roundup's utility on cotton was limited by the fact that its active ingredient, glyphosate, kills cotton. That is because glyphosate is a systemic, non-selective herbicide. It provides no residual control. Thus, prior to 1997, Roundup's use on cotton was limited for the most part to non-selective, pre-emergent applications (i.e., burndown).

15.    DuPont manufactures and sells a selective, pre- and post-emergent cotton

3

herbicide under the trademark "Staple". Staple provides very effective residual control and a single application typically provides season long control. In comparison, glyphosate provides no residual control, thus requiring multiple applications during the growing season. Staple is particularly effective in controlling broadleaf weeds, and therefore is well suited to be used in combination with glyphosate, which is more effective on grasses than it is on certain broadleaf weeds.

16.     Taking advantage of the complementary properties of Staple and glyphosate, Dupont also sells a cotton herbicide under the trademark "Staple Plus", which is a combination or "co-pack" of Staple and glyphosate. Staple Plus is sold as a container of glyphosate with Staple enclosed in a soluble pack. Staple Plus is superior to glyphosate alone when used with the genetically modified cotton seeds and crops described below because it provides better initial weed control and can reduce the number of herbicide applications necessary during the growing season. A single application of Staple Plus can replace the need for multiple applications when glyphosate alone is used, thus providing growers better grass and broadleaf weed control at significant savings in time and money. Both Staple and Staple Plus compete with Roundup in the cotton market.

17.     DuPont has for many years manufactured and sold a class of herbicides known as sulfonylureas ("SU"). SUs provide a broad range of weed control. SUs are very active compounds. They are effective at lower rates of application and have high safety margins compared to many competing herbicides. Many SUs are selective while others are non-selective. They generally have good residual control. Growers have used combinations of DuPont SUs for both pre-emergent and post-emergent application for weed control. Certain DuPont SUs compete with Roundup for "burndown" applications in the cotton markets.

**B.     Genetically Modified Seed Technology**

18.     Biotechnology has made it possible to introduce new genetic characteristics into a given plant seed. Through genetic modification, a characteristic or trait of the seed is altered by transferring an individual gene or DNA to the seed genome, and consequently altering the

4

characteristics of the crop grown from the seed. Through use of this technology, a crop can be given a trait that makes it resistant to or tolerant of certain herbicides or insects.

19.   On information and belief, Monsanto has patented technology to make certain plants, including cotton, tolerant of herbicides containing glyphosate as the active ingredient. Monsanto's patents relate to the glyphosate resistant trait, the process by which it is produced and the use of Roundup glyphosate with plants containing this trait.

20.   In 1992, Monsanto began a collaboration with Delta & Pine Land Company ("Delta & Pine") to produce a genetically modified form of cotton seed that produces cotton plants resistant to glyphosate. At all times relevant hereto, Delta & Pine has had market power in the cotton seed market, currently controlling approximately 85 percent of the domestic cotton seed market and its supply of elite germplasm.

21.   As a result of this collaboration, Delta & Pine was able to produce cotton seed that was tolerant of glyphosate, which allowed Roundup to be applied post-emergence, or "over the top" of a cotton crop, without destroying the cotton plants. These glyphosate-resistant cotton varieties are marketed under the Monsanto trademark "Roundup Ready". Monsanto has licensed Delta & Pine to produce Roundup Ready cotton seed.

22.   Monsanto also has patented technology to make certain plants, including cotton, tolerant of certain insects. Using this technology, cotton seeds are genetically modified by transferring the gene for Bacillus thuringensis (Bt) to the cotton seed genome. As a result, Bt cotton seeds produce cotton crops which are insect resistant. Monsanto has licensed Delta & Pine to produce Bt cotton seeds, which were first marketed in 1996 under the Monsanto trademark "Bollgard".

23.   Roundup Ready seeds were first sold to cotton growers on a commercial basis in 1997. Since then, the number of acres planted with Roundup Ready cotton seeds has grown explosively. By 1999, Roundup Ready cotton seeds accounted for nearly six million of the 14.6 million acres of cotton grown in the United States in that year. On information and belief, in the year 2000, Roundup Ready seeds are expected to comprise approximately 50 percent of the

5

cotton seed market. Concomitantly, on information and belief, Roundup herbicide market shares in the cotton market soared from 8 percent prior to 1997 to approximately 50 percent today.

24.    Monsanto has entered into agreements with cotton seed producers for the purpose, and with the effect, of excluding competitors from the cotton herbicide market.

## C.    Monsanto's Tying the Use of Roundup Ready Seeds to the Purchase of Roundup Brand Glyphosate

25.    Glyphosate-resistant seeds and glyphosate herbicides are separate and distinct products for which there is a separate and independent demand by purchasers. Growers and other consumers purchase and might wish to purchase Roundup Ready cotton seeds separately without also purchasing Roundup brand herbicide.

26.    When it first commercialized Roundup Ready cotton seeds in 1997, Monsanto conditioned the grant of a license to use its patented Roundup Ready seed technology on the grower's agreement to purchase and use only Monsanto's Roundup brand glyphosate. Growers who wanted to use the patented Roundup Ready seed could do so only by executing a Technology Agreement that required them to use only Roundup brand glyphosate with the Roundup Ready seed they purchased. In about 1999, Monsanto modified the Technology Agreement to condition the license on the growers' use of Roundup brand glyphosate, or another glyphosate herbicide authorized by Monsanto.

27.    On information and belief, cotton seed producers who wanted to produce and sell Roundup Ready cotton seed were required by Monsanto to obtain a patent license that obligated them to use and promote only Roundup brand glyphosate for use with the Roundup Ready seed they produce or sell.

28.    The purpose and effect of these agreements was to tie the patented Roundup Ready seed to the purchase of Roundup glyphosate, even if the growers and seed producers, dealers and distributors preferred to buy, use or sell other available herbicides, including herbicides manufactured and/or sold by DuPont.

6

29.    For the 2000 growing season, Monsanto has continued its practice of tying Roundup Ready seeds to the purchase of Roundup herbicide. Monsanto's Technology Agreements for 2000 require growers to use only Roundup Ultra brand herbicides (or another herbicide brand authorized by Monsanto) for application on Roundup Ready crops, if the grower uses a glyphosate herbicide. In addition, Monsanto has implemented a complex scheme of economic coercion that has the effect of tying the purchase of Roundup Ready seeds to the purchase of Roundup herbicide even more effectively.

30.    Herbicide dealers and distributors who buy Roundup brand glyphosate are subject to a variety of requirements, including the requirement that a stipulated percentage (frequently as high as 90%) of all glyphosate sold by them must be Roundup. Monsanto pays rebates to herbicide dealers and distributors, based on the market share of Monsanto herbicides sold by the dealer. Markups by Monsanto dealers and distributors are generally small or nonexistent, and most profits are made in the form of rebates from Monsanto. Under Monsanto's arrangements with its dealers and distributors, if Monsanto's share of the dealer's or distributor's total sales of glyphosate falls below the stipulated percentage, the dealer or distributor forfeits all or a substantial portion of the rebates otherwise payable on all of its Roundup sales. In some instances, Monsanto is deliberately vague as to the percentage of glyphosate that must be Roundup, so that dealers and distributors are deterred from selling competing brands of glyphosate at all. Monsanto imposes a number of additional requirements and restrictions on dealers, including the requirement that all bulk sales of glyphosate must be Roundup. The effect of these and other, related practices is to foreclose competitors from a substantial portion of the market for herbicides applied to cotton.

31.    With respect to cotton growers, Monsanto has tied the sale of Roundup Ready seed to the use of Roundup brand herbicide through the use of Technology Agreements that require the payment of a "technology fee". This technology fee is paid by the grower when he buys a bag of Roundup Ready cotton seed and/or Bollgard Bt cotton seed. The technology fee represents a substantial part of the cost of the seeds themselves, and purportedly compensates

7

Monsanto for the benefits conferred by Monsanto's patented gene modification technology. In fact, the technology fee is part of Monsanto's scheme to monopolize the cotton herbicide market.

32.    The technology fee provides only one benefit to the cotton grower, beyond the purchase of the cotton seed itself. Purchase of Roundup Ready cotton and payment of the associated technology fee entitles the grower to participate in Monsanto's "TVP Rewards" program. The TVP Rewards program includes, *inter alia*, an insurance program whereby, if the grower's crop is lost for any reason (e.g., flood, hail, etc.) Monsanto will pay the grower the cost of seeds necessary for replanting, and will not charge the grower a technology fee on the replant seeds. This insurance program is of benefit to purchasers of Roundup Ready genetically modified seeds, but its value represents only a fraction of the technology fee charged by Monsanto.

33.    Under Monsanto's TVP Rewards program for the 2000 growing season, if the cotton grower uses any glyphosate or systemic, non-selective herbicide other than Roundup on his cotton crop, he loses his rights under Monsanto's insurance program, the only tangible benefit he receives from Monsanto's technology fee. Thus, the technology fee is part of Monsanto's scheme to monopolize the cotton herbicide market. It serves to tie the purchase of Roundup Ready seed to the purchase of Roundup herbicide, and thereby forecloses competitors from a substantial portion of the cotton herbicide market.

34.    The economic coercion detailed above, which is directed at distributors, dealers and growers, has had the effect of foreclosing competition in the cotton herbicide market and preventing DuPont and other competitors from selling glyphosate and other herbicides on acres planted with Roundup Ready cotton.

**D. DuPont's Glyphosate Supply Agreement**

35.    Monsanto's patent on the isopropylamine salt of glyphosate expires in September 2000. In contemplation of the expiration of this patent, Monsanto has taken a number of actions, including a) marketing and heavily promoting Roundup Ultra, which remains under patent for several more years beyond Roundup; b) reducing the price of Roundup; and c) entering into

8

supply agreements with DuPont and other chemical companies to supply glyphosate, and licensing them to produce and sell herbicides containing Monsanto glyphosate under their own brand names.

36.    In December 1999, DuPont and Monsanto entered into a supply agreement whereby DuPont agreed to purchase glyphosate from Monsanto for sale under its own brand name.

37.    At the same time that it was entering into the agreements with DuPont and other chemical companies whereby it would sell them glyphosate, Monsanto was planning to continue and strengthen its illegal tying arrangement between Roundup Ready seed and Roundup herbicide, in a way that would make it economically unfeasible for dealers to stock significant quantities of glyphosate sold by Monsanto's competitors, including those who buy glyphosate from Monsanto, or for growers to buy glyphosate and other herbicides sold by Monsanto's competitors.

38.    The various actions detailed herein, and other similar and related actions which are ongoing at the present time, have been carried out by Monsanto for the purpose and with the intent of monopolizing the market for cotton herbicides in the United States.

39.    Through the various means detailed herein, and other related and similar means, Monsanto has successfully sought to leverage its market power in the cotton seed market into a similar position of market power in the cotton herbicide market.

40.    As a direct and proximate result of Monsanto's conduct as alleged herein, DuPont has sustained damages in that its sales of cotton herbicides, and profits from the sales of cotton herbicides, have been reduced.

## THE RELEVANT MARKETS

41.    The markets relevant to DuPont's antitrust claims include:  a) the market for cotton seeds, in which Monsanto has market power; and b) the market for herbicides used on cotton crops, in which Monsanto also has market power.

42.    The relevant geographic market is the United States of America.

9

43.    Monsanto has market power, and dangerously threatens to achieve monopoly power, in each of the relevant markets.  Upon information and belief, as of 1999 Monsanto controlled at least 40 percent of the market for cotton seeds, and an even higher percentage in the Southern and Southeastern states where most herbicides are used, and this proportion is rising rapidly.  Upon information and belief, as of 2000 Monsanto's Roundup herbicide will have in excess of 40 percent of the market for cotton herbicides.

### FIRST CLAIM FOR RELIEF

#### *Clayton Act § 3 and Sherman Act § 1--Exclusive Dealing and Unlawful Tying*

44.    The allegations of paragraphs 1 through 43 are realleged and incorporated herein by reference.

45.    Through the various wrongful acts alleged herein and others, including, without limitation, wrongfully conditioning a patent license to use patented genetically modified seed on the purchase of Roundup herbicide; tying the purchase of Roundup herbicide to the purchase of Roundup Ready seed through economic coercion; excluding competitors from the market for glyphosate herbicides through exclusive dealing arrangements; and obtaining market power in the cotton seed market, and using that market power to control the market for cotton herbicides, Monsanto has precluded and limited competition in the relevant markets.

46.    As a direct and proximate result of Monsanto's exclusive dealing and tying arrangements, competition in the relevant markets has been injured, and DuPont has been injured.

47.    Monsanto's unlawful conduct adversely impacts interstate commerce, in violation of § 3 of the Clayton Act and § 1 of the Sherman Act.

### SECOND CLAIM FOR RELIEF

#### *Sherman Act--§ 2--Attempt to Monopolize*

48.    The allegations of paragraphs 1 through 43 are realleged and incorporated herein by reference

49.    Through the various wrongful acts alleged herein and others, including, without limitation, wrongfully conditioning a license to use patented genetically modified cotton seed on the purchase of Roundup herbicide; tying the purchase of Roundup herbicide to the purchase of Roundup Ready seed through economic coercion; excluding competitors from the market for glyphosate herbicides through exclusive dealing arrangements; and obtaining market power in the cotton seed market and using that market power to control the market for cotton herbicides, Monsanto has engaged in predatory and exclusionary conduct with the specific intent of monopolizing the relevant markets.

50.    Monsanto's scheme poses the dangerous probability that, left unrestrained by this Court, it will achieve monopoly power in the relevant markets.

51.    As a direct and proximate result of Monsanto's attempted monopolization, competition in the relevant markets has been injured, and DuPont has been injured.

