## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PULLEN SEEDS AND SOIL, on behalf of itself, and all others similarly situated, ) ) ) | C.A. No. 06-599 (SLR) |
| Plaintiff, ) ) | |
| v. ) ) | |
| MONSANTO COMPANY, ) ) | |
| Defendant ) ) | |
| WADE FARMS, WHITTINGTON & SUMNER FARMS, CLIFFORD F. , DANCE, D/B/A CLIFFORD DANCE FARMS, and all other similarly Situated, ) ) ) ) ) ) | C.A. No. 06-600 (SLR) |
| Plaintiff, ) ) | |
| v. ) ) | |
| MONSANTO COMPANY, ) ) | |
| Defendant ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MONSANTO'S MOTION TO QUASH PLAINTIFFS' THIRD-PARTY SUBPOENA TO FAEGRE & BENSON, LLP.

Jeffrey S. Goddess (No. 630)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com

*Attorney for Plaintiffs*

Additional counsel on signature page

May 31, 2007

# TABLE OF CONTENTS

**PAGE**:

TABLE OF CITATIONS                                                                                    ii

INTRODUCTION                                                                                          1

ARGUMENT                                                                                             2

    I.     MONSANTO LACKS STANDING TO CHALLENGE          2
          THIS SUBPOENA

    II.    THE SPECIFIC DOCUMENTS SOUGHT IN THE           4
          SUBPOENA

    III.   THE SIMILARITIES BETWEEN THIS CASE AND          5
          THE *DUPONT* CASES

    IV.   THE SUBPOENAED DOCUMENTS ARE RELEVANT           7
          TO THIS LITIGATION

    V.    PROTECTIVE ORDERS FROM OTHER COURTS            8
          DO NOT BAR PRODUCTION OF THE DOCUMENTS
          HERE

    VI.   MONSANTO'S OTHER ARGUMENTS (INCLUDING          10
          TIME FRAME LIMITS) HAVE NO MERIT AND ARE
          SIMPLY MEANT TO DELAY DISCOVERY

CONCLUSION                                                                                          15

i

# TABLE OF CITATIONS

**CASE:**                                                                    **PAGE:**

*Berkley Photo, Inc. v. Eastman Kodak Company*,                                 11
    603 F.2d 263 (2d Cir. 1979)

*Board of Education of Evanston Township High School*                           14
    *District No. 202 v. Admiral Heating & Ventilating, Inc.*,
    104 F.R.D. 23 (N.D. Ill. 1984)

*Brown v. Braddick*,                                                            2
    595 F.2d 961 (5th Cir. 1979)

*In re Buspirone Patent Litig.*,                                             11, 13
    185 F.Supp.2d 365 (S.D.N.Y. 2002)

*Clayton Brokerage Co. v. Clement*,                                             3
    87 F.R.D. 569 (D. Md. 1980)

*Dart Industries, Inc. v. Liquid Nitrogen Processing Corp.*,                    3
    50 F.R.D. 286 (D.Del. 1970)

*Donahoo v. Ohio Dept. of Youth Services*,                                      2
    211 F.R.D. 303 (N.D. Ohio 2002)

*Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*,                       14
    95 F.R.D. 398 (S.D.N.Y. 1982)

*In re Folding Carton Antitrust Litig.*,                                        14
    83 F.R.D. 251 (N.D. Ill. 1978)

*FTC v. Lukens Steel Co.*,                                                      14
    444 F.Supp. 803 (D.D.C. 1977)

*Goldinger v. Boron Oil Co.*,                                                   14
    60 F.R.D. 562 (W.D. Pa. 1973)

*Grossman v. First Pennsylvania Corp.*,                                         13
    1992 WL 38402 (E.D. Pa. Feb. 24, 1992)

ii

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,                               11
    392 U.S. 481 (1968)

*Kellam Energy, Inc. v. Duncan*,                                                   13
    616 F.Supp. 215 (D.Del. 1985)

*Hickman v. Taylor*,                                                               7
    329 U.S. 495 (1947)

*In re K-Dur Antitrust Litigation*,                                               11
    338 F.Supp.2d 517 (D.N.J. 2004)

*Klehr v. A.O. Smith Corp.*,                                                      11
    521 U.S. 179, 117 S.Ct. 1984 (1997)

*Kopacz v. Delaware River and Bay Auth.*,                                          7
    225 F.R.D. 494 (D.N.J. 2004)

*Langford v. Chrysler Motors Corp.*,                                              2
    513 F.2d 1121 (2nd Cir. 1974)

*LaSalvia v. United Dairymen of Arizona*,                                         12
    804 F.2d 1113 (9th Cir. 1986)

*Leksi, Inc. v. Federal Ins. Co.*,                                                7
    129 F.R.D. 99 (d.N.J. 1989)

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,                            11
    998 F.2d 1144 (3d Cir. 1993)