52.    Monsanto's scheme adversely affects interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### THIRD CLAIM FOR RELIEF

#### *Sherman Act—§ 2—Monopolization*

53.    The allegations of paragraphs 1 through 43 are realleged and incorporated herein by reference.

54.    Through the various wrongful acts alleged herein and others, including, without limitation, wrongfully conditioning a license to use patented genetically modified cotton seed on the purchase of Roundup herbicide; wrongfully tying the purchase of Roundup herbicide to the purchase of Roundup Ready seed through economic coercion; excluding competitors from the market for glyphosate herbicides through exclusive dealing arrangements; and obtaining market power in the cotton seed market, and using that market power to control the market for cotton herbicides, Monsanto has engaged in predatory and exclusionary conduct with the specific intent of monopolizing the relevant markets, and has in fact achieved monopoly power in the relevant markets.

11

55.    As a direct and proximate result of Monsanto's monopolization, competition in the relevant markets has been injured, and DuPont has been injured.

56.    Monsanto's scheme adversely affects interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### FOURTH CLAIM FOR RELIEF

#### *Unfair Competition*

57.    The allegations of paragraphs 1 through 43 are realleged and incorporated herein by reference.

58.    Monsanto's illegal conduct in, *inter alia*, unlawfully conditioning a patent license to use patented genetically modified cotton seed on the purchase of Roundup glyphosate; tying the sale of Roundup Ready cotton seed to the sale of Roundup herbicide; engaging in the other exclusionary practices described above; and entering into long term supply agreements with DuPont and other chemical companies for glyphosate, knowing that the illegal conduct described above would effectively exclude these other competitors from the intended markets for herbicides containing glyphosate, constitutes unfair competition.

59.    As a direct and proximate result of Monsanto's unfair competition, DuPont has been damaged.

### FIFTH CLAIM FOR RELIEF

#### *South Carolina Unfair Trade Practices Act*

60.    The allegations of paragraphs 1 through 43 are realleged and incorporated herein by reference.

61.    Monsanto's actions as alleged herein constitute unfair methods of competition and unfair and deceptive acts or practices in the conduct of trade or commerce, within the meaning of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10 *et seq.*

62.    Monsanto knowingly and willfully violated the South Carolina Unfair Trade Practices Act.

63.    Pursuant to the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-140. DuPont is entitled to recover three times the damages it has sustained as a result of Monsanto's conduct, together with its attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DuPont respectfully requests that this Court:

(1) Adjudge and declare that Monsanto has engaged in unlawful conduct in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 3 of the Clayton Act, 15 U.S.C. § 14;

(2) Award DuPont treble damages plus attorneys' fees and costs of suit, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15. and pursuant to the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10 *et seq.*;

(3) Enjoin Monsanto from continuing its illegal and anticompetitive actions as alleged herein; and

(4) Grant such further relief at law or in equity as the Court deems just and appropriate.

PLAINTIFF DEMANDS A TRIAL BY JURY OF ITS CLAIMS.

HAYNSWORTH, MARION, McKAY & GUERARD, L.L.P.

By: _____
Stephen F. McKinney. #3790
1201 Main Street, Suite 2400
Post Office Drawer 7157
Columbia, SC  29202

Of Counsel:
FAEGRE & BENSON LLP
John D. French. #31914
John H. Hinderaker, #45305
Brian B. O'Neill. #82521
Gerard M. Nolting, #121319
2200 Norwest Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 336-3000

Columbia, South Carolina
March __27__. 2000

ATTORNEYS FOR
E.I. DU PONT DE NEMOURS AND COMPANY

13

# EXHIBIT 4

FROM RICHARDS, LAYTON & FINGER #"                    (MON) 9. 25' 00 17:25/℃™ 17:23/NO. 4862637247 P  5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RECEIVED

SEP 2 5 2000

G. P. W.

| | |
|---|---|
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| MONSANTO COMPANY and ASGROW SEED COMPANY LLC, | ) ) ) |
| Defendants. | ) ) ) |

Civil File No. 00-359-SLR

## PROTECTIVE ORDER
## REGARDING CONFIDENTIAL INFORMATION

The parties, E. I. du Pont de Nemours and Company ("DuPont"), Monsanto
Company ("Monsanto") and Asgrow Seed Company ("Asgrow"), collectively the "Parties,"
by and through their respective counsel, stipulate to the entry of the following Protective
Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. IT IS HEREBY
ORDERED THAT:

1.    **PROCEEDINGS AND FORM OF INFORMATION GOVERNED**

This Protective Order shall govern any document, information or other thing which is
designated as containing "Confidential Information" as defined herein, and is furnished by
any Party to any other Party in connection with this action. The form of information
protected is any document or form of evidence or discovery contemplated by the Federal
Rules of Civil Procedure and includes, but is not limited to, documents and things, responses
to requests to produce documents or other things, responses to interrogatories, responses to

requests for admissions, deposition testimony and exhibits, and all copies, extracts, summaries, compilations, designations and portions thereof.

## 2.     DEFINITION OF CONFIDENTIAL INFORMATION

a.     The term "Confidential Information" shall be interpreted to mean trade secrets, other confidential and proprietary technical, research or development information, non-public commercial, financial, budgeting and/or accounting information, non-public information about existing and potential customers, marketing studies, performance and projections, non-public business strategies, decisions and/or negotiations, personnel compensation, evaluations and other employment information, and confidential and proprietary information about affiliates, parents, subsidiaries and third parties with whom the Parties to this action have had or contemplate having business relationships.

b.     The scope of this Order shall be understood to encompass not only those items or things which are expressly designated as Confidential Information, but also any information derived therefrom, and all copies, excerpts, and summaries thereof, as well as testimony and oral conversation derived therefrom or related thereto.

## 3.     DESIGNATION OF CONFIDENTIAL INFORMATION

a.     Any information produced in this action that is reasonably believed by the producing Party to contain Confidential Information may be designated as "CONFIDENTIAL" or language to similar effect, as appropriate.

b.     In the event that a Party desires to designate information as "CONFIDENTIAL" which is outside of the categories identified in ¶ 2(a), such Party shall provide notice to the other Party.

-2-

c.      The designation of Confidential Information shall be made at the following time:

(1)     For documents and things, at the time of the production of the documents or things.  However, in the event a producing person or Party elects to produce documents and things for inspection pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, no designation need be made prior to the inspection.  For purposes of the inspection, all documents shall be considered "Confidential."  Upon request for copying, the producing Party shall designate such documents with the appropriate confidentiality marking;

(2)     For written responses to interrogatories or requests for admissions, at the time of the written response;

(3)     For declarations and pleadings, at the time of the filing of such declaration or pleading (see ¶ 9(d));

(4)     For deposition testimony, at the time of the testimony (see ¶ 9(b)) or in writing within thirty (30) days after receipt by the designating Party of the transcript of the deposition.

d.      The designation of Confidential Information shall be made in the following manner:

(1)     For documents, by placing a legend on each page of such document;

(2)     For tangible objects, by placing a label or tag on the object or the container therefor, or if not practicable, as otherwise agreed;

(3)     For written responses to interrogatories or requests for admissions, on the face of any such responses;

(4)    For declarations or pleadings, on the face of any such declaration or pleading; and

(5)    For depositions, following the procedure set forth in ¶ 9(b) or in writing within thirty (30) days after receipt by the designating Party of the transcript of the deposition.

e.    Each Party retains the right to subsequently redesignate documents and to require such documents to be treated in accord with such designations from that time forward.

f.    Should a responding Party determine that a document subject to privilege or immunity from discovery has been produced inadvertently, he or she shall bring it to the attention of the receiving Party. The inadvertently disclosed documents and all copies shall be returned promptly to the responding Party. Such disclosure shall not result in the waiver of any associated privilege, if it is subsequently determined that the document was, in fact, privileged. If a receiving Party believes in good faith that a document subject to privilege or immunity from discovery has been produced inadvertently, he or she shall bring it to the attention of the responding Party.

## 4.    RESOLUTION OF DISPUTES REGARDING DESIGNATION OF CONFIDENTIAL INFORMATION

a.    In the event that any Party disputes the designation of Confidential Information, such Party shall so inform the designating Party by providing written notice, and the Parties shall meet and confer in a good faith effort to resolve the dispute.

b.    In the event that the Parties are unable to resolve a dispute regarding designation of information as "Confidential," the Party disputing the designation may request

appropriate relief from the Court ten (10) business days after the meet and confer session described in 4(a). The burden of establishing that information has been properly designated as "Confidential" is on the Party making such designation. This Protective Order does not alter the burden imposed by law on any Party seeking to uphold any limitation on the production or dissemination of materials.

      c.     Counsel for a non-designating Party shall have the right to assert that any information designated confidential is, in fact, in the public domain. Any information which prior to disclosure hereunder, is either in the possession or knowledge of a non-designating Party or person who, absent this Order, is under no restriction with respect to the dissemination of such Confidential Information, or is public knowledge or which, after disclosure, becomes public knowledge other than through an act or omission of a Party receiving the information designated as confidential, shall be deemed to be in the public domain. A non-designating Party or person asserting that designated Confidential Information is in the public domain shall, prior to any disclosure (outside of the parameters of this Order) of such information previously designated Confidential, either obtain the approval, in writing, of the designating Party, or the approval of the Court to make such disclosure and shall specifically indicate why it believes that the designated information is in the public domain.

## 5.   ACCESS TO "CONFIDENTIAL" INFORMATION

      a.     Access to information marked "Confidential" shall be limited to, and only to, the following "qualified persons":

         (1)    Outside attorneys of record for any Party in connection with this action, and, if the attorney is a member of a law firm of record, the employees and staff of the law

firm who are responsible for assisting in the preparation, trial or appeal of this action and organizations retained by law firms or attorneys of record to any Party to provide litigation and/or consulting or support services in this action. Before any such person or organization is permitted access to any of the Confidential Information, such person shall be informed of the existence and contents of this Protective Order.

(2)     The in-house lawyers for each Party who are actively involved in the assertion of claims or defenses in this action, and their staff, but only for such purposes.

(3)     Independent experts and consultants retained or utilized as expert consultants in this action by the attorneys of record, in so far as the attorneys of record may deem it necessary for the preparation or trial of this case to consult with such experts or consultants. Before any such person is permitted access to any of the Confidential Information, such person shall be informed of the existence and contents of this Protective Order, and the conditions set forth in Paragraph 6 of this Protective Order must be fulfilled.

(4)     The Court and court officials involved in this litigation (including court reporters, persons operating video recording equipment and any special master appointed by Court).

(5)     Such other persons as hereafter may be designated by written agreement of the Parties involved or designated by the Court in the interest of justice. Before any such person is permitted access to any of the Confidential Information, such person shall be informed of the existence and contents of this Protective Order.

(b)     Except as specifically provided herein, no Confidential Information may be disclosed to any employee or representative of any Party; except that the parties may disclose confidential documents and information relating to the alleged use by Asgrow and Monsanto

of RFLP and genetic marker technology, and of soybean varieties that may have benefited from such varieties if, prior to disclosure: (1) the party seeking to make such disclosure notifies the opposing party of the identity of the person to whom disclosure is to be made and the identity of the documents and information to be disclosed, (2) the person to whom disclosure of such documents and information is to be made abides by Paragraph 6(b) of this order, and (3) the opposing party expressly consents, in writing, to such disclosures. Such consent will not unreasonably be withheld. The parties acknowledge that they have not come to agreement on the production and handling of any breeding records as of the date of this Order but commit to continue to negotiate in good faith on this issue.

6.    **DISCLOSURE OF CONFIDENTIAL INFORMATION**

a.    All individuals to whom Confidential Information is to be disclosed shall be informed of the existence of this Order, shall be provided with a copy thereof and shall be instructed that such matter may not be used other than in connection with this litigation and may not be disclosed to anyone other than persons contemplated by this Order.

b.    Before disclosing any document, information or material designated as "Confidential" to any person contemplated herein, each individual, except: (1) outside attorneys of record for the parties in this action who are actively engaged in the conduct of this litigation, and the partners, associates, secretaries, paralegal assistants, agents and employees of such an attorney; (2) in-house counsel and their secretaries, paralegal assistants, agents and employees; and (3) court officials involved in this litigation (including court reporters, persons operating video recording equipment, and any special master appointed by the Court), shall acknowledge in writing in the Declaration attached as Exhibit A that he or she has been informed of this Order and that:

-7-

(1)    The signatory has read and understands this Order;

(2)    The signatory understands that disclosures of the documents and information designated as "Confidential" may constitute contempt of Court; and

(3)    A statement that the signatory consents to the exercise of personal jurisdiction by this Court.

c.    It shall be the obligation of the receiving Party and its counsel to obtain and maintain copies of such acknowledgements.

## 7.    USE OF CONFIDENTIAL INFORMATION GENERALLY

Confidential Information disclosed pursuant to this Protective Order shall be used only for purposes of this litigation and shall be protected from any unauthorized or unrelated use.