*Maritime Cinema Serv. Corp. v. Movies en Route, Inc.*,                           14
    60 F.R.D. 587 (S.D.N.Y. 1973)

*Meijer, Inc. v. 3M*,                                                             12
    2005 WL 1660188 (E.D. Pa. 2005)

*Oliver B. Cannon and Son, Inc. v. Fidelity and*                                 3, 4
    *Casualty Co. of New York*,
    519 F.Supp. 668 (D.Del. 1981)

*Poster Exchange, Inc. v. National Screen Service Corporation*,
 517 F.2d 117 (5th Cir. 1975)             12

*In re Potash Antitrust Litig.*,
 1993 WL 1108312 (D.Minn., Dec. 5, 1994)       13, 14

*Quonset Real Estate Corp. v. Paramount Film Distr. Corp.*,
 50 F.R.D. 240 (S.D.N.Y. 1970)           14

*Schenley Industries, Inc. v. New Jersey Wine & Spirit Wholesalers*,
 272 F.Supp. 872 (D.N.J. 1967)           14

*In re Shopping Carts Antitrust Litig.*,
 95 F.R.D. 299 (S.D.N.Y. 1982)           14

*State of Florida v. Jones Chemical, Inc.*,
 1993 WL 388645 (M.D. Fla. March 4, 1993)       4

*Syngenta Seeds, Inc. v. Monsanto Company and Monsanto Technology*,
 (D.Del.), C.A. No. 04-908 SLR           14

*Thomas v. Marina Associates*,
 202 F.R.D. 433 (E.D. Pa. 2001)           3

*Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*,
 632 F.2d 1135 (4th Cir. 1980)           14

*In re Wirebound Boxes Antitrust Litig.*,
 129 F.R.D. 534, *vac. in part on other grounds*,
 131 F.R.D. 578 (D.Minn. 1990)           13

*Xechem, Inc. v. Bristol-Meyers Squibb Company*,
 372 F.2d 889 (7th Cir. 2004)            12

*Ziner v. Cedar Crest College*,
 2006 U.S.Dist. LEXIS 34858 (E.D. Pa. May 30, 2006)    3

**OTHER AUTHORITIES**:

C. Wright & A. Miller, 9A Federal Practice And Procedure § 2459          3
    (2d ed. 1994)

Moore's Federal Practice, §45.50(3)                                       3

**INTRODUCTION**

Put simply, the production of these specific relevant documents will burden absolutely no one and Monsanto should not be allowed to interfere with Faegre's compliance with the subpoena. Moreover, Monsanto lacks standing to challenge this subpoena. Monsanto's motion to quash Plaintiffs' subpoena to Faegre & Benson ("Faegre") is without merit.

Plaintiffs here seek: (1) a very specific set of highly-relevant documents that was already produced to Faegre (counsel for DuPont) in a previous herbicide-monopolization antitrust case against Monsanto that involved (even according to DuPont's own counsel) many of the same factual and legal theories raised here; (2) all of the requested documents are currently located on specific electronic disks located in Faegre's law firm; (3) Faegre does not object, and is prepared to immediately produce all of these disks to Plaintiffs; (4) this process will significantly advance the litigation of all five related Roundup antitrust cases pending before the Court;[1] (5) the Stipulated Protective Order in place here, D.I. 23, will continue to preserve the confidentiality of the subpoenaed documents; and (6) the production will enable the parties to adhere to the Court's rigorous scheduling order on discovery.[2] The

---

[1] Although they have not yet been formally consolidated or coordinated, the complaints pending in the Court on behalf of Roundup purchasers in Iowa, Mississippi, South Dakota, Wisconsin and by members of the American Corn Growers Association all involve similar factual and legal theories, and thus Plaintiffs believe that allowing the Faegre subpoena to proceed in these two cases will create discovery benefits and efficiencies in all five cases.

[2] Plaintiffs are actively trying to avoid the problems that arose in the *Syngenta/Monsanto* antitrust case where Monsanto ultimately required several additional months to produce documents to Syngenta, compressing the schedule for the parties and the Court. The discovery schedule in this case requires as a matter of practicality that Plaintiffs review documents continuously in the months leading up to the start of the deposition period, which begins the day document discovery ends, in order to fairly be prepared to take those depositions. One way to promote compliance with the Court's schedule in this case -- while reducing the time-crunch problems that arise in many cases at the end of the schedule -- is to enable Plaintiffs to immediately start reviewing documents already produced in other matters, such as the DuPont litigation., which requires little, if any, effort by Monsanto.

1

inescapable conclusion to be drawn from Monsanto's strenuous objections in the face of the complete absence of any burden or assertion of any privilege is that Monsanto wants to filter that earlier production. Plaintiffs are concerned that this process will be used to remove any "smoking gun" documents.