## 8.    USE OF CONFIDENTIAL INFORMATION IN CONDUCT OF THIS ACTION

a.    Confidential Information may be used by the attorneys of record in good faith in conducting discovery, provided that the Confidential Information is protected pursuant to the terms and conditions of this Protective Order.

b.    At any deposition session, upon any inquiry with regard to the content of a document marked "Confidential" or when counsel for a Party deems that the answer to a question may result in the disclosure of Confidential Information of his or her client within the meaning of this Order, counsel for the person whose information is involved, at his or her option, in lieu of taking other steps available in such situation, may orally designate the testimony as "Confidential" and may direct that the questions and answers be transcribed separately from the remainder of the deposition and direct that testimony that relates to Confidential Information be filed in a sealed envelope marked in the manner set forth in

-8-

¶ 8(d) hereof. When such a direction has been given, the disclosure of the testimony shall be limited (subject to the provisions of ¶ 4) in the manner specified in ¶¶ 5-7 hereof, and the information contained therein shall not be used for any purpose other than as provided in this Order. Counsel for the person whose Confidential Information is involved may also request that all persons other than the reporter, counsel and individuals authorized under ¶¶ 5-7 hereof leave the deposition room during the confidential portion of the deposition. The failure of such other persons to comply with a request to leave the deposition shall constitute substantial justification for counsel to advise the witness that he or she need not answer the question until the assistance of the Court, Magistrate or Master (as the case may be) is obtained.

c.    Notwithstanding the Parties' designation of Confidential Information, any court hearing which refers to or describes Confidential Information shall in the Court's discretion be held in open court with records unsealed unless there is a specific showing that confidentiality is required. The disclosing Party has the option to request that the proceeding be conducted *in camera*, out of the presence of all unqualified persons and any transcript relating thereto shall, subject to the Court's approval, be designated as confidential.

d.    All information designated as Confidential Information which is filed or lodged with the Court shall be filed or lodged in sealed envelopes on which shall be affixed a copy of the cover page of the document contained therein. The cover page shall include the word "Confidential" and a legend substantially in the following form:

> "This sealed container filed in this case, E. I. Du Pont de Nemours and Company vs. Monsanto Company and Asgrow Seed Company LLC, Case Number 00-359-SLR, contains confidential materials generally identified as "Confidential" pursuant to the Protective Order herein, and this envelope shall

not be opened nor the contents thereof revealed except by the Court including court personnel as necessary for handling of the case, or as directed by further Order of the Court. After any such opening or revelation, the envelope shall be resealed with the contents inside."

If the court clerk shall refuse to lodge or file a sealed pleading or memorandum, the Party attempting to file or lodge the pleading or memorandum shall not be prejudiced from refiling an unsealed version of the pleading or memorandum as soon as reasonably practicable, and seeking to have such pleading or memorandum sealed through a motion. Upon default of the filing or lodging Party properly to designate Confidential Information and file or lodge such information in accordance with this Protective Order, any Party who in good faith believes that designation and filing under seal is required may do so within ten (10) days of learning of the defective filing or lodging. Notice of such designation shall be given to all Parties.

9.    **PARTY'S OWN INFORMATION**

The restrictions on the use of Confidential Information established by this Protective Order are applicable only to the use of Confidential Information received by a Party from another Party. A Party is free to do whatever it desires with its own Confidential Information.

10.    **DISCLOSURE TO AUTHOR OR ADDRESSEE**

Nothing herein shall prohibit a Party, or its counsel, from disclosing a document which contains Confidential Information to the person who is an author, addressee or recipient of such document.

## 11.    RENDERING ADVICE TO CLIENTS

Nothing in this Protective Order shall bar or otherwise restrict any attorney from rendering advice to his client with respect to this litigation and, in the course of rendering advice, referring to or relying generally on the examination of Confidential Information produced or exchanged; provided however, that in rendering such advice and in otherwise communicating with his client, the attorney shall not disclose the contents of any Confidential Information produced by another Party if that disclosure would be contrary to the terms of this Protective Order.

## 12.    NO WAIVER

Other than as specified herein the taking of or the failure to take any action to enforce the provisions of this Protective Order, or the failure to object to any designation or any such action or omission, shall not constitute a waiver of any right to seek and obtain protection or relief in this action or any other action, such right including, but not limited to, the right to claim that any information is or is not proprietary to any Party, is or is not entitled to particular protection or that such information does or does not embody Confidential Information of any Party. The procedures set forth herein shall not affect the rights of Parties to object to discovery on grounds other than those related to trade secrets or proprietary information claims, nor shall it relieve a Party of the necessity of proper response to discovery.

## 13.    NO PROBATIVE VALUE

This Protective Order shall not abrogate or diminish any contractual, statutory or other legal obligation or right of any Party or person with respect to any Confidential Information. The fact that information is designated "Confidential Information" under this

Protective Order shall not be deemed to be determinative nor probative of what a trier of fact may determine to be confidential or proprietary in this or any other action. This Order shall be without prejudice to the right of any Party to bring before the Court the question of: (a) whether any particular material is or is not confidential; (b) whether any particular information or material is or is not entitled to a greater or lesser degree of protection than provided hereunder; (c) whether any particular information or material is or is not relevant to any issue of this case, provided that in doing so the Party complies with the foregoing procedures. Absent a stipulation of all Parties, the fact that information has been designated "Confidential" under this Order shall not be admissible during the trial of this action, nor shall the jury be advised of such designation. The fact that any information is disclosed, used or produced in discovery or trial herein shall not be construed in any action or proceeding before any court, agency or tribunal, as evidence of whether such information is confidential or proprietary.

## 14.    TERMINATION OF LITIGATION

Within one hundred twenty (120) days of the final disposition of the above entitled case, whether by judgment and exhaustion of all appeals, or by settlement, the attorneys of record:

(1)    Shall destroy or return to the disclosing Party, or its attorney of record, the Confidential Information in their possession, custody or control or in the possession, custody or control of their staff.

(2)    Shall insure that all the Confidential Information in the possession, custody or control of their experts and consultants, is destroyed or returned to the disclosing Party, or its attorney of record;

FROM RICHARDS, LAYTON & FINGER #7    (MON) 9. 25' 00 17:28/  17:23/NO. 4862637247 P 17

(3)    Shall destroy all notes, memoranda or other documents which contain excerpts from any of the Confidential Information; and

(4)    Shall deliver to the disclosing Party, or its attorney of record, written confirmation that there has been compliance with the terms of this paragraph or that there has not been compliance and the reason for such noncompliance, upon receipt of which the disclosing Party may make application to the Court for such further order as may be appropriate.

Notwithstanding the foregoing, either Party may retain copies of any material filed with the Court.

## 15.    ENFORCEMENT OF THIS PROTECTIVE ORDER

This Protective Order shall survive the final conclusion of the action and the Court shall have jurisdiction to enforce this Order beyond the conclusion of this action.

## 16.    MODIFICATION OF THIS PROTECTIVE ORDER

In the event any Party hereto seeks a court order that in any way seeks to vary the terms of this Protective Order, said Party shall make such request in the form of a written stipulation, or noticed motion to all Parties that must be served and filed in accordance with local court rules.

Dated: _____

_____
Honorable Sue L. Robinson
UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

M2:20319938.01

-13-

FROM RICHARDS, LAYTON & FINGER #"                    (MON) 9.25'00 17:28/⌐⌐ 17:23/NO. 4862637247 P 18

## STIPULATED AND AGREED TO:

Dated: August 22 , 2000

_(signature)_

Thomas A. Stevens, , Esquire, #3039
CONNOLLY BOVE LODGE & HUTZ LLP
1220 N. Market Street
P.O. Box 2207
Wilmington, Delaware 19899
Telephone:   (302) 884-6583
Fax:   (302) 658-5614

_(signature)_

John H. Hinderaker, Esquire
FAEGRE & BENSON, LLP
2200 Norwest Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:   (612) 336-3000
Fax:   (612)336-3026

Attorneys for Plaintiff E.I. du Pont de Nemours
and Company

M2:20319938.01

-14-

**STIPULATED AND AGREED TO:**

Dated: August 24 , 2000

*[signature]*

Marguerite Willis
Wilburn Brower, Fed ID No.: 1463
Val H. Stieglitz, Fed ID No.: 4318
Nikole Setzler Mergo, Fed ID No.: 7410
NEXSEN PRUET JACOBS & POLLARD, LLP
1441 Main Street, Suite 1500
Post Office Drawer 2426
Columbia, SC  29202
Telephone:    (803) 253-8265
Fax:    (803) 253-8277

*[signature]*

Gregory P. Williams
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
Telephone:    (302) 651-7734 Direct
Fax:    (302) 658-6548


Of Counsel,

Ernest A. Sellers
James W. Prevatt, Jr.
SELLERS & PREVATT
105 N. Ohio Avenue
Live Oak, FL  32060
Telephone: (904) 362-4437

Kenneth A. Letzler
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C.  20004
Telephone: (202) 942-5921

Attorneys for Defendants Monsanto Company
and Asgrow Seed Company, LLC

M2:20319938.01

FROM RICHARDS, LAYTON & FINGER #⌐                    (MON) 9. 25'00 17:28 ⌐⌐ 17:23/NO. 4862637247 P 20

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| E. I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil File No. 00-359-SLR |
| MONSANTO COMPANY and ASGROW SEED COMPANY LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION REGARDING
## RECEIPT OF CONFIDENTIAL INFORMATION

I, _____, declare as follows:

1.    I have been provided and I have read a copy of the Protective Order Regarding Confidential Information entered in this matter and understand its contents.

2.    I understand that unauthorized disclosure of documents and information designated as "CONFIDENTIAL" contrary to the terms of the Protective Order regarding Confidential Information may constitute contempt of Court.

3.    I consent to the exercise of personal jurisdiction by this Court in Delaware in connection with this matter.

4.    I declare under penalty of perjury that the foregoing is true and correct.

FROM RICHARDS, LAYTON & FINGER #"        (MON) 9. 25' 00 17:29 ⁻  17:23/NO. 4862637247 P 21

Dated:_____        _____
                                              Declarant

M2:20319938.01

17

# EXHIBIT 5

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

**NOV 2 0 2000**

LARRY W. PROPES, CLERK
FLORENCE. S. C.

E.I. DuPont De Nemours and Company,

      Plaintiff,

vs.

Monsanto Company,

      Defendant.

CASE NO.: 4:00-952-23

**ENTERED**
11-21-00 *fon*

## AMENDED PROTECTIVE ORDER
## REGARDING CONFIDENTIAL INFORMATION

The parties, E. I. du Pont de Nemours and Company ("DuPont") and Monsanto

Company ("Monsanto"), collectively the "Parties," by and through their respective counsel,

stipulate to the entry of the following Amended Protective Order pursuant to Rule 26(c) of

the Federal Rules of Civil Procedure. The purpose of the amendments to the earlier

Protective Order is to maintain the confidentiality of documents produced by non-parties,

whether persons or businesses (herein, "Third Party" or "Third Parties") related to this

litigation. IT IS HEREBY ORDERED THAT:

1.    **PROCEEDINGS AND FORM OF INFORMATION GOVERNED**

This Protective Order shall govern any document, information or other thing which is

designated by any Party or Third Party as containing "Confidential Information" as defined

herein, and is furnished by any Party or Third Party to any other Party in connection with this

action. The form of information protected is any document or form of evidence or discovery

contemplated by the Federal Rules of Civil Procedure and includes, but is not limited to,

documents and things, responses to requests to produce documents or other things, responses



50

to interrogatories, responses to requests for admissions, deposition testimony and exhibits, and all copies, extracts, summaries, compilations, designations and portions thereof.

2.    **DEFINITION OF CONFIDENTIAL INFORMATION**

a.    The term "Confidential Information" shall be interpreted to mean trade secrets, other confidential and proprietary technical, research or development information, non-public commercial, financial, budgeting and/or accounting information, non-public information about existing and potential customers, marketing studies, performance and projections, non-public business strategies, decisions and/or negotiations, personnel compensation, evaluations and other employment information, and confidential and proprietary information about affiliates, parents, subsidiaries and third parties with whom the Parties to this action, or Third Parties who produce to documents to the Parties in this action, have had (or contemplate having) business relationships.

b.    The scope of this Order shall be understood to encompass not only those items or things which are expressly designated as Confidential Information, but also any information derived therefrom, and all copies, excerpts, and summaries thereof, as well as testimony and oral conversation derived therefrom or related thereto.

3.    **DESIGNATION OF CONFIDENTIAL INFORMATION**

a.    Any information produced in this action that is reasonably believed by the producing Party or Third Party to contain Confidential Information may be designated as "CONFIDENTIAL" or language to similar effect, as appropriate.



b.      In the event that a Party or Third Party desires to designate information as "CONFIDENTIAL" which is outside of the categories identified in ¶ 2(a), such Party or Third Party shall provide notice to the other Party or Parties.

c.      The designation of Confidential Information shall be made at the following time:

(1)      For documents and things, at the time of the production of the documents or things.  However, in the event a producing person, Party or Third Party elects to produce documents and things for inspection pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, no designation need be made prior to the inspection.  For purposes of the inspection, all documents shall be considered "Confidential."  Upon request for copying, the producing Party or Third Party shall designate such documents with the appropriate confidentiality marking;

(2)      For written responses to interrogatories or requests for admissions, at the time of the written response;

(3)      For declarations and pleadings, at the time of the filing of such declaration or pleading (see ¶ 9(d));

(4)      For deposition testimony, at the time of the testimony (see ¶ 9(b)) or in writing within thirty (30) days after receipt by the designating Party or Third Party of the transcript of the deposition.

d.      The designation of Confidential Information shall be made in the following manner:

(1)      For documents, by placing a legend on each page of such document;



-3-

(2)    For tangible objects, by placing a label or tag on the object or the container therefor, or if not practicable, as otherwise agreed;

(3)    For written responses to interrogatories or requests for admissions, on the face of any such responses;

(4)    For declarations or pleadings, on the face of any such declaration or pleading; and

(5)    For depositions, following the procedure set forth in ¶ 9(b) or in writing within thirty (30) days after receipt by the designating Party or Third Party of the transcript of the deposition.

e.    Each Party or Third Party retains the right to subsequently redesignate documents and to require such documents to be treated in accord with such designations from that time forward.

f.    Should a responding Party or Third Party determine that a document subject to privilege or immunity from discovery has been produced inadvertently, he or she shall bring it to the attention of the receiving Party. The inadvertently disclosed documents and all copies shall be returned promptly to the responding Party or Third Party. Such disclosure shall not result in the waiver of any associated privilege, if it is subsequently determined that the document was, in fact, privileged. If a receiving Party believes in good faith that a document subject to privilege or immunity from discovery has been produced inadvertently, he or she shall bring it to the attention of the responding Party or Third Party.