Indeed, considering Monsanto's problems complying with the discovery schedule in the *Syngenta* case, why would Monsanto aggressively press to undertake months of extra effort to review an additional 1.2 million pages of documents, when they could avoid any such effort by allowing Faegre to immediately produce the documents to Plaintiffs' counsel. Monsanto's proposal will not only deny Plaintiffs access to potentially significant information, but Monsanto's unnecessary review of an extra 1.2 million pages will undoubtedly divert significant resources from other discovery productions, thereby interfering with both sides' ability to comply with the Court's schedule. This motive is entirely inconsistent with the liberal discovery principles of the Federal Rules of Civil Procedure. Accordingly, the motion to quash should be denied.

## ARGUMENT

### I.    MONSANTO LACKS STANDING TO CHALLENGE THIS SUBPOENA

The Motion to Quash must be denied because Monsanto lacks standing to challenge the subpoena to Faegre. It is well established that a party only has standing to move to quash a subpoena served on a nonparty in order to assert a claim of privilege. *Langford v. Chrysler Motors Corp.*, 513 F. 2d 1121, 1126 (2nd Cir. 1974) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness."); *Brown v. Braddick*, 595 F. 2d 961, 967 (5th Cir. 1979); *Donahoo v. Ohio Dept. of Youth Services*, 211 F.R.D. 303, 306 (N.D. Ohio 2002) ("The law is clear, absent a claim of privilege, a party has no standing to challenge a subpoena to a

2

nonparty."); *Thomas v. Marina Associates*, 202 F.R.D. 433, 434 (E.D. Pa. 2001); *Oliver B. Cannon and Son, Inc., v. Fidelity and Casualty Co. of New York*, 519 F. Supp. 668, 680 (D. Del. 1981); *Clayton Brokerage Co. v. Clement*, 87 F.R.D. 569, 571 and n.3 (D. Md. 1980); C. Wright & A. Miller, 9A FEDERAL PRACTICE AND PROCEDURE § 2459 (2d ed. 1994) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the documents sought.") (citing cases); MOORE'S FEDERAL PRACTICE, Sec. 45.50(3).

None of the provisions of Federal Rule of Civil Procedure 45(c)(3), governing motions to quash, apply here. Under Federal Rule of Civil Procedure 45(c)(3), a court may quash or modify a subpoena if it (1) fails to allow a reasonable time for compliance; (2) requires a person who is not a party to travel more than 100 miles from where the person resides; (3) requires disclosure of privileged or protected matter; or (4) subjects a person to undue burden. Neither (1) nor (2) applies here. Subpart (3) does not apply because Monsanto has not made a showing (or even insinuated) that the documents at issue contain privileged or protected materials, nor does (4) apply here given that there is no burden in the production sought and, if there were, only Faegre would have standing to raise that argument.

Monsanto's assertion that the documents that Faegre stands ready to produce are "irrelevant" is simply not a valid basis for quashing the subpoena under the federal rules or the case law. *See Clayton Brokerage Co.*, 87 F.R.D. at 571 n.3 ("[R]elevancy is available to neither the [non-party] nor the defendant as a basis for challenging the subpoena directed to the [non-party].").[3] Instead, Monsanto

---

[3] The cases cited by Monsanto do not hold otherwise. That is, they do not support the notion that a party has standing to entangle a court in relevancy or burdensomeness objections claimed to arise on a non-party subpoena. *See, e.g., Ziner v. Cedar Crest College*, 2006 U.S. Dist. LEXIS 34858 (E.D. Pa. May 30, 2006); *Dart Industries, Inc. v. Liquid Nitrogen Processing Corp.*, 50 F.R.D. 286 (D. Del. 1970).

must establish the existence of attorney-client or work product privileges with regard to the documents held by Faegre. *See State of Florida v. Jones Chemical, Inc.*, 1993 WL 388645 at *2 (M.D. Fla. March 4, 1993) (unpublished). *See also Oliver B. Cannon and Son, Inc.*, 519 F. Supp. at 680 (while attorney-client privilege is basis for conferring standing on party to object to subpoena to non-party, where information to be protected is related to billing and payment of attorney's fees, privilege does not apply, and party's motion to quash is without merit).

Given that it originally produced these documents to DuPont, Monsanto cannot now be heard to argue that some privilege confers standing upon it to advance its motion to quash. Further, because the Court has entered the confidentiality agreement prepared by Monsanto and agreed to by Plaintiffs, whatever concerns Monsanto might have regarding the dissemination of its documents are completely obviated. This interest in confidentiality, thus completely satisfied and accordingly not raised by Monsanto, cannot serve as a bootstrap to allow standing for Monsanto's relevance arguments. Monsanto's lack of standing is sufficient to deny the motion to quash without further inquiry by the Court.