4.   **RESOLUTION OF DISPUTES REGARDING DESIGNATION OF**
     **CONFIDENTIAL INFORMATION**

a.   In the event that any Party disputes the designation of Confidential

Information, such Party shall so inform the designating Party or Third Party by providing

written notice, and the Parties, or the Party and the Third Party, as the case may be, shall

meet and confer in a good faith effort to resolve the dispute.

b.   In the event that the Parties, or a Party and a Third Party, are unable to resolve

a dispute regarding designation of information as "Confidential," the Party disputing the

designation may request appropriate relief from the Court ten (10) business days after the

meet and confer session described in 4(a).  The burden of establishing that information has

been properly designated as "Confidential" is on the Party or Third Party making such

designation.  This Protective Order does not alter the burden imposed by law on any Party or

Third Party seeking to uphold any limitation on the production or dissemination of materials.

c.   Counsel for a non-designating Party shall have the right to assert that any

information designated confidential is, in fact, in the public domain.  Any information which

prior to disclosure hereunder, is either in the possession or knowledge of a non-designating

Party or person who, absent this Order, is under no restriction with respect to the

dissemination of such Confidential Information, or is public knowledge or which, after

disclosure, becomes public knowledge other than through an act or omission of a Party

receiving the information designated as confidential, shall be deemed to be in the public

domain.  A non-designating Party or person asserting that designated Confidential

Information is in the public domain shall, prior to any disclosure (outside of the parameters



-5-

of this Order) of such information previously designated Confidential, either obtain the approval, in writing, of the designating Party or Third Party, or the approval of the Court to make such disclosure and shall specifically indicate why it believes that the designated information is in the public domain.

5.    **ACCESS TO "CONFIDENTIAL" INFORMATION**

   a.    Access to information marked "Confidential" shall be limited to, and only to, the following "qualified persons":

   (1)    Outside attorneys of record for any Party in connection with this action, and, if the attorney is a member of a law firm of record, the employees and staff of the law firm who are responsible for assisting in the preparation, trial or appeal of this action and organizations retained by law firms or attorneys of record to any Party to provide litigation and/or consulting or support services in this action. Before any such person or organization is permitted access to any of the Confidential Information, such person shall be informed of the existence and contents of this Protective Order.

   (2)    The in-house lawyers for each Party who are actively involved in the assertion of claims or defenses in this action, and their staff, but only for such purposes.

   (3)    Independent experts and consultants retained or utilized as expert consultants in this action by the attorneys of record, in so far as the attorneys of record may deem it necessary for the preparation or trial of this case to consult with such experts or consultants. Before any such person is permitted access to any of the Confidential Information, such person shall be informed of the existence and contents of this Protective Order, and the conditions set forth in Paragraph 6 of this Protective Order must be fulfilled.



(4)    The Court and court officials involved in this litigation (including court reporters, persons operating video recording equipment and any special master appointed by Court).

(5)    Such other persons as hereafter may be designated by written agreement of the Parties involved or designated by the Court in the interest of justice.  Before any such person is permitted access to any of the Confidential Information, such person shall be informed of the existence and contents of this Protective Order.

(b)    Except as specifically provided herein, no Confidential Information may be disclosed to any employee or representative of any Party.

6.    **DISCLOSURE OF CONFIDENTIAL INFORMATION**

a.    All individuals to whom Confidential Information is to be disclosed shall be informed of the existence of this Order, shall be provided with a copy thereof and shall be instructed that such matter may not be used other than in connection with this litigation and may not be disclosed to anyone other than persons contemplated by this Order.

b.    Before disclosing any document, information or material designated as "Confidential" to any person contemplated herein, each individual, except: (1) outside attorneys of record for the parties in this action who are actively engaged in the conduct of this litigation, and the partners, associates, secretaries, paralegal assistants, agents and employees of such an attorney; (2) in-house counsel and their secretaries, paralegal assistants, agents and employees; and (3) court officials involved in this litigation (including court reporters, persons operating video recording equipment, and any special master



appointed by the Court), shall acknowledge in writing in the Declaration attached as Exhibit A that he or she has been informed of this Order and that:

      (1)    The signatory has read and understands this Order:

      (2)    The signatory understands that disclosures of the documents and information designated as "Confidential" may constitute contempt of Court; and

      (3)    A statement that the signatory consents to the exercise of personal jurisdiction by this Court.

      c.    It shall be the obligation of the receiving Party and its counsel to obtain and maintain copies of such acknowledgments.

## 7.    USE OF CONFIDENTIAL INFORMATION GENERALLY

      Confidential Information disclosed pursuant to this Protective Order shall be used only for purposes of this litigation and shall be protected from any unauthorized or unrelated use.

## 8.    USE OF CONFIDENTIAL INFORMATION IN CONDUCT OF THIS ACTION

      a.    Confidential Information may be used by the attorneys of record in good faith in conducting discovery, provided that the Confidential Information is protected pursuant to the terms and conditions of this Protective Order.

      b.    At any deposition session, upon any inquiry with regard to the content of a document marked "Confidential" or when counsel for a Party or Third Party deems that the answer to a question may result in the disclosure of Confidential Information of his or her client within the meaning of this Order, counsel for the person whose information is involved, at his or her option, in lieu of taking other steps available in such situation, may



-8-

orally designate the testimony as "Confidential" and may direct that the questions and answers be transcribed separately from the remainder of the deposition and direct that testimony that relates to Confidential Information be filed in a sealed envelope marked in the manner set forth in ¶ 8(d) hereof. When such a direction has been given, the disclosure of the testimony shall be limited (subject to the provisions of ¶ 4) in the manner specified in ¶¶ 5-7 hereof, and the information contained therein shall not be used for any purpose other than as provided in this Order. Counsel for the person whose Confidential Information is involved may also request that all persons other than the reporter, counsel and individuals authorized under ¶¶ 5-7 hereof leave the deposition room during the confidential portion of the deposition. The failure of such other persons to comply with a request to leave the deposition shall constitute substantial justification for counsel to advise the witness that he or she need not answer the question until the assistance of the Court, Magistrate or Master (as the case may be) is obtained.

      c.    Notwithstanding the Parties' or Third Parties' designation of Confidential Information, any court hearing which refers to or describes Confidential Information shall in the Court's discretion be held in open court with records unsealed unless there is a specific showing that confidentiality is required. The disclosing Party or Third Party has the option to request that the proceeding be conducted *in camera*, out of the presence of all unqualified persons and any transcript relating thereto shall, subject to the Court's approval, be designated as confidential.

      d.    All information designated as Confidential Information which is filed or lodged with the Court shall be filed or lodged in sealed envelopes on which shall be affixed a

-9-

copy of the cover page of the document contained therein. The cover page shall include the

word "Confidential" and a legend substantially in the following form:

> "This sealed container filed in this case, E. I. Du Pont de
> Nemours and Company vs. Monsanto Company, Case Number
> 4:00-952-23, contains confidential materials generally identified
> as "Confidential" pursuant to the Protective Order herein, and
> this envelope shall not be opened nor the contents thereof
> revealed except by the Court including court personnel as
> necessary for handling of the case, or as directed by further
> Order of the Court. After any such opening or revelation, the
> envelope shall be resealed with the contents inside."

If the court clerk shall refuse to lodge or file a sealed pleading or

memorandum, the Party or Third Party attempting to file or lodge the pleading or

memorandum shall not be prejudiced from refiling an unsealed version of the pleading or

memorandum as soon as reasonably practicable, and seeking to have such pleading or

memorandum sealed through a motion. Upon default of the filing or lodging Party or Third

Party properly to designate Confidential Information and file or lodge such information in

accordance with this Protective Order, any Party or Third Party who in good faith believes

that designation and filing under seal is required may do so within ten (10) days of learning

of the defective filing or lodging. Notice of such designation shall be given to all Parties.

9.    **PARTY'S AND THIRD PARTY'S OWN INFORMATION**

The restrictions on the use of Confidential Information established by this

Protective Order are applicable only to the use of Confidential Information received by a

Party from another Party or Third Party. A Party or Third Party is free to do whatever it

desires with its own Confidential Information.

10.    **DISCLOSURE TO AUTHOR OR ADDRESSEE**



-10-

Nothing herein shall prohibit a Party or Third Party, or its counsel, from disclosing a document which contains Confidential Information to the person who is an author, addressee or recipient of such document.

## 11.    RENDERING ADVICE TO CLIENTS

Nothing in this Protective Order shall bar or otherwise restrict any attorney from rendering advice to his client with respect to this litigation and, in the course of rendering advice, referring to or relying generally on the examination of Confidential Information produced or exchanged; provided however, that in rendering such advice and in otherwise communicating with his client, the attorney shall not disclose the contents of any Confidential Information produced by another Party or Third Party if that disclosure would be contrary to the terms of this Protective Order.

## 12.    NO WAIVER

Other than as specified herein the taking of or the failure to take any action to enforce the provisions of this Protective Order, or the failure to object to any designation or any such action or omission, shall not constitute a waiver of any right to seek and obtain protection or relief in this action or any other action, such right including, but not limited to, the right to claim that any information is or is not proprietary to any Party or Third Party, is or is not entitled to particular protection or that such information does or does not embody Confidential Information of any Party or Third Party.  The procedures set forth herein shall not affect the rights of Parties or Third Parties to object to discovery on grounds other than those related to trade secrets or proprietary information claims, nor shall it relieve a Party or Third Party of the necessity of proper response to discovery.



-11-

## 13.  NO PROBATIVE VALUE

This Protective Order shall not abrogate or diminish any contractual, statutory or other legal obligation or right of any Party, person, or Third Party with respect to any Confidential Information. The fact that information is designated "Confidential Information" under this Protective Order shall not be deemed to be determinative nor probative of what a trier of fact may determine to be confidential or proprietary in this or any other action. This Order shall be without prejudice to the right of any Party or Third Party to bring before the Court the question of: (a) whether any particular material is or is not confidential; (b) whether any particular information or material is or is not entitled to a greater or lesser degree of protection than provided hereunder; (c) whether any particular information or material is or is not relevant to any issue of this case, provided that in doing so the Party or Third Party complies with the foregoing procedures. Absent a stipulation of all Parties, the fact that information has been designated "Confidential" under this Order shall not be admissible during the trial of this action, nor shall the jury be advised of such designation. The fact that any information is disclosed, used or produced in discovery or trial herein shall not be construed in any action or proceeding before any court, agency or tribunal, as evidence of whether such information is confidential or proprietary.

## 14.  TERMINATION OF LITIGATION

Within one hundred twenty (120) days of the final disposition of the above entitled case, whether by judgment and exhaustion of all appeals, or by settlement, the attorneys of record:



-12-

(1)    Shall destroy or return to the disclosing Party or Third Party, or its attorney of record, the Confidential Information in their possession, custody or control or in the possession, custody or control of their staff.

(2)    Shall insure that all the Confidential Information in the possession, custody or control of their experts and consultants, is destroyed or returned to the disclosing Party or Third Party, or its attorney of record;

(3)    Shall destroy all notes, memoranda or other documents which contain excerpts from any of the Confidential Information; and

(4)    Shall deliver to the disclosing Party or Third Party, or its attorney of record, written confirmation that there has been compliance with the terms of this paragraph or that there has not been compliance and the reason for such noncompliance, upon receipt of which the disclosing Party or Third Party may make application to the Court for such further order as may be appropriate.

Notwithstanding the foregoing, either Party may retain copies of any material filed with the Court.

## 15.    ENFORCEMENT OF THIS PROTECTIVE ORDER

This Protective Order shall survive the final conclusion of the action and the Court shall have jurisdiction to enforce this Order beyond the conclusion of this action.



-13-

## 16.    MODIFICATION OF THIS PROTECTIVE ORDER

In the event any Party hereto seeks a court order that in any way seeks to vary the terms of this Protective Order, said Party shall make such request in the form of a written stipulation, or noticed motion to all Parties that must be served and filed in accordance with local court rules.

Dated: _Nov. 16th 2000_

_Honorable Michael Duffy_
Honorable Michael Duffy
UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA

14

**STIPULATED AND AGREED TO:**

Dated: November ___7___, 2000

Steve McKinney
Haynsworth, Marion, McKay & Guerard, LLP`
1201 Main Street, Suite 2400
Post Office Box 7157
Columbia, SC  29202
Telephone:    (803) 758-1349 or (803) 765-1818
Fax:    (803) 376-3064

John H. Hinderaker, Esquire
FAEGRE & BENSON, LLP
2200 Norwest Center
90 South Seventh Street
Minneapolis, MN  55402
Telephone:    (612) 336-3000
Fax:    (612)336-3026

Attorneys for Plaintiff E.I. du Pont de Nemours
and Company

-15-

**STIPULATED AND AGREED TO:**

Dated: November ___2___, 2000

_(signature)_

Marguerite Willis
Wilburn Brewer, Fed ID No.: 1463
Russell T. Burke, Fed. ID No.: 1604
Val H. Stieglitz, Fed ID No.: 4318
Nikole Setzler Mergo, Fed ID No.: 7410
NEXSEN PRUET JACOBS & POLLARD, LLP
1441 Main Street, Suite 1500
Post Office Drawer 2426
Columbia, SC  29202
Telephone:   (803) 253-8265
Fax:   (803) 253-8277


Of Counsel,

Ernest A. Sellers
James W. Prevatt, Jr.
SELLERS & PREVATT
105 N. Ohio Avenue
Live Oak, FL  32060
Telephone: (904) 362-4437

Kenneth A. Letzler
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C.  20004
Telephone: (202) 942-5921

Attorneys for Defendant Monsanto Company

-16-

# EXHIBIT A



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

E.I. DuPont De Nemours and Company,          CASE NO.: 4:00-952-23

        Plaintiff,

vs.

Monsanto Company,

        Defendant.