## II.     THE SPECIFIC DOCUMENTS SOUGHT IN THE SUBPOENA

As noted in the accompanying affidavit of John Hinderacker, DuPont's lead counsel at Faegre, the documents sought by Plaintiffs were originally produced by Defendant to Faegre pursuant to confidentiality orders. Aff. ¶3. Those orders were modified by the Master Settlement Agreement in the *DuPont/Monsanto* cases, which provided that if Faeger received a subpoena to produce these documents, it was required to notify Defendant's legal department by facsimile. *Id.* at ¶4. Subsequent to the litigation between DuPont and Defendant, Hinderacker received a telephone call from the United States Department of Justice requiring him to preserve these documents, an order that was never

4

rescinded. *Id.* at ¶¶5, 6, 8. Nor was he aware that DOJ had concluded its investigation. *Id.* at ¶6.

Significantly, Defendant has made no effort to compel Faegre to destroy these documents, despite its

knowledge that they still exist. Plaintiffs alerted Defendant upon their service of the subpoena on

Faegre (and Hinderacker, consistent with the Master Settlement Agreement, notified Monsanto's legal

department by facsimile, *see id.* at ¶10), and Plaintiffs made every effort to resolve this dispute prior

to its presentation to this Court.

### III.    THE SIMILARITIES BETWEEN THIS CASE AND THE *DUPONT* CASES

Contrary to Monsanto's assertions, the documents in Faegre's possession are clearly relevant

to this action. *See* Hinderacker Aff. at ¶11 (expressing belief that "the document collection in question

does contain documents that would be relevant to the issues in th[is] case."). The *DuPont/Monsanto*

litigation, raised issues that directly parallel those here. Among DuPont's grounds for complaint in

those cases were Monsanto's preservation of its herbicide monopoly for Roundup (i.e. glyphosate),

through improper tactics that it has used to hamper or delay competition from other types of herbicides

(such as gluofsinate and DuPont's sulfonylureas ("SUs")) as well as generic glyphosate, and

Monsanto's use of its monopoly power over seed traits to block herbicide competition through, among

other things, tying and bundled rebates. In the instant matter, Plaintiffs seek damages resulting from

the same or similar conduct.

In summary, Plaintiffs' allege here that in order to preserve its seed-trait monopoly power,

Monsanto started in or about 1997 doing various acts to block rivals from developing competing seed-

traits that would make crops resistant to other types of herbicides, such as gluofsinate (made by Bayer)

and SUs (made by DuPont). Had  rivals been unfettered in their ability to develop and market

competing types of herbicide-resistant seed traits, there would have been greater competition (and lower

5

prices) not only for seed-traits, but also for herbicides. The *DuPont* cases raised factual issues and legal theories that directly parallel those in the instant action. For example, Plaintiffs allege that Monsanto has used various acts to improperly block rivals from developing competing seed-traits that would make crops resistant to other types of herbicides, such as gluofsinate (made by Bayer) and SUs. Similarly, DuPont alleged in the Delaware case that Monsanto improperly hampered the development of competing SU-resistant seed traits, which is part of the anticompetitive pattern alleged in this case.

The South Carolina case mirrors our allegations that Monsanto used tying and bundling practices to leverage its seed-trait monopoly to hamper and foreclose competition in the herbicide market. The genesis of that claim was that, as Monsanto has acknowledged, "in 1999 DuPont and Monsanto entered into a Glyphosate Supply Contract in 1999, under which Monsanto supplied finished glyphosate that DuPont would then sell to wholesalers, retailers and growers under its own brand." Motion at p. 4 (citing *DuPont* South Carolina complaint at ¶36). However, DuPont alleged that when it tried to sell its competing form of glyphosate it found itself blocked from the market by various Monsanto practices also alleged here. For example DuPont alleged in the South Carolina case that:

> 29 . . . . Monsanto has implemented a complex scheme of economic coercion that has the effect of tying the purchase of Roundup Ready seeds to the purchase of Roundup herbicide even more effectively.
>
> 30. Herbicide dealers and distributors who buy Roundup brand glyphosate are subject to a variety of requirements, including the requirement that a stipulated percentage (frequently as high as 90%) of all glyphosate sold by them must be Roundup. Monsanto pays rebates to herbicide dealers and distributors, based on the market share of Monsanto herbicides sold by the dealer. Markups by Monsanto dealers and distributors are generally small or nonexistent, and most profits are made in the form of rebates from Monsanto. Under Monsanto's arrangements with its dealers and distributors, if Monsanto's share of the dealer's or distributor's total sales of glyphosate falls below the stipulated percentage, the dealer or distributor forfeits all or a substantial portion of the rebates otherwise payable on all of its Roundup sales. In some instances, Monsanto is deliberately vague as to the percentage of glyphosate that must be Roundup, so that dealers and distributors are deterred from selling competing brands of glyphosate

6

at all. . . . .The effect of these and other, related practices is to foreclose competitors from a substantial portion of the market for herbicides applied to cotton

34. The economic coercion detailed above, which is directed at distributors, dealers and growers, has had the effect of foreclosing competition in the cotton herbicide market and preventing DuPont and other competitors from selling glyphosate and other herbicides on acres planted with Roundup Ready cotton.