---

## DECLARATION REGARDING
## RECEIPT OF CONFIDENTIAL INFORMATION

I, _____, declare as follows:

1.     I have been provided and I have read a copy of the Protective Order

Regarding Confidential Information entered in this matter and understand its contents.

2.     I understand that unauthorized disclosure of documents and information

designated as "CONFIDENTIAL" may constitute contempt of Court.

3.     I consent to the exercise of personal jurisdiction by this Court in South

Carolina in connection with this matter.

4.     I declare under penalty of perjury that the foregoing is true and correct.


Dated:_____          _____
                                            Declarant



# EXHIBIT 6

| HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS |

TimesSelect Free

**The New York Times**
Wednesday, May 23, 2007

# Archives

| WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL |

AUTOS

PRINT

SAVE

# COMPANY NEWS; MONSANTO SAYS JUSTICE DEPARTMENT INQUIRY HAS ENDED

Published: August 19, 2004

ARTICLE TOOLS
SPONSORED BY

Now Playing

The Monsanto Company said yesterday that the Justice Department had closed its inquiry into possible antitrust practices in the herbicide industry, requiring no action by Monsanto, the agribusiness and biotechnology company. "We're pleased that the Justice Department has closed its inquiry and this issue is now behind us," Hugh Grant, Monsanto's chief executive, said. In announcing the investigation in March 2003, Monsanto, maker of the popular Roundup weed killer, said the government was looking into "possible anticompetitive conduct in the glyphosate-based herbicide industry." Glyphosate is an ingredient in Roundup. A Monsanto spokeswoman, Lori Fisher, declined to discuss specifics of the inquiry yesterday.

Learn how to start and ru

Also in Business:
- Today's entreprenueria
- How to finance your sta
- The tip of the day

Copyright 2007 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us |

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **PULLEN SEEDS AND SOIL, on behalf of itself, and all others similarly situated,** | : : : : | **Civil Action No. 06-599  SLR** |
|  | : |  |
| **Plaintiff** | : |  |
| **v.** | : : |  |
| **MONSANTO COMPANY,** | : : |  |
| **Defendant.** | : : |  |

|  |  |  |
|---|---|---|
|  | : : | **Civil Action No. 06-600  SLR** |
| **WADE FARMS, WHITTINGTON & SUMNER FARMS, CLIFFORD F. DANCE, D/B/A CLIFFORD DANCE FARMS, and all others similarly situated,** | : : : : : |  |
| **Plaintiffs** | : |  |
| **v.** | : : |  |
| **MONSANTO COMPANY,** | : : : |  |
| **Defendant.** | : : |  |

## PLAINTIFFS' FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS TO DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 34, and Local Civil Rules 26.1 and 34.1 plaintiffs Pullen Seeds and Soil, Wade Farms, Whittington & Sumner Farms, Clifford F. Dance, d/b/a Clifford Dance Farms ("Plaintiffs") hereby propound their First Request for Production of Documents to Monsanto Company ("Defendant"). Defendant is directed to produce the requested documents at the offices of Garwin, Gerstein & Fisher, 1501 Broadway, Suite 1416, New York, NY within thirty (30) days of service hereof. Each Request is continuing in nature and must be supplemented as provided by Federal Rule of Civil Procedure 26(e).

1

# I. DEFINITIONS

1.    The term "person" means a natural person, corporation, association, company, firm, partnership, joint venture, trust, estate, agency, department or bureau, governmental or judicial person or legal entity.

2.    The terms "you," "your" or "yours" mean the recipient of this discovery request and unless otherwise specified in a particular request, its predecessor and successor entities, its officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), employees, consultants, independent contractors, agents, attorneys, representatives and/or other persons acting or authorized to act on its behalf and in the course and scope thereof.

3.    The terms "Monsanto" means Monsanto Company and any of its predecessors or successor entities, their officers, directors, shareholders, parent and subsidiary companies (whether direct or indirect), employees, consultants, independent contractors, agents, attorneys, representatives and/or other persons acting or authorized to act on its behalf and in the course and scope thereof.

4.    The term "including" shall be deemed to be followed by the phrase "but not limited to."

5.    The term "RoundUp" means any form, version, model or brand of Monsanto RoundUp that is used, or sold or promoted for commercial agricultural uses, including but not limited to Roundup Original® Herbicide, Roundup Original® II Herbicide, Roundup Original Max® Herbicide, Roundup Pro® Concentrate Herbicide, Roundup Pro® Herbicide, Roundup ProDry™ Herbicide, Roundup UltraDry ® Herbicide, Roundup UltraMAX II® Herbicide, Roundup UltraMAX ® RT Herbicide, RT 3 ™ Herbicide, RT Master® II Herbicide, RT Master® Herbicide, Roundup WeatherMAX® Herbicide.

6.    The term "Glyphosate" means any product that is used, or sold or promoted for commercial agricultural uses, and which product contains Glyphosate as the active, primary or main ingredient.

2

7.    The term "Herbicide" shall mean any substance or mixture of substances for use on crops that are intended to prevent, destroy, repel or mitigate any weeds, including glyphosate-based herbicides and other selective or non-selective herbicides.

8.    The term "document" means any written, printed, recorded, digital, electronic and/or video matter and/or tangible thing upon which any words, phrases, numbers, data and/or images are affixed or conveyed, including but not limited to any item within the scope of Rule 34 of the Federal Rules of Civil Procedure. The term "document" includes, but is not limited to, any writing, report, memorandum, file, computer file, computer-stored data or databases in computer-readable format, computer drive, home computer contents, personal computer contents, floppy disk, zip disk, printout, communications, computer transmission, e-mail, correspondence, electronic transmission, word processing file, spreadsheet, spreadsheet program file, calculation, database, database entries, database queries, database query results, mainframe computer file, computerized spreadsheet, analysis, outline, pro forma, forecast, white paper, projection, market study, marketing plan, tactical plan, long-range plan, strategic forecast, plan of action, pricing study, budget, presentation, slide, slide deck, Powerpoint presentation, proposal, record, draft, memorialization, computerized memorialization, personal digital assistant file, message, book, survey, research, background information, talking points, list, contract, agreement, purchase order, invoice, receipt, shipping paper, catalog, brochure, manual, publication, policy statement, promotional or advertising literature or materials, credit memos or memoranda, claim form, production record, inventory record, account, letter, side letter, letter of commitment, journal, profit and loss statement, income and expense sheet, statement of financial condition, audit report, organizational chart, flow chart, addendum, check, docket sheet, brief, court filing, pleading, transcript, affidavit, deposition, discovery request, discovery response, log, calendar, list, journal, pamphlet, abstract, computation, tabulation, bill, statement, invoice, schedule, exhibit, attachment, photostat,

3

electronic transmission, image, network communications and transmissions, satellite network communications, study, telegram, telex, agenda, minutes, bulletin, instruction, literature, memorandum of conversations, notes, notebook, diary, data sheet, work sheet, recording, tape, videotape, audiotape, internal or interoffice communication, drawing, table, diagram, graph, index, chart, telephone record, photograph, phonographic record, written memorialization of oral communication, and/or other data compilation of any other written, recorded, transcribed, punched, taped, filed and/or other graphic matter including any draft of the foregoing items upon which any notation, work, figure or form is recorded or has been made which does not appear on the original, or as to whose existence, either past or present, the responding party has any knowledge or information.

9.    The phrases "relating to" and "relates to" include reflecting, constituting, memorializing, discussing, regarding, evidencing, referring to, concerning, involving, explaining, treating, dealing with, in connection with, referenced in, attached to, and/or bearing on (whether legally, factually, or otherwise), in whole or in part.

10.    The terms "communication" and "communications" include all forms of transmission of information, whether oral, in writing, electronic, or in some other medium.

11.    The term "correspondence" means any letter, memorandum, email, or other writing.

12.    The term "minutes" includes action taken in lieu of meeting, minutes of meetings, including exhibits and attachments, agendas for meetings (including exhibits, attachments and/or materials distributed or circulated at, or in connection with, any meeting), notices of meetings, waivers of meetings and certification or signatures appended to or referred to in the notices, agendas or minutes.

13.    "And" and "or" shall be construed either conjunctively or disjunctively so as to bring within the scope of any  particular Request any document or writing or information that might be deemed outside its scope by another construction.

4

14.    The phrases "any document" and "any documents" also include "each document(s)" and "all document(s)," and *vice versa*. The word "document" also includes "any document," "all documents," and "each document."

15.    The terms "market share-based rebates and/or discounts" and "loyalty or conversion incentives, rebates and/or discounts " refer to the methods and/or contractual provisions pursuant to which a manufacturer's price for a product, (and/or the amount of any rebate or discount offered or forfeited with respect to a product) is conditioned on, linked to, or affected by whether or not the buyer's purchases of a manufacturer's product equals or exceeds a certain percentage of the buyer's total or estimated total purchases of a defined set of products from one or more manufacturers.

16.    The terms "bundling," "product bundling," "bundled rebates" or "bundled discounts" refer to any practice, policy, offer or program whereby a discount, rebate or other financial incentive pertaining to the purchase of a product is made available based on the customer's purchase or commitment to purchase specified amounts or percentages of a different product.

## II.  INSTRUCTIONS

1.    In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your predecessor and/or successor entities, affiliates, officers, directors, managing agents, shareholders, parent and/or subsidiary companies (whether direct or indirect), employees, agents, attorneys and/or their agents, representatives and/or other persons acting or authorized to act on your behalf.

2.    Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and/or other versions of a document must be produced in addition to the unaltered

5

version of the document.

3.    If responsive documents exist in computerized, digital, imaged or other electronic form, please produce them in that form, particularly for transactional and sales data.

4.    If you are unable to produce a document in response to any request, so state and indicate whether the document ever existed, or whether the document once existed, but cannot be located, or otherwise. If any document once was, but is no longer in your possession, custody or control, state the whereabouts of any such document, state when it was last in your possession, custody or control, state the date and manner of its disposition, and identify its last known custodian. To the extent any documents are lost or destroyed, produce any documents which support your assertion that the document was lost or destroyed, and provide the date thereof.

5.    If any documents requested herein have been lost, discarded, destroyed, or are otherwise no longer in your possession, custody or control, or have been transferred voluntarily or involuntarily to another person or persons, or otherwise disposed of, they shall be identified as completely as possible including information necessary to identify the document and the following information: the date of disposal or transfer; the manner of disposal or transfer; the reason for disposal or transfer; the person authorizing the disposal or transfer; and the person disposing of or transferring the document.

6.    If you file a timely objection to any portion of a request, definition, or an instruction, provide a response to the remaining portion.

7.    The terms defined above and the individual requests for production and inspection should be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

8.    As used in these requests, the singular shall also be treated as plural and vice-versa.

9.    These document requests are continuing and require supplemental responses as specified

in Federal Rule of Civil Procedure 26(e) if you (or any person acting on your behalf) obtain additional information called for by the request between the time of the original response and the time set for trial. Each supplemental response shall be served on Plaintiff no later than thirty (30) days after discovery of the additional information, and in no event shall any supplemental response be served later than the day before the first day of trial.

10.    The fact that a document is produced by another party does not relieve you of the obligation to produce your copy of the same document, even if the two documents are identical in all respects.

11.    Documents are to be produced in full, regardless of whether you consider the entire document to be relevant or responsive to these Requests. If any requested document or thing cannot be produced in full, produce it to the extent possible, indicating which document or portion of that document is being withheld and the reason that document or portion is being withheld. Production of a partial or redacted document without an indication of which portion of the document has been withheld and/or without an explanation of the reason that the entire document has not been produced will not constitute compliance with these requests

12.    Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the request.

13.    All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained by you. If the container cannot be produced, produce copies of all labels or other identifying marks.

14.    Documents shall be produced in such fashion as to identify the department, branch or office in whose possession they were located and, where applicable, the natural person in whose

7

possession they were found and the business address of each document's custodian(s).

     15.     Documents attached to each other should not be separated.

     16.     Documents not otherwise responsive to this discovery request shall be produced if such documents help to understand the documents which are called for by this discovery request, or if such documents are attached to documents called for by this discovery request and constitute routing slips, transmittal memoranda, letters, comments, evaluations or similar materials.

     17.     If you claim the attorney-client privilege, or any other privilege or work product protection for any document, you shall provide all information required by Fed. R. Civ. P. 26(b)(5) and Loc. Civ. R. 34.1, including but not limited to the following information with respect to each such document:

     a.     The title of the document or writing;

     b.     The number of pages of the document or writing;

     c.     The identity of all author(s) or drafters of the document or writing;

     d.     The identity of each person to whom an original or a copy of the document or writing was sent;

     e.     The subject matter of the document or writing;

     f.     The subject matter and a description of the material withheld, to the fullest extent possible short of waiving the claim to privilege, in sufficient detail to permit plaintiffs to assess the applicability of the privilege claimed;

     g.     The reason for withholding the document or writing;

     h.     The identity of each person, firm, corporation or other entity in possession of an original or copy of the document or writing; and

     i.     The date the document or writing was created.

Failure to comply with the foregoing will result in the waiver of any such privilege or other basis for nonproduction. *See, e.g., Tarlton v. Cumberland County Correctional Facility*, 192 F.R.D. 165 (D.N.J. 2000); *Nagele v. Electronic Data Sys. Corp.*, 193 F.R.D. 94, 108 (W.D.N.Y. 2000); *In re Imperial Corp. of America*, 174 F.R.D. 475 (S.D. Cal. 1997); *Massachusetts School of Law at Andoyer, Inc. v. Am. Bar Assoc.*, 914 F. Supp. 1172, 1178 (E.D. Pa. 1996); *Burns v. Imagine Films Entertainment, Inc.*, 164 F.R.D. 589, 594 (W.D.N.Y. 1996); *Dorf & Stanton Communications, Inc. v. Molson Breweries*, 100 F.3d 919, 923 (Fed. Cir 1996); *Rural Water Sys. Ins. Benefit Trust v. Group Ins. Adm'r*, 160 F.R.D. 605 (D. Kan.1995).