37. At the same time that it was entering into the agreements with DuPont and other chemical companies whereby it would sell them glyphosate, Monsanto was planning to continue and strengthen its illegal tying arrangement between Roundup Ready seed and Roundup herbicide, in a way that would make it economically unfeasible for dealers to stock significant quantities of glyphosate sold by Monsanto's competitors, including those who buy glyphosate from Monsanto, or for growers to buy glyphosate and other herbicides sold by Monsanto's competitors.

38. The various actions detailed herein, and other similar and related actions which are ongoing at the present time, have been carried out by Monsanto for the purpose and with the intent of monopolizing the market for cotton herbicides in the United States.

39. Through the various means detailed herein, and other related and similar means, Monsanto has successfully sought to leverage its market power in the cotton seed market into a similar position of market power in the cotton herbicide market.

## IV.    THE SUBPOENAED DOCUMENTS ARE RELEVANT TO THIS LITIGATION

To the extent that the Court would entertain Monsanto's relevance arguments, despite Monsanto's lack of standing in the current setting, it is certainly the case that the documents and testimony from the *DuPont* cases are highly relevant to this action. "Relevant matter encompasses any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." *Kopacz v. Delaware River and Bay Auth.*, 225 F.R.D. 494, 497 (D. N.J. 2004) (citing *Leksi, Inc. v. Federal Ins. Co.*, 129 F.R.D. 99, 104 (D. N.J.1989); *Hickman v. Taylor*, 329 U.S. 495 (1947)).

The two sets of cases focus on similar (if not identical) Monsanto conduct. The instant cases and the *DuPont* Delaware case focus on Monsanto's efforts to block the development of competing

7

herbicide-seed traits as a means of monopolizing the herbicide market, while the instant cases and the *DuPont* South Carolina case focus on Monsanto's use of tying, bundling and other practices to leverage its seed-trait monopoly to exclude herbicide competition. Moreover, both the instant cases and the *DuPont* cases focus on the same anticompetitive impact from Monsanto's conduct -- namely the foreclosure and exclusion of herbicide competition.

Because of the foregoing, Plaintiffs believe that the discovery in the *DuPont* cases may contain highly relevant and inculpatory evidence about: (a) Monsanto's agreements with certain parties, such as agreements with seed companies or dealers which restricted their ability to use, promote or sell, competing herbicides; and (b) Monsanto's internal strategies, those strategies' anticompetitive purpose and effects, and the general market structure, workingsand dynamics that may be relevant here. Plaintiffs believe that the documents from those cases may not be merely relevant, but potentially critical, because Plaintiffs are concerned that all of the older strategy documents that were produced in those cases may no longer separately exist in Monsanto's files, and even if they do it might be difficult (if not impossible) to recreate the collection of documents that were produced there.

## V.   PROTECTIVE ORDERS FROM OTHER COURTS DO NOT BAR PRODUCTION OF THE DOCUMENTS HERE

Monsanto argues that the production of the documents in question should be barred because they were the subject of confidentiality orders in the Delaware and South Carolina cases. Once again, Monsanto lacks standing to raise this argument, because it is not an assertion of a valid privilege against their production and, even if it were, the protective order entered in this case resolves any confidentiality issues.[4]   In any event, the fact is that these documents still exist. They were maintained because of a

---

[4] Moreover, given Monsanto's assertion that it will produce at least some of these documents to Plaintiffs itself, it appears to be less concerned with how these confidentiality orders will impact production, and more focused on maintaining control over what is produced.

8

request from the United States Department of Justice, and while Defendant may quibble about whether this was a valid basis for not destroying them, Plaintiffs have nothing to do with their having been preserved based on the DOJ request. Moreover, despite the fact that Defendant has been fully aware for over a year that these documents were not destroyed, it has not asked Mr. Hinderacker to destroy the documents or sought a court order authorizing their destruction. To allow it to do so now is to countenance the spoliation of critical evidence in this case.