18.    If a document contains both privileged and non-privileged information, all portions of the document that are not privileged must be produced.

## III.    RELEVANT TIME PERIOD

Unless otherwise stated in the body of a particular Request, the time period for which you must respond to these Requests is that period beginning January 1, 1997 and ending at the present time. You have a duty to seasonably supplement your answers to these Requests pursuant to Fed. R. Civ. P. 26(e).

## IV.    DOCUMENT REQUESTS

**REQUEST NO. 1**: All non-privileged documents received, produced, or filed with a court, in connection with any case or legal action which contains allegations that Monsanto engaged in, and/or attempted to engage in, unfair, wrongful, or anticompetitive business or trade practices, exclusive dealing, exclusionary dealing, bundling, tying, monopolization, violations of the antitrust laws, unfair trade practices, and/or violations of state statutes or common law governing fair competition and/or business practices regarding RoundUp, Glyphosate or Herbicides, including but not limited to:

(a) *E. I. DuPont De Nemours and Company v. Monsanto Company*, No. 4:00-CV-00952-CWH, (D.S.C.)(Florence Division);

(b) *E.I. DuPont de Nemours and Co. v. Monsanto Co. and Asgrow Seed Co.*, No. 00-359-SLR (D.Del);

(c) *Agrevo Environmental Science USA LP v. Scotts Company, et al*, (S.D.N.Y.) 1:99-CV-04015-LAP-THK; and

(d) *Aventis v. Scotts Company and Monsanto*, (S.D.N.Y.) 1:02-CV-03722-LAP-THK

This request includes, but is not limited to:

(a) all documents produced or received by Monsanto in discovery in any of the cases or actions described in this request;

(b) all court filings, court orders or opinions, pleadings, discovery requests and responses, correspondence, deposition testimony, deposition exhibits, expert reports or affidavits, exhibits attached to or cited in any expert reports of affidavits, and/or deposition videos in any of the cases or actions described in this request.

**REQUEST NO. 2**:  The following documents from the antitrust case entitled *Syngenta Seeds, Inc. v. Monsanto Company and Monsanto Technology, LLC* (D.Del), C.A. No. 04-908-SLR:

all deposition transcripts, deposition exhibits, expert reports or affidavits, exhibits attached to or cited in any expert reports of affidavits, deposition videos, pre-trial exhibit lists that were (or are hereafter) exchanged between the parties, pre-trial witness lists that were (or are hereafter) exchanged between the parties, motions in limine that were (or are hereafter) exchanged between the parties.

**REQUEST NO. 3**:  All documents relating to any subpoena, document request, or investigation demand issued by any government agency or body, which relate to:

(a) competition for, and/or Monsanto's competitive conduct or practices regarding, RoundUp, Glyphosate or Herbicides;

(b) Monsanto's sales and/or pricing of RoundUp, Glyphosate or Herbicides, and/or

(c) conditions or requirements regarding, or in connection with, the payment and/or accrual of rebates, discounts, incentives, fees, and/or consideration by, or from, Monsanto in connection with RoundUp, Glyphosate or Herbicides.

This request includes, but is not limited to: (a) the subpoena, document requests, or investigation demand referenced above; (b) any documents modifying, interpreting or affecting the terms of such subpoena, document requests, or investigation demand; (c) any correspondence regarding such subpoena, document requests, or investigation demand; and (d) any documents produced in response to, or connection with, any such subpoena, document requests, or investigation demand.

**REQUEST NO. 4**:  Documents sufficient to show Monsanto's document retention policies, procedures, and/or practices.

**REQUEST NO. 5**:  Documents sufficient to identify Monsanto's internal corporate structure and/or reporting structure which deal, in whole or in part, with RoundUp, Glyphosate or Herbicides, including but not limited to divisions, departments, groups, committees, teams, officers, executives, employees, and/or other entities that deal with RoundUp, Glyphosate or Herbicides, and any changes over time.

**REQUEST NO. 6**:  One set of all contracts or agreements between Monsanto and any seed company, dealer, retailer, distributor, and/or agricultural cooperative which constitute or contain a license to use, grow, sell or distribute any Monsanto patented seed traits, and any exhibits, attachments, amendments, revisions, modifications or documents constituting changes to such contracts or agreements.    This request includes, but is not limited to:

> (a) any of the above-referenced agreements or contracts between Monsanto and any other entities which prohibited or restricted the promotion or recommendation of any glufosinate-resistant traits contained in any types of seeds; and/or

> (b) any of the above-referenced agreements or contracts between Monsanto and any other entities which prohibited or restricted the promotion or recommendation of any herbicides other than Roundup.

**REQUEST NO. 7**:  One set of all contracts or agreements between Monsanto and any seed company, dealer, retailer, distributor, agricultural cooperative, and/or farmer or grower regarding or referring, in whole or in part, to the purchase, sale, use, stocking, marketing and/or promotion of RoundUp, Glyphosate or Herbicides, and any exhibits, attachments, amendments, revisions, modifications or documents constituting changes to such contracts or agreements.  This request includes, but is not limited to:

> (a) any agreements or contracts which restricted seed companies from promoting or recommending any herbicides other than Roundup;

> (b) any Action Pact agreements (and any amendments or addendum thereto);

> (c) any signed copies of any Repackaging Agreements regarding in whole, or in part, to Roundup, Glyphosate or Herbicides.

**REQUEST NO. 8**:  A list or other documents sufficient to show the names and last-known addresses of all farmers or growers who entered into contracts or agreements with Monsanto (and/or its agents) to use or grow any Monsanto patented seed traits and/or seeds containing Monsanto patented seed traits.

**REQUEST NO. 9**:  All documents regarding the Plaintiffs to these actions.

**REQUEST NO. 10**: All documents (other than sales invoices, checks, check requests, bills of sale, transaction records, product catalogs, brochures, promotional pamphlets, advertisements, labeling information, and/or product use instructions) relating to any potential,  proposed, model, draft and/or considered contract, agreement, plan, program, initiative, strategy or tactic regarding or relating in whole, or in part, to the purchase, sale, use, stocking, marketing and/or promotion of RoundUp, Glyphosate or Herbicides, and/or the conditions under which rebates, discounts, price concessions, moneys, incentives or consideration are paid in connection with RoundUp, Glyphosate or Herbicides.

This includes, but is not limited to:

11

(a) documents constituting, discussing, analyzing, evaluating or regarding any draft, proposed or potential contracts, agreements, programs, plans, strategies, tactics, or initiatives regarding or relating to the sale, purchase, use, stocking, marketing or promotion of RoundUp, Glyphosate or Herbicides;

(b) any draft or final summaries, term sheets, fact sheets, data sheets, information sheets, guides, implementation materials, worksheets, launch materials, overviews, reviews, updates, status documents, memoranda, reports, or presentations regarding any such contracts, agreements, plans, programs, initiatives, strategies or tactics;

(c) any draft, proposed or potential contracts or agreements with any seed company, dealers, distributors, retailers, and/or agricultural cooperatives related to the sale, purchase, use, stocking, marketing or promotion of RoundUp, Glyphosate or Herbicides;

(d) any draft, potential or proposed agreements or contracts which restricted any entities from promoting or recommending any herbicides other than Roundup;

(e) any exhibits, attachments, amendments, revisions, modifications or documents constituting changes to such contract, agreements, programs, plans, initiatives or strategies; and/or

(f) all documents regarding the Action Pact program.

**REQUEST NO. 11:**  To the extent not produced in response to other requests herein, all documents relating to any actual, draft, potential and/or considered contract, agreement, plan or program, and/or any term thereof, relating to RoundUp, Glyphosate or Herbicides, which provides in whole or in part that a party will, shall or may:

(a) refrain (in whole or in part) from purchasing, utilizing, selling, marketing, stocking and/or making available Glyphosate and/or any Herbicides other than RoundUp;

(b) aid or assist Monsanto in limiting, impeding and/or restricting the sale, purchases, utilization and/or availability of Glyphosate and/or any Herbicides other than RoundUp;

(c) limit, impede and/or restrict others from purchasing, utilizing, selling, stocking or marking available Glyphosate and/or any Herbicides other than RoundUp;

(d) purchase, utilize, and/or make available RoundUp, Glyphosate or Herbicides made, sold or promoted by Monsanto at a particular volume and/or so as to attain and/or maintain a particular percentage share of Monsanto RoundUp, Glyphosate or Herbicides relative to the Glyphosate or Herbicides made or sold by other persons or entities.

**REQUEST NO. 12**: All documents summarizing, discussing, analyzing or evaluating any actual, potential or proposed programs, strategies, initiatives, contracts, agreements or plans that involve fees, incentives, rebates, discounts or prices for *any Monsanto product or service*, which fees, incentives, rebates, waivers, penalties, discounts or prices are based on, tied to, related to, conditioned on, impacted by, or affected by:

12

(a) the purchase, sale, marketing, promotion, or utilization of specific volumes, amounts, percentages, bundles or combinations, and/or market share of RoundUp, Glyphosate or Herbicide that is made or sold by Monsanto;

(b) refraining from purchasing, utilizing, selling, marketing, stocking and/or making available Glyphosate and/or any Herbicides other than RoundUp;

(c) aiding or assisting Monsanto in limiting, impeding and/or restricting the sale, purchases, utilization and/or availability of Glyphosate or Herbicides other than RoundUp;

(d) limiting, impeding and/or restricting others from purchasing, utilizing, selling, stocking or marking available Glyphosate and/or any Herbicides other than RoundUp.

**REQUEST NO. 13:** To the extent not sought by other requests herein, all documents (other than product catalogs, brochures, promotional pamphlets, advertisements, product labeling information, and/or product use instructions) regarding any actual, potential or proposed strategies, tactics, practices, policies, procedures, proposals, initiatives or plans to:

(a) increase in the United States sales, market share, utilization, distribution, revenue from, profit from, and/or demand for RoundUp, Glyphosate or Herbicides made by Monsanto;

(b) respond to competition or potential competition from any actual or potential manufacturer or seller of glyphosate;

(c) impede or decrease in the United States the sales, utilization, distribution, promotion, marketing, demand, revenues, profits, sales opportunities, operating efficiencies and/or market-share of any manufacturer of Glyphosate or Herbicides other than Monsanto.

**REQUEST NO. 14:** All documents relating to the actual or potential financial, economic, or competitive effect on:

(i) Monsanto;

(ii) any other person, firm, corporation or other business entity, including but not limited to any of Monsanto's actual or potential competitors, dealers, distributors, agricultural cooperatives and/or end-users of RoundUp, Glyphosate or any Herbicides; and/or

(iii) the market(s) in which RoundUp, Glyphosate or any Herbicides are sold (including the actual or potential effect or impact upon prices, volumes, profits, market shares, consumer choice, and/or consumer welfare).

As a result of, or due to:

(a) any actual, potential, proposed, category, class or type of contract, agreement, plan, program, strategy, tactic or initiative that relates (in whole or in part) to the sale, purchase, use, stocking, marketing or promotion in the United States of RoundUp, Glyphosate or any

13

Herbicides; or

(b) any actual, potential, or proposed plan or strategy regarding prices, incentives, rebates, discounts or fees that was used (or potentially to be used) in the United States related to RoundUp, Glyphosate or any Herbicides (or any changes thereto);

(c) loyalty or conversion incentives, rebates and/or discounts;

(d) bundled rebates and/or discounts;

(e) market share-based rebates and/or discounts; and/or

(f) the Action Pact program.

**REQUEST NO. 15:** All documents (including electronic data in computer-readable format) relating to the actual, proposed or considered administration, compliance monitoring, auditing, and/or enforcement of any contracts, agreements, plan(s) or program(s), including but not limited to the Action Pact program, that relate in whole or in part to the purchase, sale, stocking, marketing, promotion, or use of RoundUp, Glyphosate or Herbicides, including but not limited to monitoring of and/or compliance with the conditions under which rebates, discounts, and/or other consideration would be paid and/or accrued in connection therewith.

**REQUEST NO. 16:** All documents relating to any written or telephonic communications, meetings, conferences, gatherings, and/or events, held at any time for, or with, purchasers, resellers or users of RoundUp, Glyphosate or any Herbicides (or their executives, representatives, agents) regarding:

(a) any contract(s), agreement(s), plan(s) or program(s) that relate in whole or in part to the purchase, sale, stocking, marketing, promotion, or use of RoundUp, Glyphosate or Herbicides; and/or

(b) compliance with any agreement(s), contract(s), program(s) or plan(s) that relate in whole or in part to the purchase, sale, stocking, marketing, promotion or use of RoundUp, Glyphosate or Herbicides; and/or

(c) the consequences of noncompliance with any agreement(s), contract(s), program(s) or plan(s) that relate in whole or in part to the purchase, sale, stocking, marketing, promotion or use of RoundUp, Glyphosate or Herbicides.

**REQUEST NO. 17:** Documents relating to any meetings of Monsanto's Board of Directors (including committees and sub-committees thereof) regarding or relating to:

(a) the pricing, marketing, contracting and/or competitive strategies regarding RoundUp, Glyphosate or Herbicides; and/or

(b) the conditions under which discounts, rebates, price concessions, and/or other consideration would be given regarding RoundUp, Glyphosate or Herbicides.

14

**REQUEST NO. 18:** All documents relating to any actual, draft, proposed, considered or potential contracts or agreements between Monsanto and any other actual or potential Glyphosate or Herbicide manufacturer, which contracts or agreements relate in whole, or in part, to Roundup, Glyphosate or Herbicides, including but not limited to any licenses, marketing agreements, manufacturing or supply agreements, purchase agreements, or litigation settlement agreements that relate in whole or in part to litigation concerning Roundup, Glyphosate or Herbicides. This request includes, but is not limited to, all documents relating to any actual, draft, proposed, considered or potential contracts or agreements between Monsanto and Dupont, Dow, BASF, Chemnova, Albaugh, and Nufarm, Chemical Products Technologies ("CPT"), Syngenta, which contracts or agreements relate in whole, or in part, to Roundup, Glyphosate or Herbicides.