As a general matter, the policy and purpose underlying confidentiality orders is not to create a tool to enable a defendant to suppress the production of relevant information, but rather to make sure that the information is protected from inadvertent or inappropriate disclosure. Monsanto's argument ignores the fact that there is a protective order in place in this case that gives Monsanto sufficient confidentiality protection – as reflected by the fact that Monsanto not only agreed to that protective order but actually drafted it. Thus, the confidentiality of Monsanto's documents will clearly be protected here.[5]

Significantly, the settlement in the *DuPont* cases provide that, prior to the production of these documents to any other entity, Faegre is to provide Monsanto's legal department with notice by facsimile. Hinderacker Aff. at ¶4. Clearly, then, Defendant anticipated the fact that these documents might ultimately be sought in other litigation, and made a provision for receiving notice before such production occurred. Plaintiffs have, of course, kept counsel for Defendant well informed of their discovery efforts, and have attempted to resolve issues related to this subpoena, to no avail. These protective orders were not, and could not legally and ethically be, designed to prevent all disclosures of

---

[5]     In its relevance argument, Monsanto observes that its agreements and programs have changed since 2000. Monsanto Mem., D.I. 28 at 4-5. Plaintiffs do not accept this staleness argument, and their position is supported by the case law in this area – as discussed in section VII, *infra* – but the very fact that some of the documents in Faegre's possession pre-date the year 2000 certainly calls into question any confidentiality concerns for Monsanto.

these documents, and Defendant's inclusion of the notice provision implicitly recognized this reality.

Based on the law discussed above, and the entry of the Monsanto-drafted protective order in the instant

cases, these documents must be produced to Plaintiffs, and the existence of earlier protective orders does

nothing to change that outcome.[6]

## VI.    MONSANTO'S OTHER ARGUMENTS (INCLUDING TIME FRAME LIMITS) HAVE NO MERIT AND ARE SIMPLY MEANT TO DELAY DISCOVERY

Monsanto asserts that it has all of the documents that were produced from the *DuPont* cases on

a set of 740 CDs. Assuming that this is true, it does not alter the result here, but it does illuminate

Monsanto's true purpose. Instead of permitting Plaintiffs to receive, without delay, the documents from

Faegre, Monsanto instead requests that the Court permit it to delay their production by allowing it to

filter those documents first. Defendant wants to create for itself the very burden that currently does not

exist. Of course, the fact that it is offering to undertake this expensive proposition makes its goal

transparent. A litigant undertakes such a burden only when it perceives a potential advantage, and here

that advantage is the ability to deprive Plaintiffs of immediate access to facts that will enable them to

prove their case. In addition, Defendant's proposal to review the over 1 million pages will delay this

case, as it will undoubtedly take several months to complete, and will divert attorney time and other

resources that can be used to collect, review and produce current documents that were the subject of

Plaintiffs' other document requests to Monsanto.

Monsanto contends that the subpoena is legally overbroad because the statute of limitations for

damages under the Sherman Act is four years (absent a basis for tolling). As noted above, this is

---

[6] As to the deposition transcripts containing testimony from parties other than Monsanto, Plaintiffs are willing to stipulate that they are not entitled to receive those transcripts unless they receive waivers or permission from those third parties. Plaintiffs respectfully request that the Court order that, once Plaintiffs have such waivers or permission, Faegre be allowed to produce those materials.

irrelevant because Monsanto lacks standing to raise any issue other than privilege. In any event, Monsanto misstates the law on the scope of discovery in antitrust cases.

The Supreme Court, the Third Circuit, and various other courts have repeatedly held that antitrust plaintiffs may recover for injuries resulting from conduct that occurred outside of the 4 year limitations period, so long as the damages sought (*i.e.*, the purchase at an inflated price) occurred in the 4 years before the suit was filed. *See e.g. Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 15 (1968) (rejecting defendant's argument that the plaintiff's Section 2 claim for inflated purchases in the past four years was barred by the statute of limitations because although the case was brought in 1955, the monopolist's ongoing misconduct began decades before the suit was filed);[7] *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3rd Cir. 1993) (rejecting the defendants' argument that plaintiffs may only recover for damages resulting from "overt acts" occurring during the 4 year period prior to suit and allowing the plaintiff to recover even though the injuries resulted from the defendants' conduct which began 25 years earlier).[8] Thus, plaintiffs may recover for "damages they

---

[7] *See also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 1990-1991 (1997) ("Antitrust law provides that, in the case of a 'continuing violation,' say, a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g., each sale to the plaintiff' starts the statutory period running again*, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.") (citations omitted)

[8] *See also Berkley Photo, Inc. v. Eastman Kodak Company*, 603 F.2d 263, 296 (2nd Cir. 1979) ("We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."); *In re K-Dur Antitrust Litigation*, 338 F.Supp.2d 517, 551 (D.N.J. 2004) ("Under, this [continuing violations] theory, an injury can include being overcharged for a product as a result of an unlawful act that allows a party to maintain market control . . . [Thus, purchasers' antitrust claims] "are not barred by the statute of limitations to the extent that they bought and overpaid for [defendant's] products within the applicable time limitations"); *see also In re Buspirone Patent Litig.*, 185 F. Supp. 2d 365, 378 (S.D.N.Y. 2002) ("[i]f a party commits an initial unlawful act that allows it to maintain market control and overcharge customers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings.").

prove were caused by anticompetitive conduct begun before the four-year period under the continuing

harm doctrine." *LaSalvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1119 (9th Cir. 1986).