**REQUEST NO. 19:** All documents (excluding copies of bills, invoices, checks, check requests wire-transfer documents, product catalogs, or brochures) regarding pricing, discounts, incentives, rebates and/or fees offered or given in the United States regarding RoundUp, Glyphosate or any Herbicides, and/or any changes thereto. This request includes, but is not limited to:

(a) documents regarding Monsanto's decisions or analysis regarding its actual or potential prices, discounts, incentives, rebates and/or fees offered, given or paid in the United States regarding RoundUp, Glyphosate or any Herbicides, and/or any changes thereto;

(b) all documents regarding any actual, potential or proposed strategies, practices, policies, procedures, initiatives, plans, matrix(s), or formulas regarding or relating to the prices, incentives, rebates, discounts and/or fees that were offered, given or paid in the United States for RoundUp, Glyphosate or any Herbicides, and/or any changes thereto;

(c) all documents relating to any actual or potential Monsanto's decision(s) to increase and/or decrease (or not to increase and/or decrease) prices, incentives, rebates, discounts and/or fees in the United States, for RoundUp, Glyphosate or any Herbicides, including but not limited to, the reasoning and/or justifications therefor;

(d) any comparisons, analysis or evaluation of prices, discounts, rebates or incentives offered to different parties or entities regarding or relating to RoundUp, Glyphosate or Herbicides;

(e) any comparisons, analysis or evaluations of prices, discounts, rebates or incentives offered to different parties or entities regarding or relating to non-herbicide products as a result of any action or inaction regarding the purchase, sale, use, stocking, promotion or marketing of RoundUp, Glyphosate or Herbicide;

(f) pricing and/or contracting manuals, price lists, guidelines, matrices, policies, and/or formulas, for each customer, class of customers, and/or class of trade or subgroup thereof;

(g) the wholesale acquisition cost, direct price, list price, and/or other published prices for RoundUp, Glyphosate or Herbicides;

(h) payment terms for RoundUp, Glyphosate or Herbicides.

15

**REQUEST NO. 20**: Any documents (excluding copies of individual bills, invoices, checks, check requests, wire-transfer documents, or product catalogs) which are sufficient to show on a quarterly, semi-annually, or annual basis any rebates, discounts, incentives, payments, compensation or consideration by Monsanto to, and/or accrued by, any seed company, dealer, distributor, agricultural cooperative or any other person, firm, or corporation in the chain of distribution, in connection with:

    (a) RoundUp, Glyphosate or Herbicides;

    (b) Contracts, agreements, programs, plans or initiatives that contain terms or provisions relating to RoundUp, Glyphosate or Herbicides.

**REQUEST NO. 21**: All documents relating to any actual, potential and/or considered discount, rebate, price concession, incentive, fee and/or other consideration relating to RoundUp, Glyphosate, Herbicides or any other product, service or item manufactured, sold or licensed by Monsanto, whereby the receipt, payment, and/or accrual of same is, in whole on in part, conditioned upon, contingent on, tied to, affected or impacted by, or related to:

    (a) the degree or amount of purchase, utilization, sale, stocking, marketing or promotion of RoundUp, Glyphosate or other Herbicide manufactured or sold by Monsanto;

    (b) the degree or amount of purchase, utilization, sale, stocking, marketing, non-purchase, and/or non-utilization, of Glyphosate and/or any other Herbicide that is manufactured or sold by a person, firm, corporation, or business entity other than Monsanto.

**REQUEST NO. 22**: All data (preferably in electronic format) or documents (other than bills, invoices, distributor notices, wire transfer documents and checks), sufficient to show on a quarterly basis each of the following types of information (actual and projected) relating to:

    (a) each Glyphosate (including RoundUp) manufacturer's percentage (measured by revenue/dollars and volume) of Glyphosate (including RoundUp) sold in the United States;

    (b) the amount (measured by revenue/dollars and volume) of Glyphosate (including RoundUp) sold in the United States;

    (c) each Herbicide manufacturer's percentage (measured by revenue/dollars and volume) of Herbicide sold in the United States;

    (d) the amount (measured by revenue/dollars and volume) of Herbicide sold in the United States;

    (e) each Glyphosate (including RoundUp) manufacturer's percentage (measured by revenue/dollars and volume) of Glyphosate (including RoundUp) sold in the United States for commercial agricultural purposes;

    (f) the amount (measured by revenue/dollars and volume) of Glyphosate (including RoundUp)

16

sold in the United States for commercial agricultural purposes;

(g) each Herbicide manufacturer's percentage (measured by revenue/dollars and volume) of Herbicide sold in the United States for commercial agricultural purposes;

(h) the amount (measured by revenue/dollars and volume) of Herbicides sold in the United States for commercial agricultural purposes;

(i) the share of genetically- modified soybean seeds versus all soybean seeds sold in the United States;

(j) the share genetically-modified soybean seeds which contain a Monsanto-patented seed trait versus all genetically-modified soybean seeds sold in the United States;

(k) the share of genetically-modified cotton seeds versus all cotton seeds sold in the United States;

(l) the share genetically-modified cotton seeds which contain a Monsanto-patented seed trait versus all genetically-modified cotton seeds sold in the United States;

(m) the share of genetically-modified corn seeds versus all corn seeds sold in the United States; and

(n) the share genetically-modified corn seeds which contain a Monsanto-patented seed trait versus all genetically-modified corn seeds sold in the United States.

**REQUEST NO. 23**: All data (preferably in electronic format) or documents (other than bills, invoices, distributor notices, wire transfer documents and checks), sufficient to show on a quarterly basis each of the following types of information (actual and projected):

(a) the percentage (measured by revenue/dollars and volume) of all glyphosate-tolerant corn seeds sold in the United States that contain a Monsanto-patented glyphosate-tolerant seed trait;

(b) the percentage (measured by revenue/dollars and volume) of all glyphosate-tolerant cotton seeds sold in the United States that contain a Monsanto-patented glyphosate-tolerant seed trait;

(c) the percentage (measured by revenue/dollars and volume) of all glyphosate-tolerant soybean seeds sold in the United States that contain a Monsanto-patented glyphosate-tolerant seed trait;

(d) the percentage (measured by revenue/dollars and volume) of all herbicide-tolerant corn seeds sold in the United States that contain a Monsanto-patented herbicide-tolerant seed trait;

17

(e) the percentage (measured by revenue/dollars and volume) of all herbicide-tolerant cotton seeds sold in the United States that contain a Monsanto-patented herbicide-tolerant seed trait;

(f) the percentage (measured by revenue/dollars and volume) of all herbicide-tolerant soybean seeds sold in the United States that contain a Monsanto-patented herbicide-tolerant seed trait;

(g) the percentage (measured by revenue/dollars and volume) of all genetically-modified corn seeds sold in the United States that are resistant to Corn Borer or European Corn Borer that contain a Monsanto-patented seed trait;

(h) the percentage (measured by revenue/dollars and volume) of all genetically-modified seeds sold in the United States that are resistant to Root Worm that contain a Monsanto-patented seed trait;

(i) the percentage (measured by revenue/dollars and volume) of all genetically-modified cotton seeds sold in the United States that are resistant or protected from worms (including but not limited to Bollworm) that contain a Monsanto-patented seed trait; and

(j) the percentage (measured by revenue/dollars and volume) of seeds that contained any combination or "stacking" of the traits listed above in (a) - (i) that contain a Monsanto-patented seed trait.

**REQUEST NO. 24**: All documents relating to actual, potential, desired, and/or forecasted substitution of, and/or switching between and among, different RoundUp, Glyphosate or Herbicides by purchasers and/or users of such products. This request includes, but is not limited to:

(a) substitution of, and/or switching between, RoundUp, Glyphosate or Herbicides made or sold by different manufacturers;

(b) substitution of, and/or switching between and/or among, different categories or types of RoundUp, Glyphosate or Herbicides;

(c) functional and/or economic substitutability of RoundUp, Glyphosate or Herbicides made or sold by different manufacturers; and

(d) functional and/or economic substitutability of different types or categories of RoundUp, Glyphosate or Herbicides.

**REQUEST NO. 25**: All documents concerning or discussing the extent to which, if any at all, genetically modified soybean seeds (used with or without associated herbicides or pesticides) compete with conventional soybean seeds (used with or without associated herbicides or pesticides), the substitutability of one type for another, and/or any price-disciplining or price-limiting effect that one type has on the other.

18

**REQUEST NO. 26**: All documents concerning or discussing the extent to which, if any at all, genetically modified cotton seeds (used with or without associated herbicides or pesticides) compete with conventional cotton seeds (used with or without associated herbicides or pesticides), the substitutability of one type for another, and/or any price-disciplining price-limiting effect that one type has on the other.

**REQUEST NO. 27**: All documents concerning or discussing the extent to which, if any at all, genetically modified corn seeds (used with or without associated herbicides or pesticides) compete with conventional corn seeds (used with or without associated herbicides or pesticides), the substitutability of one type for another, and/or any price-disciplining or price-limiting effect that one type has on the other.

**REQUEST NO. 28**: All documents relating to pricing studies, price elasticity studies, optimal pricing studies, and/or cross-price elasticity studies for RoundUp, Glyphosate or Herbicides, by whomsoever performed.   This request includes, but is not limited to:

>   (a) all documents relating to the cross-elasticity of demand with respect to price between and/or among (i) RoundUp, Glyphosate or Herbicides of different manufacturers and/or (ii) different types of RoundUp, Glyphosate or Herbicides;

>   (b) all documents discussing or regarding the willingness of farmers or other users of RoundUp or Glyphosate to pay certain prices for Roundup or Glyphosate.

**REQUEST NO. 29**: All documents relating to the extent to which constraints on price are exerted as between and/or as among (a) the RoundUp, Glyphosate or Herbicides of different manufacturers and/or (b) different categories or types of RoundUp, Glyphosate or Herbicides.

**REQUEST NO. 30**: All documents regarding or discussing your possession and/or maintenance of monopoly power, market power or dominance in the market(s) in which RoundUp, Glyphosate or Herbicides are sold.

**REQUEST NO. 31**: All documents relating to barriers to entry into the market(s) in which RoundUp, Glyphosate or Herbicides are sold.   This request includes, but is not limited to, all documents relating to the ability, ease (and/or lack thereof) of actual or potential competitors or rivals to sell RoundUp, Glyphosate or Herbicides, and/or increase their sales of RoundUp, Glyphosate or Herbicides.

**REQUEST NO. 32**: To extent not otherwise requested herein, all documents relating to analysis of the markets in which RoundUp, Glyphosate or Herbicides are sold.

**REQUEST NO. 33**: To extent not otherwise requested herein, all documents discussing or regarding the supply of Roundup or Glyphosate, including capacity utilization for the production of Glyphosate and/or the conversion/packaging go Glyphosate to Roundup

**REQUEST NO. 34**: To extent not otherwise requested herein, all documents discussing or regarding: (a) the number of dealers or other entities that sell Roundup to farmers or other users of Roundup for commercial agricultural uses, and (b) competition or the competitive conditions between or among such

entities.

**REQUEST NO. 35:** All competitive analysis or other documents, by whomsoever created, relating to an analysis of competition or competitors in the market(s) in which RoundUp, Glyphosate or Herbicides are sold in the United States. This request includes, but is not limited to all documents relating to:

(a) any actual or proposed analysis, evaluation, communication, and/or monitoring of actual or potential Monsanto competitors relating to RoundUp, Glyphosate or Herbicides, including but not limited to the sales potential of such actual or potential competitors, product differences (including safety differences), pricing differences, and/or any other actual or potential competitive issues;

(b) any competitive brand information received in connection with, or as a result of, the Action Pact program and/or any data or analysis used by Monsanto to determine or identify which products constituted competitive brands of glyphosate;

(c) the potential or actual effect of Glyphosate or Herbicides made or sold by an entity other than Monsanto on the unit sales, dollar sales, profits from, prices of, and/or market share of Monsanto's RoundUp, Glyphosate or Herbicides;

(d) any and all actual, potential and/or contemplated action by any actual or potential manufacturer of RoundUp, Glyphosate or Herbicides other than Monsanto to begin selling and/or increase its sales of Glyphosate or Herbicides in the United States;

(e) any actual, potential or contemplated action by another Glyphosate or Herbicide manufacturer to increase its sales of Glyphosate or Herbicides in the United States;

(f) any difficulties any manufacturer of Glyphosate or Herbicides other than Monsanto might have in entering, expanding or succeeding in the United States market for Glyphosate or herbicides.

**REQUEST NO. 36:** All documents summarizing, analyzing, discussing or evaluating:

(a) any competitive advantage (or competitive disadvantage) that Monsanto has over or in relation to its rivals regarding RoundUp, Glyphosate or Herbicides;

(b) any competitive advantage (or competitive disadvantage) that Monsanto's actual or potential rivals or competitors have regarding RoundUp, Glyphosate or Herbicides;

(c) any competitive or quality differences between RoundUp, Glyphosate or Herbicides made or sold by Monsanto versus RoundUp, Glyphosate or Herbicides made or sold by other companies;

(d) the efficiency, skill, strategy, effectiveness, and/or lack thereof, of any actual and/or potential competitor in, and/or actual and/or potential new entrant to, the market(s) in which

RoundUp, Glyphosate or Herbicides are sold, relating to product features, product benefits, cost structures, manufacturing, pricing, marketing, selling, distribution, account management, contracting, and/or otherwise, including but not limited to criticisms thereof.