While Plaintiffs have alleged various types of overt acts during the Class Period, even if

Monsanto did not commit any exclusionary acts during the Class Period, each sale at an inflated price

constituted an "overt act" that was part of a "continuing violation."[9] In analyzing the applicable law, the

Court should note that there is a significant distinction between excluded competitor cases and

overcharged purchasers case. A competitor's harm (and claim) arises when the defendant's exclusionary

acts occur, and so a competitor's claim is time-barred if it is injured by exclusionary acts all of which

occurred more than four years before a suit was filed. However, an overcharged purchaser's claim is

not ripe until the purchase occurs, and each new purchase at an inflated price creates the basis for a new

claim, even if the exclusionary acts occurred years earlier.

As the court recently summarized the law in this area in denying a motion to dismiss in *Meijer,*

*Inc. v. 3M*, 2005 WL 1660188, *4 (E.D. Pa. 2005):

> The four year statute of limitations does not bar recovery for later private antitrust
> actions if the defendant's conduct "constituted a continuing violation of the Sherman Act
> and inflicted continuing and accumulating harm." *Hanover Shoe, Inc. v. United Shoe
> Mach. Corp.*, 392 U.S. 481, 502, n.15 (1968). In such situations, even if the overt act
> which demonstrates the antitrust violation occurs outside the statute of limitations
> period, an injurious act within the limitations period may serve as the basis for a timely
> antitrust suit. *Lower Lake Erie Iron Ore*, 998 F.2d at 1172.
>
> [I]t has long been held that "a purchaser suing a monopolist for overcharges paid within
> the previous four years may satisfy the conduct prerequisite to recovery by pointing to

---

[9] *See also Xechem, Inc. v. Bristol-Meyers Squibb Company*, 372 F.2d 889, 902 (7th Cir. 2004)
("[I]mproperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully
acquiring market power in the first place. Each discrete act with fresh adverse consequences starts its
own period of limitations."); *Poster Exchange, Inc. v. National Screen Service Corporation*, 517 F.2d
117, 127 (5th Cir. 1975) ("[E]ach injurious act of a continuing conspiracy gives rise to an antitrust cause
of action");

anticompetitive actions taken before the limitations period." *Berkev Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979). This principle is based on the recognition that:

> although the business of a monopolist may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. The case of predatory pricing illustrates the point clearly. As soon as the dominant firm commences such a policy, other producers, who may be driven out of the market, are injured. But, clearly, purchasers are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser feels the adverse impact of the violation. And if the monopolist never consummates its scheme by taking this final step, the purchaser has no cause of action.

> *Id.* at 295 (quoting *Zenith*, 401 U.S. at 339).[10]

In light of the foregoing, it is not surprising that courts have repeatedly held that events which occurred before the 4-year claim period were properly the subject of discovery. *See, e.g., Grossman v. First Pennsylvania Corp.*, 1992 WL 38402, at *2-3 (E.D. Pa. Feb. 24, 1992) (overruling relevancy and scope objections, noting that there is "no general rule which would limit class action discovery solely to the class action period"); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 (D. Del. 1985) ("The cases clearly establish that the temporal scope of discovery in antitrust suits should not be confined to the limitations period of the antitrust statutes.").[11] Indeed, even in Syngenta's action against Monsanto,

---

[10] Similarly, in *In re Buspirone Antitrust Litigation*, the Court held regarding a 7-year old conspiracy in which a brand-name pharmaceutical company allegedly paid a generic manufacturer to stay off the market, that even though there were no separate overt events to implement the conspiracy during the past four years, purchasers would still be allowed to seek damages starting 4 years earlier for inflated prices that resulted from a 7-year old event.

[11] *See also New Park Entertainment*, 2000 WL 62315, at *2-3 (permitting discovery seven years before damage period to present); *In re Wirebound Boxes Antitrust Litig.*, 129 F.R.D. 534, 539 *vac. in part on other grounds*, 131 F.R.D. 578 (D. Minn. 1990) (requiring one defendant to produce documents dating back an additional ten years, to the year of its establishment, where plaintiff alleged that a conspiracy began even before that date ); *In re Potash Antitrust Litig.*, 1994 WL 1108312, at *13 (D.

which began in 2004, the discovery period extended back to 1996, well outside the limitations period. Accordingly, even if Monsanto had standing to raise these issues, Plaintiffs would still be entitled to the documents held by Faegre.

Monsanto also suggests that Plaintiffs have acted improperly or inappropriately because Plaintiffs have requested that Monsanto produce documents, testimony and expert reports from *Syngenta Seeds, Inc. v. Monsanto Company and Monsanto Technology, LLC* (D.Del), C.A. No. 04-908-SLR, which is a related case pending in this Court in which Syngenta accused Monsanto of using several of the acts alleged in this case to improperly obtain and/or maintain certain types of seed-trait monopolies.