**REQUEST NO. 37:**   All documents discussing, evaluating or analyzing:

(a) the relationship between Monsanto's current and/or past output of RoundUp, Glyphosate or Herbicides and its costs;

(b) the relationship between another firm's current and/or past output of Glyphosate or Herbicides and its costs;

(b) how costs vary with output of RoundUp, Glyphosate or Herbicides;

(c) economies of scale, scope, learning, research and/or distribution;

(d) minimum efficient scale;

(e) any efficiencies created by bundling, selling, and/or producing RoundUp, Glyphosate or Herbicides with other products;

(h) the relationship (if any) between a manufacturer's past experience and/or past output of RoundUp, Glyphosate or Herbicides and its current costs;

(i) learning curve economies;

(j) the ease of entry (or of expansion of sales) into one market in which RoundUp, Glyphosate or Herbicides are sold, by an incumbent in another market in which RoundUp, Glyphosate or Herbicides are sold, compared with (and/or relative to) the ease of entry (or of expansion of sales) into a market in which RoundUp, Glyphosate or Herbicides are sold, by a new entrant into any market in which RoundUp, Glyphosate or Herbicides are sold;

(k) whether a current incumbent in one of the markets in which RoundUp, Glyphosate or Herbicides are sold would have an easier time entering another market in which RoundUp, Glyphosate or Herbicides are sold, compared with a person, firm, corporation and/or other business entity that is not an incumbent in any market in which RoundUp, Glyphosate or Herbicides are sold;

(l) documents sufficient to show Monsanto's total manufacturing and/or distribution capacity on a semi-annual basis for RoundUp, Glyphosate and/or any Herbicide;

(m) documents sufficient to show Monsanto's used or unused manufacturing and/or distribution capacity on a semi-annual basis  for RoundUp, Glyphosate and/or any Herbicide.

**REQUEST NO. 38:**   With regard to RoundUp, Glyphosate or Herbicides, all documents  and electronic data discussing, evaluating, summarizing, analyzing, listing Monsanto's annual and monthly

21

per-product:

(a) gross revenue;

(b) net revenue;

(c) cost of goods sold;

(d) manufacturing costs;

(e) all other costs, including but not limited to allocation of depreciable equipment, capital improvements, research and development, technology related expenses, licensing fees, and/or royalties, individuated by category;

(f) short-run average variable costs;

(g) long-run average variable costs;

(h) fixed costs;

(i) marginal cost;

(j) gross profit;

(k) net profit;

(l) per-unit cost of goods sold;

(m) per-unit short-run average variable costs;

(n) per-unit long-run average variable costs;

(o) per-unit manufacturing costs;

(p) per-unit other costs, including but not limited to allocation of depreciable equipment, capital improvements, research and development, technology related expenses, licensing fees, and royalties, individuated by category;

(q) per-unit fixed costs;

(r) per-unit gross profit;

(s) per-unit net profit;

(t) materials cost per unit manufactured;

22

(u) labor cost per unit manufactured;

(v) unit volume sold; and

(w) unit volume sold, net of returns.

**REQUEST NO. 39**: All documents (other than bills, invoices, distributor notices, wire transfer documents and checks) discussing, analyzing, projecting or predicting Monsanto's actual and/or anticipated sales, revenues, profits, royalties and/or payments to Monsanto, or revenue from or based upon, RoundUp, Glyphosate or Herbicides.

**REQUEST NO. 40**: All transaction-level sales data (in digital, computer-readable format) relating to your sales of RoundUp, Glyphosate or Herbicides. Such data shall identify:

(a) each sales and/or other transaction (including returns), including the date thereof and the identity of the particular product;

(b) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom Monsanto billed for the sale (the "bill-to customer") and, in addition, the full name and address of the parent company, if the database or documents identify a subsidiary, corporate affiliate, division, satellite office, or warehouse;

(c) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity to whom Monsanto shipped the products (the "ship-to customer") and, in addition, the full name and address of the parent company, if the database or documents identify a subsidiary, corporate affiliate, division, satellite office, or warehouse;

(d) the number of units of the particular product sold, by package size, SKU, and any and all other unique codes or other identifiers for each sale or other transaction;

(e) the invoice amount in dollars for each sale or other transaction;

(f) any and all discounts, rebates, chargebacks, returns, and any other price and/or quantity adjustments relating to each sale, transaction, or set of sales or transactions regarding RoundUp, Glyphosate or Herbicides, including the payee of same, if different from the bill-to customer or the ship-to customer;

(g) any other price or unit adjustments -- whether monthly, quarterly or on any other basis -- involving or relating to sales or transactions involving RoundUp, Glyphosate or Herbicides;

(h) the net amount in dollars, and in dollars per unit, for each sale or transaction; and

(i) average variable costs per transaction.

**REQUEST NO. 41**: A list or other document sufficient to show the different fields used in any database(s) in which you contain the sales transactional data requested in this set of document requests.

23

**REQUEST NO. 42:** All data, in digital, computer-readable format, relating to rebates, discounts, and/or other consideration given and/or accrued relating to sales of RoundUp, Glyphosate or Herbicides. Such data shall identify:

(a) each transaction, including the date thereof;

(b) the name and address of, and all unique codes or identifiers for, the person, firm, corporation, or other business entity whom Monsanto paid, and/or on whose behalf Monsanto accrued, the rebate, discount and/or other consideration;

(c) the name and address of, and all unique codes or identifiers for, the person(s), firm(s), corporation(s), or other business entity(ies) that made the purchase(s) in respect of which Monsanto paid and/or accrued the rebate, discount and/or other consideration;

(d) the identity of the sales, or group of sales, upon which the rebate, discount and/or other consideration is based, including:

    (1)    the number of units of the particular product sold, by package size, SKU, and any and all other unique codes or other identifiers for each sale or other transaction;

    (2)    the bill-to customer;

    (3)    the ship-to customer;

    (4)    the date(s) of the sales, or group of sales;

    (5)    the invoice amount in dollars for the sale(s) or group of sales;

(e) the amount of the rebate, discount, and/or other consideration paid and/or accrued;

(f) the identity of the contract, agreement, or other basis upon which the rebate, discount, and/or other consideration is based.

**REQUEST NO. 43:** Documents sufficient to identify each person, firm, corporation and/or other business entity ("vendee") that purchases RoundUp, Glyphosate or Herbicides pursuant to a contract with you that provides that the vendee shall take delivery of the RoundUp, Glyphosate or Herbicides from a person, firm, corporation and/or other business entity other than you.

**REQUEST NO. 44:** All documents concerning any policy of your company, formal or informal, oral or written, that relates to compliance with antitrust laws.

**REQUEST NO. 45:** Documents or electronic data regarding, concerning, reflecting or relating to:

(a) the actual, projected or forecasted price(s) that farmers or other end-users pay (or paid) for RoundUp or Glyphosate;

(b) the actual, projected or forecasted price(s) that any dealer(s), distributor(s), wholesaler(s), retailer(s), reseller(s), or agricultural cooperative(s) charge (or charged) for RoundUp or Glyphosate;

(c) the actual, projected or forecasted margin(s) or mark-up(s) by any dealer(s), distributor(s), wholesaler(s), retailer(s), reseller(s), or agricultural cooperative(s) regarding or in connection with RoundUp, Glyphosate or any other herbicide.

Dated: April 11, 2007          GARWIN GERSTEIN & FISHER, LLP

Bruce E. Gerstein
Noah Silverman
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

*Attorneys for Plaintiffs*

Additional Plaintiffs' Counsel

ROSENTHAL, MONHAIT & GODDESS, P.A.
Jeffrey S. Goddess
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
Tel: (302) 656-4433

KOZYAK TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
T. Tucker Ronzetti
David M. Buckner
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

ODOM & DES ROCHES, LLP
John Odom
Stuart E. Des Roches
Charles Zimmer
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PERCY, SMITH & FOOTE, LLP
David P. Smith
W. Ross Foote
David Raphael
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

25

LAW OFFICE OF MICHAEL MILLER
Michael Miller
926 Chulie Drive
San Antonio, TX 78216
Tel: 210-225-6666
Fax: 210-225-2300

HARKE & CLASBY, LLP
Lance A.Harke, Esq.
David Maher
155 S. Miami Avenue, Suite 600
Miami, FL 33130
Tel: 305-536-8220
Fax: 305-536-8229

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

WHITTINGTON, BROCK & SWAYZE, P.A.
H. Donald Brock.
308 Fulton
Greenwood, MS 38930
Tel: 662-453-7325
Fax: 662-453-7394

## CERTIFICATE OF SERVICE

I, Joseph Opper, do hereby certify that on April 11, 2007, I caused the attached Plaintiffs' First Request for Production of Documents to Defendant to be served electronically and by First Class Mail on the following Defendant's counsel:

> Peter E. Moll, Esquire  (mollp@howrey.com)
> John J. Rosenthal, Esquire (rosenthalj@howrey.com)
> Scott Flick, Esquire  (flicks@howrey.com)
> Howrey LLP
> 1299 Pennsylvania Avenue, N.W.
> Washington, DC 20004
>
> Kenneth A. Letzler, Esquire (kenneth.letzler@aporter.com)
> Jonathan Gleklen, Esquire (jonathan.gleklen@aporter.com)
> Robert N. Weiner, Esquire (robert.weiner@aporter.com)
> Arnold & Porter LLP
> 555 12th Street, N.W.
> Washington, DC 20004
>
> Richard L. Horwitz, Esq. (rhorwitz@potteranderson.com)
> Potter Anderson & Corroon LLP
> Hercules Plaza, 6th Floor
> 1313 North Market Street
> Wilmington, DE 19889-0951

I also caused the attached to be served electronically on the following Plaintiffs' counsel:

ROSENTHAL, MONHAIT & GODDESS, P.A.
 Jeffrey S. Goddess
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
Tel: (302) 656-4433

KOZYAK TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
T. Tucker Ronzetti
David M. Buckner
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

ODOM & DES ROCHES, LLP
John Odom
Stuart E. Des Roches
Charles Zimmer
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PERCY, SMITH & FOOTE, LLP
David P. Smith
W. Ross Foote
David Raphael
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

BERGER & MONTAGUE, P.C.Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

LAW OFFICE OF MICHAEL MILLER
Michael Miller
926 Chulie Drive
San Antonio, TX 78216
Tel: 210-225-6666
Fax: 210-225-2300

HARKE & CLASBY, LLPLance A. Harke,
Esq.
David Maher
155 S. Miami Avenue, Suite 600
Miami, FL 33130
Tel: 305-536-8220
Fax: 305-536-8229

WHITTINGTON, BROCK & SWAYZE, P.A.
H. Donald Brock.
308 Fulton
Greenwood, MS 38930
Tel: 662-453-7325
Fax: 662-453-7394

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Noah Silverman
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

28

# EXHIBIT 8

**GARWIN GERSTEIN & FISHER LLP**

Counselors at Law
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055
Telecopier No. (212) 764-6620
E-Mail: lawoffices@garwingerstein.com

Bruce E. Gerstein
Scott W. Fisher
Barry S. Taus
Noah H. Silverman
Brett H Cebulash
Joseph Opper
Kevin S. Landau
Adam M. Steinfeld

Sidney L. Garwin (1908-1980)

Jan Bartelli
Archana Tamoshunas
Anne K. Fornecker
Kimberly M. Hennings
Elena K. Chan
Anna L. Tydniouk

May 11, 2007

**VIA E-MAIL AND FAX**

Peter E. Moll, Esq.
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2402
Fax: (202) 383 - 6610

    Re:    *Pullen Seeds and Soil v. Monsanto Company*; D.Del. C.A. No. 06-599-SLR
           *Wade Farms, et al., v. Monsanto Company*; D.Del. C.A. No. 06-600-SLR

Dear Peter:

    I am writing in response to your May 9, 2007 letter.

    Based on your recent letter, and our preceding discussions, it appears to us that the two major concepts underlying your objections to our discovery requests are: (a) your view that events prior to January 2002 are automatically irrelevant to this case, and therefore we are not entitled to any discovery on those issues; and (b) your view that documents and testimony that we requested from other litigations are irrelevant to this case and therefore need not be produced. As we have previously informed you, we disagree with your positions for a number of reasons.

    Since both of the foregoing positions seem to be raised in connection with your objection to the Faegre & Benson subpoena, hopefully the Court's resolution of that particular disagreement will give the parties some insight or guidance that can help them to resolve the larger underlying disputes. Since you have repeatedly told us that unless the parties quickly agree on the discovery parameters you may not be able to complete your document production by the court-mandated August 31, 2007 deadline, we believe that it would be better for both sides if the Court can quickly resolve the subpoena dispute,

Peter E. Moll, Esq.
May 11, 2007
Page 2

since that will hopefully lead to a faster resolution of the overarching conceptual disputes and your completion of the document production process. Moreover, even if the Court's resolution of the specific subpoena dispute does not foster resolution of the larger conceptual disputes, both sides will nonetheless benefit from the expeditious resolution of the specific dispute at hand.

Consequently, we have also sent today a letter to John Hinderaker of Faegre & Benson informing him that: (a) since the response date to our subpoena has come and gone without any objection from him, his obligation to produce the requested materials has clearly attached; and (b) we expect him to begin producing the subpoenaed materials by next Monday, May 21, 2007, unless we have been served with a motion to quash the subpoena.

We are willing to continue discussing other discovery issues-- such as the appropriate discovery time frame -- if you think those continued discussions might be productive. With the foregoing in mind, we believe that the parties should still continue to discuss the custodian issues, since we anticipate that you will want to use that search format regardless of how the court rules on the Faegre & Benson subpoena and regardless of how the parties resolve the other conceptual issues discussed above. We will be sending you a separate letter regarding certain outstanding questions we have regarding your proposed custodian search process.

Sincerely,

Noah Silverman

cc:  John Rosenthal
      Robert Weiner