To the contrary, these requests are not only appropriate but mandated as part of Plaintiffs effort to efficiently and expeditiously meet the Court's rigorous discovery schedule. The *Syngenta* case raised various factual assertions that Monsanto used several of the tactics alleged here to exclude competing seed-traits and to improperly obtain/maintain various seed-trait monopolies. Because Monsanto's

---

Minn., Dec. 5, 1994); *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135 (4th Cir. 1980) (discovery regarding allegedly unlawful agreement during two years preceding limitations period should have been permitted where it was relevant to the question of conspiracy); *Board of Education of Evanston Township High School District No. 202 v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 29 (N.D. Ill. 1984) (ordering discovery for period 1956 - present (1984), seven years after end of alleged conspiracy). *See, e.g., In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 308-09 (S.D.N.Y. 1982) (ordering discovery three years after conspiracy period); *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.*, 95 F.R.D. 398 (S.D.N.Y. 1982) (discovery in antitrust actions routinely goes beyond statutory period); *FTC v. Lukens Steel Co.*, 444 F. Supp. 803, 805-06 (D.D.C. 1977); *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251, 254-55 (N.D. Ill. 1978)(discovery allowed for several years beyond the alleged conspiracy period as relevant to the existence of the alleged conspiracy and the determination of damages); *Goldinger v. Boron Oil Co.*, 60 F.R.D. 562, 564 (W.D. Pa. 1973) (permitting discovery of acts/events transpiring after complaint filed, especially where one side may have all the facts and the ability to conceal those facts); *Maritime Cinema Serv. Corp. v. Movies en Route, Inc.*, 60 F.R.D. 587 (S.D.N.Y. 1973) (discovery permitted six years prior to alleged damages); *Quonset Real Estate Corp. v. Paramount Film Distr. Corp.*, 50 F.R.D. 240 (S.D.N.Y. 1970) (discovery permitted for period of ten years antedating earliest possible wrong); *Schenley Industries, Inc. v. New Jersey Wine & Spirit Wholesalers*, 272 F. Supp. 872 (D.N.J. 1967) (asserted history of conspiracy rather than scope of plaintiff's damages provides temporal boundary for discovery).

monopoly power in the seed-trait markets (and how it obtained and maintained that power) is a limited part of this case, Plaintiffs have not sought to recreate all of the discovery in the *Syngenta* case by asking for all 5 million pages that were produced there. Rather, in light of the fact that the most important documents from that production were likely used in either depositions or the expert reports, Plaintiffs have asked for only the deposition transcripts (with exhibits) and the expert reports (and related materials, such as the expert deposition transcripts). Nor is this request an unusual one. In the *Syngenta* case, Monsanto voluntarily produced documents from other matters as well.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Monsanto's motion to quash the subpoena to Faegre.

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
302-656-4433
jgoddess@rmgglaw.com

*Attorney for Plaintiffs*

**_Additional Plaintiffs' Counsel_**

GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein
Noah H. Silverman
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel:  (212) 398-0055
Fax: (212) 764-6620

ODOM & DES ROCHES, L.L.P.
Stuart E. Des Roches
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

15

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

KOZYAK, TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
David M. Buckner
Alex S. Bokor
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800

PERCY, SMITH & FOOTE
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

MICHAEL MILLER, ESQ.
Law Office of Michael Miller
926 Chulie Drive
San Antonio, TX 78216
Tel:  (210) 225-6666
Fax: (210) 225-2300

WHITTINGTON, BROCK & SWAYZE, P.A.
H. Donald Brock
308 Fulton
Greenwood, MS 38930
Tel:  (662) 453-7325
Fax: (662) 453-7394

16

## CERTIFICATE OF SERVICE

I, Jeffrey S. Goddess, do hereby certify that on May 31, 2007, I hand delivered and electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to all registered participants, including:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon LLP
P. O. Box 951
Wilmington, DE 19899-0951

I further certify that on May 31, 2007, I have electronically mailed the documents to the following:

Peter E. Moll, Esquire
John J. Rosenthal, Esquire
Scott Flick, Esquire
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
mollp@howrey.com
rosenthalj@howrey.com
flicks@howrey.com

Kenneth A. Letzler, Esquire
Jonathan I. Gleklen, Esquire
Robert N. Weiner, Esquire
Arnold & Porter LLP
555 12th Street, N.W.
Washington, DC 20004
kenneth.letzler@aporter.com
jonathan.gleklen@aporter.com
robert.weiner@aporter.com

*/s/ Jeffrey S. Goddess*
Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
(302) 656-4433
jgoddess@rmgglaw.com